UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,                CR. NO. 22-20504

v.                                        Hon. Jonathan C. Grey

AWS NASER,

                Defendant.

---

## DEFENDANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED IN VIOLATION OF THE FOURTH AMENDMENT

---

Aws Naser, through counsel Amanda Bashi and James Gerometta, moves for the suppression of evidence obtained in violation of the Fourth Amendment. In support of this motion, Naser provides the following:

1. Aws Naser is charged in Count One with attempting to provide material support and resources to a foreign terrorist organization, and in Count Two with possessing a destructive device as a felon. (ECF No. 1, Indictment.)

2. Naser was on parole with the Michigan Department of Corrections (MDOC) while the FBI was surveilling and investigating him. According to the discovery in this case, the FBI brought Naser's parole officer, Charles Wright, onto its

investigative team. Wright became a "Task Force Officer" ("TFO") working alongside the other TFO's to investigate and surveil Naser.

3. TFO Wright took actions outside the bounds of routine parole supervision, performing investigative tasks in furtherance of the FBI's investigation. TFO Wright conducted warrantless searches totally untethered to probable cause or even reasonable suspicion. TFO Wright then provided results of these searches to other TFOs and Agents working with the FBI.

4. The FBI then used the information collected by TFO Wright in its applications for several search warrants.

5. The information collected by TFO Wright was obtained in violation of the Fourth Amendment. Anything derived from it is fruit of the unlawful searches. *Wong Sun v. United States*, 371 U.S. 471 (1963).

6. The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violation …" U.S. Const. amend. IV.

7. The information obtained unlawfully by TFO Wright, and the information obtained as a result of the search warrants based upon TFO Wright's warrantless searches, must be suppressed.

8. The facts and law in support of this motion are further detailed in the accompanying brief.

9. Counsel for the government does not concur. *See* L.R. 7.1.

Dated:     February 12, 2024     Respectfully Submitted,

**FEDERAL COMMUNITY DEFENDER**

s/ Amanda Bashi & James Gerometta
Attorneys for Aws Naser
613 Abbott Street, Suite 500
Detroit, Michigan 48226
313-967-5542

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,               CR. NO. 22-20504

v.                                  Hon. Jonathan C. Grey

AWS NASER,

               Defendant.

---

**BRIEF IN SUPPORT OF
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED
IN VIOLATION OF THE FOURTH AMENDMENT**

---

Respectfully Submitted,

**FEDERAL COMMUNITY DEFENDER**

s/ Amanda Bashi & James Gerometta
Attorneys for Aws Naser
613 Abbott Street, Suite 500
Detroit, Michigan 48226
313-967-5542

1

# TABLE OF CONTENTS

BACKGROUND ........................................................................................ 1

  I.   Naser is released from prison to parole in January 2016 and is required to sign a
parole release order ................................................................................. 2

  II.   Naser has a smooth transition to parole, but the FBI makes specific inquiries
and investigative requests of Naser's parole officers. ..................................... 3

  III.   Charles Wright – an MDOC parole officer *and* officer on the FBI's Task
Force – assumes parole supervision of Naser ............................................... 5

  IV.   The FBI uses the unlawful May 19 and August 16 searches in applications for
federal search warrants ............................................................................ 7

      A.   August 21, 2017 Search Warrant for the LG Phone ............................ 8
      B.   October 27, 2017 Search Warrant for Naser's Home and Car ............... 8
      C.   November 6, 2017 Search Warrant for Naser's Electronic Devices ......... 8
      D.   May 18, 2018 Search Warrant for an iCloud Account .......................... 9
      E.   June 29, 2018 Search Warrant for Naser's iPhone ............................. 9
      F.   June 29, 2018 Search Warrant for Naser's 2013 Electronic Devices ....... 9

  V.   The Parole Violations ....................................................................... 10

LEGAL STANDARD ............................................................................... 10

ARGUMENT .......................................................................................... 13

  I.   The Michigan statute authorizing suspicionless parole searches is not
constitutional. ...................................................................................... 13

      A.   The Michigan statute contains no reasonableness requirement and is thus
unconstitutional ................................................................................... 15

      B.   The mandatory "consent" – obtained from parolees under threat of
imprisonment – is not Constitutional consent ............................................ 18

  II.   Even if Michigan's statutory scheme is constitutional, the way TFO Wright
used his authority did not conform to the statute's intent and did not conform to
the Constitution. ................................................................................... 23

CONCLUSION ....................................................................................... 25

CERTIFICATE OF SERVICE ................................................................... 26

# BACKGROUND

The FBI has been watching Aws Naser since at least 2011 – eleven years before his 2022 indictment in this case.[1] In 2012, FBI Agent Reintjes – who would remain involved in Naser's surveillance at least through 2016[2] – sent an informant named Billy Reilly to develop a relationship with Naser.[3] Naser suspected Billy was an informant sent to entrap him – and told Billy as much – so Agent Reintjes' attempt to gain more intimate surveillance of Naser failed. Until 2016.

That year and the following year, Naser was on parole with the Michigan Department of Corrections (MDOC), under the supervision of parole officers with that agency. Unbeknownst to Naser, the FBI was working closely with his MDOC parole officers to further the FBI's surveillance and investigation of Naser. By 2017, the FBI was working so closely with Naser's supervising officer, Charles Wright, that Wright was one of its "Task Force Officers" (TFO).

On multiple occasions, TFO Wright, without a warrant, without probable cause, and without reasonable suspicion, searched Naser's home, photographed the belongings in the home, and searched and confiscated cell phones. TFO Wright

---

[1] See, e.g., Exhibit A – FBI 302s, at 3658. For ease of review, discovery cited throughout this motion will reference the Exhibit Label, and then the Bates page number. All of the Exhibits will initially be filed under seal; the defense will request that certain exhibits that are not "sensitive" discovery be unsealed and part of the public record.

[2] Exhibit A, 3651-52.

[3] Brett Forrest, THE LOST SON (Little, Brown & Co.) at 64.

provided the unlawfully obtained material to other TFOs and FBI agents on the task force, including TFO Megan McAteeer and Agent Jeffrey O'Donnell.

Multiple times, TFO Wright claimed he needed to search electronic devices in the home for "child pornography" – an offense Naser has never been accused of or suspected of committing.[4] (Ex. A at 3792-3831.) In reality, TFO Wright lacked any reasonable suspicion that Naser had committed or was about to commit any offense or parole violation. Reasonable inferences from the disclosed reports indicate – and an evidentiary hearing can confirm – TFO Wright acted at the behest of and in concert with the FBI to further its surveillance and investigation of Naser, not to further any legitimate parole objective.

These searches were a convenient workaround for the FBI. After years of surveilling Naser, the agency still lacked sufficient information to justify a search warrant. Instead, the FBI and its Task Force Officer treated Naser's parole as a prolonged erasure of his Fourth Amendment rights, searching his home, cell phones in the home, and personal belongings, over and over.

## I.   Naser is released from prison to parole in January 2016 and is required to sign a parole release order.

On January 5, 2016, the MDOC released Naser after the parole hearing officer found that he had served sufficient time for his offense. Naser had been convicted of

---

[4] Naser has no history of sex offenses or offenses against children. Indeed, his MDOC parole orientation document struck the entire section on sex offenders, as well as the section on electronic monitoring, because they did not apply to him. (Exhibit B at 9602.)

armed robbery for pepper spraying his former employer and taking $180 from the cash register. The FBI watched and inquired as MDOC initially released Naser to immigration authorities. (Ex. A at 3591, 3600.) The FBI watched and inquired as Naser remained in immigration jail for two months. (B. 3596) And the FBI watched and inquired as it was determined that Naser has lawful status in the United States and was not deportable. (Ex. A at 3593.)

On his parole release date, Naser was required to sign an MDOC Document Entitled "Michigan Parole Board Order for Parole" ("Parole Order"). (Ex. B at 9596, 9599-9602.) Among several standard conditions, Naser's parole order included seven special conditions. (Id.) One of those conditions provided as follows:

> Written consent to search the parolee's person and/or property, MCL 791.236(19): I voluntarily consent to a search of my person and property upon demand by a peace officer or parole officer. If I do not sign this written consent, I understand that my parole may be rescinded or revoked.

(Id.) Under threat of continued imprisonment, Naser signed the document in exchange for his liberty, and began his parole term.

## II.   Naser has a smooth transition to parole, but the FBI makes specific inquiries and investigative requests of Naser's parole officers.

On March 18, 2016, Naser was released from ICE custody and met with his assigned MDOC parole officer, Cynthia Simon, that same day. (Ex. A, at 3593.) Also that day, PO Simon's unnamed partner conducted a home visit which revealed no issues, other than Naser's wife appearing nervous about the state of their home. (Id.) Naser was scheduled to meet with his parole officer every two weeks, with the next meeting set

for March 29, 2016. All of this was reported to FBI Agent Reintjes the same day. (Id.) Agent Reintjes himself had been watching Naser's home on March 21, March 23, and March 28. (Ex. A at 3651-52.)

On March 29, 2016, Naser reporter to PO Simon's office as scheduled. (Ex. A at 3650.) And PO Simon reported everything she learned to Agent Reintjes. (Id.) There were things Agent Reintjes wanted to know, and PO Simon reported she would further inquire. (Id.) This series of events would repeat itself numerous times.

On April 14, 2016, PO Simon reported to Agent Reintjes on her bi-weekly meeting with Naser. She noted no issues, but was unable to provide further information Agent Reintjes requested regarding Naser's wife's place of employment. (Ex. A at 3653.) On April 18, Agent Reintjes again surveilled Naser's home. (Ex. A at 3654-55.)

On May 12, 2016, PO Simon again reported to Agent Reintjes about her meeting with Naser that day. (Ex. A at 3656.) It appears Agent Reintjes inquired about Naser's social media use; Simon reported she "will attempt to obtain any social media or online accounts." (Id.) Of note, Naser's parole conditions place no restriction on his use of social media or the internet. (Ex. B at 9596, 9599-9602.)

On June 3, 2016, PO Simon again reported to Agent Reintjes about her meeting with Naser that day. (Ex. A at 3657.) Reintjes again inquired about Naser's social media use, and PO Simon reported that Naser said "he does not have any online accounts." (Id.)

On July 22, 2016, PO Simon again reported to Agent Reintjes about her meeting with Naser that day. (Ex. A at 3658.) Again, Simon's report revealed no behavioral or supervisory issues with Naser. (Id.)

After the July 22, 2016 report by Agent Reintjes, the next report the defense has in discovery jumps to January 5, 2017 – and Agent Reintjes is no longer the reporter. Instead, Agent Jeffrey O'Donnell checks in with PO Simon on January 5, and reports:

> As a requirement of Naser's parole conditions, Naser continues to meet with [PO] Simon on a bi-monthly basis; the two last met on 12/20/2016. Simon has not had any issues with Naser since he was assigned to her, other than a minor vehicle ticket Naser received for a broken tail light. Simon, or one of her co-worker's [sic], is scheduled to conduct a home visit at Naser's primary residence, [redacted], some time next week.

(Ex. A at 3659.)  Similarly, on April 13, 2017, Naser is continuing to do well on parole and comply with his conditions and supervision under PO Simon:

> As a requirement of Naser's parole conditions, Naser continues to meet with Simon on a bi-monthly basis; the two last met on 03/28/2017. Simon has continued to have no issues with Naser. Simon, or one of her co-worker's [sic], is scheduled to conduct a home visit at Naser's primary residence, [redacted], in the near future.

(Ex. A at 3664.)  As documented by his parole officer's notes and reports to the FBI, Naser spent more than a year on parole under PO Simon's supervision without any issues.

### III.   Charles Wright – an MDOC parole officer *and* officer on the FBI's Task Force – assumes parole supervision of Naser.

At some point between April 13 and May 19, 2017, PO Simon was removed as Naser's parole officer. There is no documentation as to the reason for this. Simon was

initially replaced by Derrick Bond, who was joined by Charles Wright.  On May 19, 2017, Bond conducted a home visit, which Charles Wright joined. (Ex. A at 3792) Wright took the lead. After searching the entire home "looking for contraband and that [Naser] maintained the conditions of his parole," the officers came up empty handed – but for a few lines of Arabic writing, Naser's Iraqi passport, and an instruction manual for the drone Naser was building with his kids. (Id.) Finding no contraband or evidence indicating any parole violations, Wright demanded Naser's iPhone. "Wright searched Naser's phone, citing he was going to look for child pornography." (Ex. A at 3793) Wright took the phone from Naser and "sent that phone to the ICAT division for review." (Id.) The very same day, Wright provided the forensic image of that phone to the FBI. (Ex. A at 3665.)

Meanwhile, other FBI agents continue to physically surveil Naser. For example, on June 26, 2017, they watch and follow Naser as he reports to a meeting at the MDOC parole office. (Ex. A at 1275-1278) That same day, Naser's parole officer reports to TFO McAteer, noting no supervision issues. It also noted Naser denied "Social Media sites." (Ex. A at 3687.) It is unclear why PO Bond made the social media inquiry, as Naser's parole conditions are silent as to social media.

On August 7, 2017, Naser again reports as directed to the MDOC office for a meeting with his parole officer, now Charles Wright. Wright meets with FBI TFO Megan McAteer the same day and provides her a written report after their meeting. (Ex. A at 3789.)

6

On August 16, 2017, TFO Wright conducts another home visit. Wright looks around the house, including the basement, and finds no contraband or evidence of a parole violation. He takes a photo of Naser's Arabic handwriting on an index card, "for his records." (Ex. A at 3794.) Wright also looks through Naser's iPhone, (Ex. A at 3793) and again comes up empty handed. Wright then asks Naser to look through another phone, an LG model. (Id.) Wright looked through the phone, and "immediately recognized" a picture of the ISIS flag and a picture of Abu Bakr al-Baghdadi, and social media applications. (Ex. A at 3794.)  "Wright told Naser that he needed to do a phone dump on the LG phone, to ensure no child pornography was present." (Ex. A at 3794.) Wright leaves Naser's home with the LG phone, and immediately reports to TFO McAteer and her colleagues at the FBI. (Id.)

## IV.    The FBI uses the unlawful May 19 and August 16 searches in applications for federal search warrants.

By August 21, 2017, the FBI believed it had finally collected enough – through TFO Wright's searches and seizures of Naser's iPhones and LG phone – to support probable cause for a federal search warrant. In all, the FBI would use the information from TFO Wright in its affidavits to justify *six* search warrants.[5] The affidavits in each

---

[5] As far as the defense is aware, this case involves a total of seven search warrants. The first was issued in 2013, prior to Naser's time on parole, and is not relevant to this motion. However, the government disclosed the 2013 search warrant most recently in discovery; the defense reserves the right to file any motion(s) regarding that warrant once it has had adequate time to review it and conduct legal research.

of those warrants relies heavily – at times almost exclusively – on TFO Wright's unlawful searches of Naser's iPhones and LG phone.

After the August 21 warrant, each warrant thereafter is another Russian doll in the set: it incorporates the information ill-gotten by the one before it.

### A. August 21, 2017 Search Warrant for the LG Phone

The first search warrant was for the LG phone TFO Wright seized during his search of Naser's  home on August 16, 2017. (Ex. C, 8/21/17 SW.) McAteer's affidavit in support of probable cause relies almost exclusively upon TFO Wright's unlawful searches of Naser's iPhone and LG phone. (Id., at 3847-3850.)

On August 22, 2017, FBI TFO McAteer collects the LG phone from TFO Wright. Wright signs the property receipt as "TFO/Parole Agent Charles Wright." (Ex. A at 9564.)

### B. October 27, 2017 Search Warrant for Naser's Home and Car

The second search warrant was for Naser's entire home and the vehicle he and his wife shared. (Ex. C, 10/27/17 SW.) McAteer is again the affiant and relies on the same information from the August 21 search warrant, plus information obtained from the LG Phone subject to the August 21 search. The affidavit also references an FBI (*not* MDOC) records search that revealed Naser's parole violations for failure to report police contact in August 2017, and a July 2017 arrest for property damage.

### C. November 6, 2017 Search Warrant for Naser's Electronic Devices

The third search warrant was for the electronic devices seized from Naser's home on October 30, as a result of the October 27 search warrant. (Ex. C, 11/6/17 SW.) FBI Agent Render is the affiant, and uses the same information from McAteer's October 27 affidavit, but also adds information obtained from Naser's home during the October 30 search.

### D. May 18, 2018 Search Warrant for an iCloud Account

The fourth search warrant was for an Apple iCloud account the FBI believed to be associated with Naser. (Ex. C, 5/18/18 SW.) TFO McAteer is again the affiant, and uses substantially the same information from Agent Render's November 6 affidavit; McAteer also incorporates information derived from the search of Naser's electronic devices facilitated by the November 6 warrant.

### E. June 29, 2018 Search Warrant for Naser's iPhone

The fifth search warrant was for the forensic image of Naser's iPhone as it was seized from the MDOC on May 19, 2017.  (Ex. C, 6/29/18 SW for iPhone.) FBI Agent John McNulty is the affiant and uses most of the information from the May 18 affidavit. McNulty does not reference what, if anything, was found on the iCloud Account pursuant to the May 18 search.

### F.  June 29, 2018 Search Warrant for Naser's 2013 Electronic Devices

The sixth search warrant was for Naser's electronic devices collected during the execution of a 2013 search warrant at his home. (Ex. C, 6/29/18 SW for 2013 Devices.) Agent McNulty is again the affiant and begins the probable cause with Naser's religious

activities on the Henry Ford Community College campus in 2011. It also references the government's investigation of Naser for a financial structuring offense, for which he was ultimately not charged. From there, the affidavit returns to the same facts used in all the prior affidavits.

## V.    The Parole Violations

On October 30, 2017, the FBI – armed with the search warrant obtained on October 27 – accompanied the MDOC to Naser's home. Naser was arrested for alleged parole violations, while the FBI executed it search warrant. (Ex. A at 4011-4016.)

Of the initially alleged 50 parole violations, exactly zero arose from TFO Wright's searches of Naser's home and cell phone devices. (Id.) Many of the violations arose out of the FBI's search of Naser's home on October 30. And many of them were for Naser's failure to report police contact. (Id.)

Thirty-seven of the violations would ultimately be dismissed by the State. (Id.) Naser pleaded guilty to 11 of them and was found guilty after a hearing on the remaining two. (Id.)

## LEGAL STANDARD

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST., AMEND. IV. The chief evil against which the amendment is directed is physical entry of a person's home. *Payton v. New York*, 445 U.S. 573, 586 (1980); citing *United States v. United States District Court for the Eastern District of Michig*an, 407 U.S. 297 (1972).

Thus, police entrance into a home generally "is permissible only where justified by a warrant, exigent circumstances, or valid consent." *Smith v. City of Wyoming*, 821 F.3d 697, 709 (6th Cir. 2016).  Not every search "is acceptable solely because a person is in custody."  To the contrary, "when privacy-related concerns are weighty enough a search may require a warrant, notwithstanding the diminished expectations of privacy of the arrestee." *Riley v. California*, 573 U.S. 373, 392, 134 S. Ct. 2473, 2488, 189 L. Ed. 2d 430 (2014).  "Modern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans the privacies of life." *Id.* at 403 (detailing the immense amount of personal information and data stored on cell phones in modern day.)

A probationer "is protected by the Fourth Amendment's requirement that searches be 'reasonable.' But the usual Fourth Amendment analysis is different for individuals subject to probation." *United States v. Ickes*, 922 F.3d 708, 710–11 (6th Cir. 2019) (cleaned up), (citing *United States v. Herndon*, 501 F.3d 683, 687 (6th Cir. 2007)). The Supreme Court has "rejected the proposition that the government can search all probationers and parolees without a warrant and probable cause." *United States v. Carnes*, 309 F.3d 950, 961 (6th Cir. 2002) (citing  *United States v. Knights*, 534 U.S. 112 (2001)).

"In evaluating a search of a parolee, [the court's] inquiry is two-fold." *United States v. Davis*, 415 F. App'x 709, 711–12 (6th Cir. 2011).  Courts must first examine whether the relevant regulation or statute "pursuant to which the search was conducted satisfies the Fourth Amendment's reasonableness requirement." *United States v. Loney*, 331 F.3d

516, 520 (6th Cir. 2003) (citing *United States v. Payne*, 181 F.3d 781, 786–91 (6th Cir. 1999)).  "[A] state statute survives Fourth Amendment scrutiny if it authorizes searches of parolees based on a *reasonable suspicion* that an individual is violating the terms or conditions of parole." *Loney*, 331 F.3d at 520–21 (emphasis added). *See also United States v. Herndon*, 501 F.3d 683, 689 (6th Cir. 2007) (a search provision is generally valid so long as it contains a reasonable suspicion requirement.).

If the statute "passes constitutional muster," the second question is whether "the facts of the search itself satisfy the regulation or statute at issue." *Id.* at 521, 520.

In *Samson v. California*, the Court further refined the Fourth Amendment analysis, as it applies to parolees. 547 U.S. 843 (2006). The general Fourth Amendment reasonableness standard continues to apply, and reasonableness is evaluated by the parolee's reasonable expectation of privacy and the totality of the circumstances. Those circumstances include the language of the parole condition authorizing a search, the parolee's expectation of privacy in the items searched, and the nature of the search. *Id.* at 850-55.  The Sixth Circuit has reiterated that, in addition to an individual's status on probation or parole, a Court evaluating his Fourth Amendment interests must "also consider the clarity of the conditions of probation, and the nature of the contents of a cell phone." *United States v. Fletcher*, 978 F.3d 1009, 1018 (6th Cir. 2020) (quoting *United States v. Lara*, 815 F.3d 605, 610 (9th Cir. 2016).

Here, the totality of the circumstances includes the uniquely coercive consent language in Naser's parole conditions, the lack of specificity and clarity in the parole

condition, the harassing way MDOC and FBI used the parole search condition, and Naser's reasonable expectation of privacy in cell phones.

## ARGUMENT

The Michigan statute authorizing suspicionless parole searches is not constitutional, because it contains no reasonableness requirement and obtains "consent" under threat of imprisonment.  Even if the parole search provision is constitutional, the way TFO Wright used the provision did not conform to the statute's language or intent, and did not conform to the Fourth Amendment.

From the first day of Naser's parole – March 18, 2016 – the FBI was in constant contact with MDOC parole staff. From that point forward, every interaction with MDOC officers, including TFO Wright, was through the lens of the FBI's surveillance and investigation of Naser. None of Naser's "parole compliance checks" were actually routine, particularly when MDOC parole agents were using them as an opportunity to gather evidence and delivery it to the FBI – evidence that the FBI did not have probable cause to obtain themselves.

### I.    The Michigan statute authorizing suspicionless parole searches is not constitutional.

The state of Michigan has two statutes governing searches of parolees. Pursuant to the Michigan Administrative Code, parole officers are permitted to conduct warrantless searches when "there is *reasonable cause* to believe that a violation of parole

exists," Mich. Admin. Code R. 791.7735(2) (emphasis added).   That statute, in its

entirety, provides as follows:

> Rule 735. (1) A parole agent may conduct a warrantless search of a
> parolee's person or property under any of the following circumstances:
>
> (a) Incident to a lawful arrest pursuant to section 39 of Act No. 232 of the
> Public Acts of 1953, as amended, being S791.239 of the Michigan
> Compiled Laws.
> (b) A stop and frisk, if there is reasonable cause to believe that the parolee
> is presently involved in criminal conduct, has violated a condition of
> parole, or is carrying a weapon.
> (c) Seizure of evidence or contraband in plain view.
> (d) With the consent of the parolee or a third party having mutual control
> over the property to be searched.
>
> (2) Where none of the circumstances specified in subrule (1) of this rule
> are present and there is reasonable cause to believe that a violation of
> parole exists, a parole agent may conduct a search of a parolee's person or
> property if, as soon as possible thereafter, the parole agent files a written
> report with his or her supervisor setting forth the specific reasons for the
> search, describing the location or place searched, and describing the
> specific items seized.

Mich. Admin. Code R. 791.7735.   Because the statute contains some reasonable

suspicion requirement, it is likely constitutional. *See Loney*, 331 F.3d at 520–21.   But that

statute is *not* the statute TFO Wright and the FBI used to justify the searches of Naser's

home and cell phones.

Instead, TFO Wright claimed "authority to conduct a search of Naser's device

and home under the 'special condition 4.2 of Naser's parole." (Ex. A at 3793.)   Special

condition 4.2 provides as follows:

> Written consent to search the parolee's person and/or property, MCL
> 791.236(19): I voluntarily consent to a search of my person and property

14

upon demand by a peace officer or parole officer. If I do not sign this written consent, I understand that my parole may be rescinded or revoked.

(Ex. B at 9596.)   The authority for special condition 4.2 comes from the Michigan statute M.C.L. 791.236.   This statute governs orders of parole, and subsection (19) provides:

> (19) The parole order must require the parolee to provide written consent to submit to a search of his or her person or property upon demand by a peace officer or parole officer. The written consent must include the prisoner's name and date of birth, his or her physical description, the date for release on parole, and the ending date for that parole. The prisoner shall sign the written consent before being released on parole. . . . Consent to a search as provided under this subsection does not authorize a search that is conducted with the sole intent to intimidate or harass.

Neither special condition 4.2 nor MCL 791.236(19) pass constitutional muster. First, the statute has no reasonableness requirement.  Second, mandatory "consent" under threat of imprisonment is not valid consent under the Constitution.

### A. The Michigan statute contains no reasonableness requirement and is thus unconstitutional.

"[T]he liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty." *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972). A probationer's home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be "reasonable." *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987). Search conditions for probationers and parolees are common, and courts have found them generally valid so long as they contain a reasonable suspicion requirement. *Herndon*, 501 F.3d at 689.

Two Supreme Court cases are especially relevant: *United States v. Knights*, 534 U.S. 112 (2001) and *Samson v. California*, 547 U.S. 843 (2006). In *Knights*, the Court "held that when an officer has **reasonable suspicion** that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." *Samson*, 547 U.S. at 849–50 (quoting *Knights*) (cleaned up).  "Because the search at issue in *Knights* was predicated on *both* the probation search condition *and* reasonable suspicion, [the Court] did not reach the question whether the search would have been reasonable under the Fourth Amendment had it been solely predicated upon the condition of probation." *Id.* at 850.

Enter *United States v. Samson*, which held that a search of a parolee or probationer "may be deemed reasonable by examining the totality of the circumstances." *United States v. Sharp*, 40 F.4th 749, 753 (6th Cir. 2022) (quoting *Samson*, 547 U.S. at 848). However, the Court noted that the parole search condition at issue did not permit "a blanket grant of discretion untethered by any procedural safeguards." *Samson*, 547 U.S. at 856. The Court noted California's prohibition on "arbitrary, capricious, or harassing" searches as a limitation on what otherwise read as a blanket Fourth Amendment waiver.

Here, the Michigan statute prohibits searches intended to "intimidate or harass." M.C.L. 791.236(19). However, the provision contains no prohibition on arbitrary or capricious searches. Even the Michigan Supreme Court has concerns about the constitutionality of this provision. In *Michigan v. Montgomery*, 508 Mich. 978 (2021), Judge

Welch, concurring in the denial of leave to appeal, described the state of the law and the concern about carte blanche searches:

> I question whether the trial court was correct to conclude that defendant's parole status created some sort of carte blanche to avoid application of the exclusionary remedy for such a clear-cut constitutional violation. At least for purposes of Michigan law, it remains unsettled what privacy interests a parolee retains and whether a parole search is lawful when it is not "directly and closely related" to the administration of the parole supervision system. *Michigan v. Woods*, 211 Mich. App. 314, 318 n 2 (1995); see also *id.* (recognizing that "there is no clear rule in this area").

TFO Wright's use of Naser's parole status alone – at times incorporating a false reference to investigating "child pornography" (Ex. A at 3794) – is exactly the kind of "carte blanche," "blanket" search that neither the Supreme Court nor the Michigan Supreme Court have condoned. Carte blanche or blanket search conditions should be especially concerning when applied to cell phones. As the Sixth Circuit has explained:

> [T]he quantity of information contained in modern cell phones, explaining that "a cell phone search would typically expose to the government far more than the most exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form—unless the phone is." The Supreme Court in *Riley* recognized that the search of a cell phone is unique and—as compared to the search of a home—infringes far more on individual privacy.

*United States v. Fletcher*, 978 F.3d 1009, 1019 (6th Cir. 2020) (quoting *Riley v. California*, 573 U.S. 373, 396 (2014)).

Further, counsel has not located any Sixth Circuit cases upholding a suspicionless parole search. Even cases applying *Samson* reference the presence of reasonable suspicion or reasonable cause. *See, e.g., United States v. Sharp*, 40 F.4th 749, 752–53 (6th

17

Cir. 2022) ("[T]he parties agree that Bailey's search was reasonable under the totality of the circumstances if it was supported by reasonable suspicion); *United States v. Herndon*, 501 F.3d 683, 688 (6th Cir. 2007) (probationer was subject to a search provision and the search was supported by reasonable suspicion that the probationer had violated a condition of his probation).

### B. The mandatory "consent" – obtained from parolees under threat of imprisonment – is not Constitutional consent.

The government may argue that Naser's "consent" to the search condition satisfies the voluntary consent exception to the protection against warrantless searches. It does not. Under this exception, "it is the [g]overnment's burden, by a preponderance of the evidence, to show through 'clear and positive testimony'" that valid and voluntary consent to a search was obtained. *United States v. Culp*, 193 F. 3d 380, 386 (6th Cir. 1999) (cleaned up). Whether "consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227; accord *United States v. Lee*, 793 F.3d 680, 684 (6th Cir.), cert. denied, 136 S. Ct. 517 (2015).

In Michigan, parolees are required to sign a parole order which includes a provision of "written consent to submit to a search of his or her person or property upon demand by a peace officer or parole officer." M.C.L. 791.236(19). Refusal to

sign this document can result in continued imprisonment. (Ex. B at 9596 ("If I do not sign this written consent, I understand that my parole may be rescinded or revoked."))

But the Supreme Court has instructed that "waivers of constitutional rights not only must be voluntary, but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970). When determining the voluntariness of a waiver of constitutional rights, courts must scrutinize carefully the facts and circumstances surrounding the supposed wavier, indulging in every reasonable presumption against its validity. *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

The facts circumstances surrounding Naser's "waiver" scream coercion. Had he not agreed to waive his Fourth Amendment rights, his parole may have been rescinded or revoked. (Ex. B.) In other words, he would remain caged.  This "choice" is more consistent with a finding of *involuntariness*, because valid waivers cannot exist "where the choice given is not real and amounts to a choice 'between the rock and the whirlpool.'" *United States v. Calhoun*, 544 F.2d 291, 296-97 (6th Cir. 1976) (quoting *Garrity v. New Jersey*, 385 U.S. 493, 498 (1967). See, e.g., *United States v. Isiofia*, 370 F.3d 226, 232-33 (2d Cir. 2004) (affirming a district court's conclusion that consent to search was not given voluntarily when law enforcement officers said the defendant would be jailed if he did not consent.)

Neither the Supreme Court nor the Sixth Circuit has addressed whether parolee consent-to-search provisions constitute voluntary consent.[6] But the Supreme Court has on several occasions deemed waivers obtained under some form of threat as involuntary. For example, in *Garrity*, a number of police officers were being investigated for allegations of improper conduct while on duty. During the investigation, the officers were warned that if they invoked their Fifth Amendment right during the interviews, they would be subject to dismissal. Holding that "the choice given petitioners was either to forfeit their jobs or to incriminate themselves," 385 U.S. at 497, the Court rejected the argument that the officers had, by consenting to make the statement under such circumstances, waived their right against self-incrimination. See also *Lefkowitz v. Turley*, 414 U.S. 70 (1973) (holding that a waiver of privilege against self-incrimination secured under the threat of substantial economic sanctions cannot be termed voluntary.)

In the parolee context, a number of courts have held that a parolee's choice of consent or prison effectively renders the consent the product of coercion. In *United States ex rel Coleman v. Smith*, 395 F. Supp 1155 (E.D. NY 1975) the Court invalidated a parolee consent to search provision because the choice between accepting the provision or remaining incarcerated was too coercive. *Id.* at 1157. In *United States v. Crawford*, 323 F.3d 700 (9th Cir. 2003), a panel of the Ninth Circuit held that parolees do not consent

---

[6] See *Samson*, 547 U.S. at 852 n. 3 ("[W]e need not reach the issue whether acceptance of the search condition constituted consent in the Schneckloth . . . sense of a complete waiver of his Fourth Amendment rights.") See also *United States v. Henry*, 429 F.3d 603, 614-15 (6th Cir. 2005) ("Although other circuits have addressed the issue, it remains an open question in this circuit.")

to waive their Fourth amendment rights by virtue of a signature on a "compulsory parole condition." The panel explained that "[t]o call this choice—either waiver or certain incarceration—"free and voluntary" would be to misconceive the concept of meaningful consent." *Id.* at 718. In *United States v. Giannetta*, 909 F.2d 571, 576 n. 4 (1st Cir. 1990), the court did not reach the consent issue but "observed . . . that a question of coercion would arise as to any contention that agreement to a probation search condition constituted a general consent to search."

The highest court in Iowa addressed the issue of parolee consent to search provisions in *State v. Baldon*, 929 N.W. 2d 785 (2013). The opinion took a deep dive into the constitutional "meaning and spirit" of the word consent in the context of parolee search provisions and concluded that "parole agreements containing a prospective search provision are insufficient evidence to establish consent . . . The purported consent extracted from a prisoner as a condition of release fails to constitute voluntary consent." *Id.* at 802-803.

Naser was faced with the decision to either remain in custody with no constitutional rights involving search and seizure or to re-enter society with no constitutional rights involving search and seizure. That is simply no choice at all.[7]

---

[7] Naser was in custody when he "agreed" to the consent-to-search provision. Professor LaFave has written extensively in this area and has concluded that a coercive atmosphere necessarily militates against finding that an ostensible consent is voluntary. 4 Wayne R. LaFave, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 8.2(b), at 66, 81-90 (5th ed. 2012). The coercive atmosphere of physical detention in an official location is of the "greatest significance." LaFave's recognition that "'the location and conditions' of even a brief detention may be such as to foreclose

This agreement had all the markers of an unenforceable contract of adhesion: It's "drafted unilaterally by the dominant party and then presented on a 'take-it-or-leave-it' basis to the weaker party who has no real opportunity to bargain about its terms." Restatement (Second) of Conflict of Laws, §187, Comment (b) (1981). These contracts are void because the weaker party "has no meaningful choice, no real alternative, or did not in fact assent or appear to assent    to the unfair terms." Id. But a "blanket authorization in an adhesion contract [waiving Fourth Amendment rights] is not the type of focused, deliberate, and immediate consent contemplated by the Constitution." *Smyth v. Lubbers*, 398 F. Supp. 777, 788 (W.D. Mich. 1975). Indeed, "to speak of [voluntary] consent in this context is to resort to a 'manifest fiction,' for 'the parolee who purportedly waives his rights by accepting such a condition has little genuine option to refuse." *Samson*, 547 U.S. at 863 n.4 (Stevens, J. dissenting) (quoting 5 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 10.10(b), at 440-41 (4th ed. 2004). See *United States v. Jarrad*, 754 F.2d 1451 (9th Cir. 1985) ("modification of Fourth Amendment protections afforded to parolees in their relationship with parole officials is not based on consent."); see also *Dearth v. Florida*, 390 So. 2d 108 (Fla. App. 1980) ("We do not believe it is reasonable to conclude that a probationer's consent to such a condition is voluntary when his only other alternative is incarceration.")

---

a finding of voluntary consent" is also instructive. *Id.* at 90 (footnote omitted) (quoting *United States v. Worley*, 193 F.3d 380, 387 (6th Cir. 1999).

Even to the extent Naser entered an agreement to permit his parole officer intimate access to his life in exchange for his liberty, Naser could not and did not know or expect that his consent to parole searches would extend to the FBI Agents and their separate investigation and surveillance aims.

When reviewing the totality of the underlying circumstances surrounding Naser's purported consent, it is clear that it was the product of a one-sided agreement that was more coercive than voluntary. And "[w]hen a constitutional right is at stake, more than a one-sided agreement is needed to establish waiver of the right." *Baldon*, supra at 801.

## II.    Even if Michigan's statutory scheme is constitutional, the way TFO Wright used his authority did not conform to the statute's intent and did not conform to the Constitution.

"[I]t is impermissible for a probation search to serve as subterfuge for a criminal investigation." *United States v. Martin*, 25 F.3d 293, 296 (6th Cir. 1994). Here, the FBI's use of TFO Wright was exactly that. A parole officer "acts as a stalking horse if he conducts a probation search on prior request of and in concert with law enforcement officers." *United States v. Price*, 2019 WL 5291015, at *3 (S.D. Ind. Oct. 18, 2019), aff'd, 28 F.4th 739 (7th Cir. 2022). "The appropriate inquiry is whether the probation officer used the probation search to help police evade the Fourth Amendment's usual warrant and probable cause requirements or whether the probation officer enlisted the police to assist his own legitimate objectives." *Id.*

Here, it is clear from the documents that the FBI sought out the MDOC parole officers' assistance – not the other way around. A hearing on this issue would likely further elucidate the extent to which MDOC parole agents were asking Naser questions, and performing investigative tasks, at the request of the investigating agents. There can be no question that TFO Wright – an MDOC parole agent deputized on the task force – proceeded impermissibly as an investigator on the Task Force that had been surveilling Naser for years.

Even if the Court concludes TFO Wright was not acting at the behest of and in concert with the agents investigating Naser, he lacked reasonable suspicion for the searches. Reasonable suspicion "is based on the totality of the circumstances and has been defined as requiring 'articulable reasons' and 'a particularized and objective basis for suspecting the particular person.' " *Payne*, 181 F.3d at 788 (citing *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). "Courts analyzing searches under the reasonable suspicion standard use the same factors but require a less demanding showing than when applying a probable cause standard." *Id.* at 790.

Here, TFO Wright articulated no reasonable suspicion that a crime or parole violation was occurring or had occurred, and that evidence of those things would be found in the places he searched. Naser's parole had no restriction on his internet or social media usage, nor was there any basis to believe Naser was misusing the internet or social media. Naser was never a sex offender and has never been alleged to have committed any sex-related offense; yet TFO Wright claimed he needed to search the

phones in Naser's home to check for "child pornography." (Ex. A at 3794.) This was a ruse. TFO Wright needed to search the phones in Naser's home because he and his fellow task force agents lacked the basis for a search warrant for the devices in Naser's home.

TFO Wright and the government may point to Arabic handwriting and notecards, an Iraqi passport, and a manual for a mail-order drone as "reasonable suspicion." If so, many residents of Dearborn – especially any whose kids or adults have an interest in drones – would be subject to searches. Those observations alone do not make it any more likely – or reasonable to suspect – that Naser was engaged in criminal activity or engaged in a parole violation. Naser was born in Iraq and speaks Arabic as well as English. Even the translations of the Arabic writings read more like Muslim prayers than ISIS propaganda or indication of criminal activity.

## CONCLUSION

For the foregoing reasons, the Court should order an evidentiary hearing, after which it should suppress the unlawfully seized evidence and the fruits of the unlawful searches.

Dated:  February 12, 2024  Respectfully Submitted,

**FEDERAL COMMUNITY DEFENDER**

s/ Amanda Bashi & James Gerometta
Attorneys for Aws Naser
613 Abbott Street, Suite 500
Detroit, Michigan 48226
313-967-5542

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 12, 2024, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system that will send notification of such filing to all registered parties.

/s/ Amanda Bashi
Attorney

## <u>INDEX OF EXHIBITS – TO BE FILED UNDER SEAL</u>

Exhibit A – Relevant FBI Reports (in BATES pagination order)

Exhibit B – Naser's MDOC Parole Documents (in BATES pagination order)

Exhibit C – Search Warrants (in BATES pagination order)
- 8/21/17 Search Warrant for LG Phone
- 10/27/17 Search Warrant for Naser's Home and Car
- 11/6/17 Search Warrant for Naser's Electronic Devices
- 5/18/18 Search Warrant for Apple iCloud account
- 6/29/18 Search Warrant for iPhone
- 6/29/18 Search Warrant for 2013 Devices