UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,               CRIMINAL NO. 22-CR-20504

v.                                 HON. JONATHAN J.C. GREY

AWS MOHAMMED NASER,

               Defendant.

---

**GOVERNMENT'S RESPONSE OPPOSING SUPPRESSION OF EVIDENCE SEIZED PURSUANT TO COURT AUTHORIZED SEARCH WARRANTS**

---

While he was on parole for an armed robbery and serving his 3-to-15-year sentence, Aws Mohammed Naser attempted to provide material support to ISIS, a foreign terrorist organization, and he was found in possession of a destructive device. Naser now moves to suppress six court-authorized search warrants and argues that the search of his property by parole agents was unconstitutional even though such searches are one of the conditions of his parole.

The Supreme Court and the Sixth Circuit have already soundly rejected arguments like Naser's and found that conditions of parole or probation that subject an offender to warrantless searches are constitutional. *See Samson v. California*, 547 U.S.

843, 846, 850 (2006) (the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee); *United States v. Knights*, 534 U.S. 112, 119 (2001) (finding probationers do not enjoy 'the absolute liberty' of other citizens); *United States v. Tessier*, 814 F.3d 432, 433 (6th Cir. 2016) (upholding Tennessee's mandatory search condition for parole). And, in any event, in this case, searches of Naser's property—including his electronic devices and media—were conducted pursuant to court authorized search warrants.

Naser was supervised by parole agents who conducted plain view searches of Naser's cellular phones and home, and one forensic search of Naser's iPhone during routine visits. The FBI independently developed evidence that found Naser participating in an ISIS supporters' chatroom bragging about his support for ISIS, encouraging other participants to support ISIS, and bragging about funding the Mujahedin with gold he obtained after killing a man in Mosul, Iraq. This evidence, along with other evidence including observations from parole agents, supported the probable cause set forth in the search warrant affidavits.

The issues presented here raise legal questions, and an evidentiary hearing is not warranted. *United States v. Ickes*, 922 F.3d 708, 710 (6th Cir. 2019) ("a defendant is not entitled to an evidentiary hearing if his argument is entirely legal in nature.") (cleaned up). For the reasons set forth in the attached brief, Naser's motion should be denied without an evidentiary hearing.

## FACTUAL BACKGROUND

As argued below, this motion raises a purely legal issue that should be resolved in the Government's favor without a deep exploration of the facts. However, because Naser's argument relies on flawed inferences based on his interpretation of the facts, the Government is providing a detailed factual background explaining the searches at issue.

A. Defendant's Radicalization (March 2011 through February 2012)

Naser came to the attention of the FBI in early 2011 when Henry Ford Community College (HFCC) campus security officers reported they had received a complaint from a student that Naser was preaching "Jihadi rhetoric" in Arabic. Def. Ex. C, 17-mc-51160-5 at 4386-4387. HFCC also reported Naser created a disturbance after he was found distributing religious material on campus without a permit. *Id.* At the time, Naser maintained a YouTube channel under the username AWS8819 with the following personal description: "Jihad for the sake of Allah is all i[1] want in this life. And if i get Martydom i'll ask Allah if i can go Back and do it Agian. Occupation: Full time Mujahd A.K.A Slave of Allah. Companies: Mujahdeen Sniper." *Id.* at 4387.

In 2011, the FBI learned of Naser's burgeoning relationship with Russell Dennison, a radical Salafist-jihadi from Tampa, Florida. Dennison was the subject of a separate FBI-Tampa investigation and was believed to have contributed to the

---

[1] Any typos and misspellings in quoted materials in this response are also in the originals.

radicalization of Sami Osmakac, who on January 7, 2012, was arrested and charged with a violation of 18 U.S.C. § 2332a, attempt to use a weapon of mass destruction against persons and property in the United States in Tampa, Florida. *See* MDFL Case No. 8:12-MJ-1008. After Osmakac's arrest, Dennison fled Tampa on January 13, 2012, traveled to Detroit, Michigan, and stayed at Naser's home for approximately a week before the pair planned to travel together to Iraq. Dennison departed the United States for Iraq on January 21, 2012, and Naser followed on February 11, 2012. Def. Ex. C, 17-mc-51160-5 at 4390, Ex. 1 at 0614.[2]

B.  Iraq with Russell Dennison (February 2012 through August 2012)

Dennison and Naser traveled together in Irbil, Baghdad, and Mosul. In March 2012, the pair visited a mosque together in Mosul. Dennison left Iraq in approximately April 2012, traveled to Jordan and then on to Lebanon in August 2012 to join the jihad. Ex. 2 at 0624. By September, Syria was engaged in a violent civil war and the al-Nusrah Front, a designated foreign terrorist organization (FTO), had taken over portions of the country. *Id.* at 0626. Dennison joined al-Nusrah Front[3], which

---

[2]  References are cited by the last 4 digits of the Bates numbers, and all of the Government's exhibits have been filed with a request to seal.

[3] Al-Nusrah Front was initially designated as a Foreign Terrorist Organization (FTO) under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist (SDGT) under section 1(b) of Executive Order 13224 on October 15, 2004, under the name "Jam'at al Tawhid wa'al-Jihad." On December 15, 2004, the Deputy Secretary of State added numerous aliases to the Jam'at al Tawhid wa'al-Jihad FTO designation including the alias al-Qaida in Iraq ("AQI"). On December 11, 2012, the Secretary of State amended the FTO and SDGT designations

was secretly affiliated with the Islamic State of Iraq, as a soldier. In emails, Dennison described his participation in taking over neighborhoods from non-believers, fighting the army, stealing weapons, and being a part of a group that consisted of other people who were "ready to sacrifice for Allah." He described himself as a "muhajir jihadi," or emigrant fighter. *Id.* at 0629-0630. He explained: "we are getting closer to victory every day, inshaAllah *[God willing]* soon the government will fall and we will be in control," and added that "[w]e control the majority of the country and will inshaAllah *[God willing]* be in power and this movement will spread further until we take over the entire middle east and have in control the lands that belong to us." *Id.* at 0625-0626. Dennison continued to fight with ISIS until approximately 2019, when it is believed he perished in Baghuz, Syria.

A.  <u>Naser's Attempts to Travel to Join the Jihad in Iraq and Syria (August 2012 through January 2013)</u>

While Dennison was busy establishing himself as an "muhajir jihadi" with al-Nusrah Front, Naser returned to the United States in August 2012. Naser's communications with Dennison during this time show Naser planned to earn money and leave the United States to join Dennison as a foreign fighter in Syria. For instance, on September 11, 2012, Dennison told Naser that he traveled through Lebanon and

---

of Jam'at al Tawhid wa'al-Jihad to include the following aliases: al-Nusrah Front ("ANF"), Jabhat al-Nusrah, Jabhet al-Nusra, The Victory Front, and Al-Nusrah Front for the People of the Levant.

had arrived "where we talked about going." Dennison told Naser that a "new door" was open to travel through Turkey and stated that he had the "connects" to help Naser "get here." Ex. 3 at 0126-0127. Referring to weapons, Dennison told Naser to try to save "money to buy some nice things" and explained "you can get a nice thing for about 1,200 dollars, not much." *Id.* Naser responded and told Dennison he needed another two months and then he would "have enough." *Id.* at 0123.

On September 14, 2012, Dennison told Naser that "we dont really have what we need but this is all part of the struggle, we really need funds for a weapon to take down the planes, make duah for us and come soon and come prepared, get ready, it is real here and this place needs us more than anywhere else." *Id.* at 0118-0120. Naser promptly responded, "I sit[] here waiting Allah knows how frustrated i am that i am not with you. If i could be there now i would already be." Regarding money, Naser told Dennison: "i will bring what we need & more. . .i know 2 months is a long time but i promise you if it is less then that I will already be there. 1 month or 3 weeks insha allah. Akhi i will be there as soon as possible INSHA ALLAH!!" *Id.* at 0114-0115.

Meanwhile, Naser voraciously consumed jihadi-propaganda videos, purchased weapons such as a sword concealed in a cane and a tactical knife, and a one-way ticket from Detroit, Michigan to Irbil, Iraq via Chicago, Illinois and Istanbul, Turkey.[4] On

---

[4] It was common practice for aspiring foreign fighters traveling to join terror groups in Syria to disguise their objectives by purchasing tickets to other places with

November 7, 2012, Naser went to the airport, checked in for his flight with luggage that contained the cane sword and tactical knife, and entered the TSA checkpoint. Ex. 4 at 0104. His plans to join Dennison and the jihad were thwarted when he was not permitted to board the plane.

Undeterred, Naser searched the internet for alternative routes—airports in Mexico and Canada; entry requirements for Egypt, Lebanon, Tunisia, and Iraq; information about refugee seekers to Norway; and the cost of living in Lebanon and Iraq. He purchased another one-way plane ticket, this time to Beirut, Lebanon, departing Chicago, Illinois on January 2, 2013, with a stopover in Amman, Jordan.[5] Hours before his January 2, 2013, scheduled flight to Lebanon, Naser engaged in two separate acts of violence. The first occurred on January 1, 2013, at a Sunoco Gas Station in Detroit where Naser had recently worked and had been fired. According to police reports (Naser was not criminally charged), at approximately 10:15 p.m., Naser poured several quarts of motor oil over merchandize, in the ATM machine, and the EBT and credit card machines, causing significant damage. Then, at 10:48 p.m., Naser entered a Mobil Gas Station in Bloomfield, Michigan where, several weeks earlier, he had worked and been fired upon suspicion of theft. Armed with the pepper spray,

---

connections in Istanbul. They then purposely missed their connections in Istanbul and instead made their way across the Turkish-Syrian border. This is the "new door" from Turkey that Dennison referred to as being open.

[5] Dennison had told Naser that he had crossed into Syria from northern Lebanon after arriving in the country through Beirut's airport.

Naser went behind the counter and grabbed money from the cash register and physically assaulted and pepper-sprayed the store clerk who attempted to stop him.

Naser then traveled to Chicago for his January 2, 2013, flight to Lebanon. Naser's attempts to join Dennison and the jihad were thwarted again when he was once again prohibited from boarding the plane. Naser returned to Michigan and promptly posted a YouTube video labeling Dennison an FBI informant and warning all Muslims to cut off contact with him.

C. Prison (January 2013 through March 2016)

Naser was arrested on January 4, 2013, charged, and later convicted of armed robbery for his conduct at Mobil and sentenced to 3 to 20 years. Naser was paroled on March 18, 2016. During his incarceration (2013-2016), the Islamic State of Iraq had become ISIS and its leader, Abu Bakr al-Baghdadi, announced a merger with al-Nusrah.[6] ISIS seized territory and declared a Caliphate. Its leaders directed adherents to either (1) travel to the Islamic State, or (2) engage in attacks in their homelands.

---

[6] Al-Baghdadi's announcement was met with some opposition in the terrorist community and caused a split and feud between al Qaida and ISIS. This led the Secretary of State to split the designation of al Qaida in Iraq into two on May 15, 2014. Al-Nusrah Front and its aliases was removed from the designation of AQI and designated separately. It remains a designated FTO today under different aliases, most prominently Hay'at Tahrir al-Sham ("HTS"). At the same time, the designation of AQI was amended to include the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name along with several additional aliases: Islamic State of Iraq and al-Sham ("ISIS"—which is how the FTO will be referenced herein), the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production. To date, ISIS remains a designated FTO.

ISIS, described as "an organization whose brutality is shocking even by the standards of terrorism," *United States v. Ahmed*, 107 F.Supp.3d. 1002, 1005 (D. Minn. 2015), inspired numerous individuals to commit terrorist acts resulting in mass casualties in the United States and elsewhere. ISIS published articles in its propaganda news magazines, released wildly popular propaganda videos, and advised individual followers through social media to engage in attacks. Moreover, these same platforms often included information on how to conduct these attacks.

   D. <u>Parole (March 2016 through January 2017)</u>

   Naser was paroled by the Michigan Parole Board with both standard and special conditions. The standard conditions included a requirement that Naser report truthfully to his parole agent (PA), and report any arrest, police contact, or loss of employment to his PA within 24 hours. Naser was prohibited from possessing firearms, simulated firearms, or weapons of any type, ammunition, or firearm components. He was required to find and maintain employment and comply with any special conditions and any written or verbal orders from his parole officer. Naser was also subject to special conditions, including:

> 4.2 written consent to search the parolee's person and/or property, MCL791.236(19): I voluntarily consent to a search of my person and property upon demand by a peace officer or parole officer. If I do not sign this written consent, I understand that my parole may be rescinded or revoked.

Def. Ex. B at 09596.

9

PA Cynthia Simon was assigned by the Michigan Department of Corrections (MDOC) to supervise Naser and she did so between March 18, 2016, and May 11, 2017. PA Derrick Bond supervised Naser between May 11, 2017, and August 7, 2017, and PA Charles Wright supervised Naser thereafter. Sealed Ex. 5 at 1-2, 5, 16.

Naser's conviction and incarceration did not mitigate the threat he posed. His attempts to join Dennison in Syria in 2012-2013 were thwarted by law enforcement and there was no cause to believe he had de-radicalized, renounced his extremist views, or otherwise reformed. Thus, in March 2016, the FBI contacted PA Simon after she had met with Naser upon his release and alerted her that Naser was a national security concern. Simon did not receive any other information from the FBI regarding Naser. Ex. 5 at 4.

Simon's parole supervision was routine and independent from any FBI interest in Naser. Naser met Simon at her office every two weeks beginning on March 18, 2016, through early 2017, until Simon went on medical leave. *Id.* at 5. These meetings were approximately 5-10 minutes in duration, and Naser was asked routine questions about where he was working and living, whether he had had police contact, and whether he was using social media. *Id.* Routine residential visits (RV) of Naser's home occurred on only two occasions in 2016: on March 18, 2016, when Naser was paroled, and on May 13, 2016. *Id.* at 4, 7.

From March 2016 through July 2016, FBI periodically contacted PA Simon to check in and see how Naser was doing on parole. Simon provided brief updates,

including that Naser reported he did not have any social media accounts or contact with law enforcement. The FBI stopped contacting Simon in July 2016. Six months later, in January 2017, the FBI contacted PA Simon again to check-in and see how things were going. Simon again reported Naser was compliant with the terms of his parole. *Id.* at 5-6.

Throughout the time she supervised Naser, the FBI did not share information with Simon about their interest in Naser, and she was not asked to take investigative steps, ask specific questions, or gather evidence for the FBI.[7] Simon performed her routine parole supervision duties independently from the FBI's investigation.

E.  <u>Violations of Parole (January 2017 through October 2017)</u>

The FBI planned to close its case on Naser until a database search conducted in January 2017 revealed that Naser had an active Telegram account with the username "ISxxxIS" associated with his telephone number. Ex. 6. Telegram is a secure mobile and desktop messaging application that allows users to communicate with each other in chat rooms called groups, which can be comprised of thousands of participants. Groups can be set up as private, and only approved users can get access to private groups.

---

[7] Naser was not the subject of FBI surveillance for over a year after his release from prison other than brief driving by his address to confirm he was living there between March 21-28, 2016, and on April 18, 2016. Surveillance on Naser began in June 2017 *after* the FBI uncovered evidence that Naser was still attempting to materially support ISIS.

On May 19, 2017, PA Bond conducted his first RV of Naser's residence. Ex. 5 at 1. PA Wright, who was assigned to the Joint Terrorism Task Force (JTTF) as a Task Force Officer (TFO), accompanied Bond to observe Naser because MDOC supervisors wanted him to take over supervision of Naser. Wright did not share any information with Bond, and Bond was unaware of Wright's status as a JTTF TFO, the FBI's interest in Naser, or the reason why Wright accompanied him on the residential visit. Like Simon, Bond's home visit was routine and conducted as part of his supervision duties. *Id.* at 17-19.

Naser gave the agents a tour of the ground floor of the home he shared with his pregnant wife and two young children. Wright noticed Naser was not sleeping with his wife in the master bedroom but was instead living out of another room and sleeping on the floor. Naser explained he wanted to be pious and "go without." In Naser's room, Wright observed a drone manual, an order/shipment statement for another drone, two lined notebook pages, and index cards with Arabic writing that were later translated and included the following statements: "*We are the soldiers of the Caliphate, we shoot a word and a bullet*" and "*It is destined by fate; I am the son of the Islamic State. If the mountains swayed, I will not sway.*" See Ex. 7, Ex. 5 at 9.

Wright's observations raised his suspicions because Wright understood these to be indicators consistent with a Lone Wolf ISIS supporter. Ex. 5 at 9. Wright knew that Lone Wolves could activate and/or accelerate their plans if detected or thwarted, and Wright did not want Naser to become aware of his suspicions. Consequently,

Wright did not conduct a thorough search of Naser's home and told Naser he would review Naser's iPhone 7 Plus for child pornography, all to avoid raising Naser's suspicions. *Id.*

Wright shared the iPhone extraction report[8] and photographs taken during the RV with the FBI. There were several social media applications downloaded on Naser's iPhone—including WhatsApp, Tinder, Instagram, and Snapchat, but neither Telegram nor Paltalk[9] (discussed *infra*) were among them. Def. Ex. A. 3664-3665.

On May 22, 2017, FBI TFO Megan McAteer learned that on April 20, 2017, a DEA undercover employee (UCE) was in a Paltalk chatroom entitled "Ansar Dawlat AlKhilafah AlIslamiyah", which translates to "The Supporters of the Islamic State," when the UCE encountered a user named "MuslimX1." MuslimX1 bragged about his support for ISIL (aka "ISIS"), mentioned the battles taking place in Mosul, Iraq, and encouraged the users in the group to not be satisfied with their support of ISIL on the Paltalk chat, but to go out and walk the streets of their towns. The UCE interpreted this statement to mean that the users should see what they can do to support ISIL in a real manner. MuslimX1 also bragged about his role in the 2012 murder and robbery of a Christian gold shop owner in Mosul. According to his retelling, after he and

---

[8] The FBI later searched an image of the iPhone 7 Plus pursuant to a court-authorized search warrant on June 29, 2018. Def. Ex. C, 17-mc-51160-6.

[9] Paltalk is a social media platform that enables users to communicate via video, internet chat and voice, and to create their own public virtual chat rooms.

others watched the man, they entered his store, killed him, stole his gold, and then gave the stolen gold to the Mujahedin.

On June 8, 2017, McAteer learned that the IP address associated with the MuslimX1 identity resolved to Naser's residence. In July 2017, McAteer learned that Naser created a Paltalk account on April 11, 2017, using the vanity name "MuslimX1." Ex. 8. Without sharing details, the FBI alerted PA Wright to their concerns. Ex. 5 at 13. Wright decided to take over supervision of Naser. The FBI did not ask him to do so, nor did they ask him to conduct searches or obtain evidence. Ex. 5 at 4-6, 8-14. According to MDOC, Wright began supervision on August 7, 2017. *Id.* at 16.

Prior to joining the JTTF, PA Wright had more than 25 years' experience with MDOC. *Id.* at 8. As a TFO, Wright continued to supervise parolees and he maintained a desk at the FBI, but he was not part of the group assigned to investigate Naser. *Id.* at 12. A parole agent's primary responsibility is to protect the public. *Id.* at 4. Wright's position within the JTTF gave him access to information about parolees that would otherwise be unavailable but would improve the agency's ability to supervise its parolees. *Id.* at 5. PAs were expected to conduct home visits within certain time periods, including after a transfer, to assess compliance with parole conditions. *Id.* at 8. Wright was concerned Naser may be a Lone Wolf, so he was careful not to alert Naser to his suspicions by conducting an in-depth search of

14

Naser's home. *Id.* at 9. Instead, Wright's searches were largely superficial and more akin to "plain view" searches. *Id.*

Wright conducted another RV on August 16, 2017, but the visit was not conducted at the direction of the FBI. *Id.* at 10. Upon entering the residence, Wright observed two cellular telephones on the floor next to the couch—a grey and black LG and an iPhone 7 Plus. Def. Ex. A. at 3793. Wright took a snapshot of Naser's iPhone, which contained several social media applications. *Id.* at 3793-3794. In Naser's room, he again observed and photographed an index card with Arabic writing. Wright toured the basement with Naser and, when they returned to the main floor, Wright observed Naser grab the LG phone and attempt to conceal it by quickly sitting on it on the couch. Naser consented to the search of the LG phone when Wright asked to see it. Wright observed the ISIS flag, a picture of Abu Bakr al Baghdadi (the leader of ISIS), ISIS magazines, and several applications, including Paltalk, Telegram, Twitter, Tor Browser, Orbot, and Orfox. *Id.* at 3794. Naser had not disclosed his use of this phone to Wright or his other PAs, and the phone contained numerous social media accounts, which Naser consistently maintained he did not use.

On August 21, 2017, the FBI sought and obtained a court-authorized warrant to search the LG phone for evidence related to a violation of 18 U.S.C. §2339B(a)(1), provision of material support to ISIL. See Def. Ex. C, 17-mc-51160 at 14. Wright transferred custody of the phone to the FBI on August 22, 2017. The FBI found ISIS and other extremist content on the phone, including images, videos, and chats and

15

downloads related to explosives. For instance, in one Telegram chat, Naser received detailed instructions on the manufacture of the explosive copper azide. Naser also participated in a chat room that discussed the use of Kalashnikov weapons, instructions on how to extract and use ricin as a poison on children and adults, and links to ISIS materials and chat rooms.

Wright conducted a third and final RV at Naser's residence on October 19, 2017. By this time, Naser was living in the basement and had leased the upstairs bedrooms of his home to tenants. His young children and his wife—who had just delivered a third child in late September—were no longer living at the residence. During a search of the basement, parole agents observed a makeshift bed, an Apple computer, a workbench containing drones that appeared to be altered from their original manufactured form, and jars. Wright's RV was conducted pursuant to his duties as a parole agent and were not at the direction of the FBI. Ex. 5 at 8-11.

The FBI obtained a search warrant for Naser's home and vehicle, which was executed on October 30, 2017. Def. Ex. C, 17-mc-51160-2. The search warrant led to the seizure of explosive components; weapons, such as a bb gun, knives, tasers, and pellets; drones; and other materials.

F. Revocation of Parole (October 2017)

Naser repeatedly violated the terms of his parole during the 18 months he was paroled between March 18, 2016, and October 30, 2017. He was in possession of multiple weapons, he engaged in new criminal activity, and had several different

16

contacts with law enforcement that he failed to report to his PA as required by the terms of his parole. For instance, he failed to report a June 2017 arrest and his subsequent conviction after he slashed the tires of a co-worker with whom he had a conflict. Naser also failed to report police contacts related to a Personal Protection Order (PPO) issued in August 2017, when his wife alleged that he physically assaulted her by punching her in the face and choking her, and that he threatened to kill her and her daughter and take their son to Iraq.

Naser also repeatedly lied to his PAs by stating that he did not have social media accounts or contact with law enforcement. Naser disclosed his use of an iPhone 7 Plus but failed to disclose his use of the LG Phone and attempted to hide the LG phone from his PA during an August 16, 2017, home visit. The LG phone had several applications downloaded including PalTalk and Telegram, which were not loaded on his iPhone 7 Plus, and it had the Tor browser[10], Orfox[11], and Orbot[12], which enable users to securely browse the internet with anonymity.

---

[10] The Tor browser, short for "The Onion Router", enables users to surf the internet anonymously and gives users access to the dark web. It erases browsing history automatically with each session and encrypts all of the user's traffic. What is the Tor Browser?: A Guide to the Dark Web Browser (vpnoverview.com)

[11] Orfox is a secure web browser that allows users to browse the web through the Tor Network. Orfox is encrypted to provide anonymity on the internet. Orfox - Guardian Project

[12] Orbot is a free proxy app that empowers other apps to use the internet more securely. Orbot uses Tor to encrypt a user's internet traffic and then hides it by bouncing through a series of computers around the world. What is Orbot and how to use its VPN (nerdschalk.com)

In sum, the FBI remained interested in Naser after his release from prison in March 2016, but other than a few drive-by surveillances shortly after his release to verify his address, and brief updates from PA Simon, no active investigation was underway. The FBI planned to close the investigation into Naser in January 2017 until it was discovered Naser had an active Telegram account under the name ISxxxIS. Although concerning, the FBI did not become alarmed until June-July 2017, when the FBI learned of Naser's communications in the ISIS supporters chatgroup on Paltalk promoting ISIS, and bragging about his support for ISIS, including the murder of a gold shop owner in Mosul, Iraq. These communications, combined with Wright's May 19, 2017, observations reignited the FBI's investigation into Naser's criminal activities and led to the execution of several search warrants and the lawful seizure of evidence showing he was attempting to support ISIS and was in possession of a destructive device.

## **ARGUMENT**

The parole officers' searches of Naser were proper. The provision in Naser's parole order allowing for a suspicionless search is taken directly from a Michigan law, which was fashioned to respond directly to the Supreme Court's requirements. It has been used in this district numerous times without issue, and the Sixth Circuit has blessed similar provisions in other states. The search in this case was reasonable

considering the state's need to monitor Naser and his lack of expectation of privacy as a parolee.

There are three key Supreme Court cases that delineate a parolee's rights under the Fourth Amendment. The first is *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987). In *Griffin*, the Supreme Court laid out a "special needs" exception to the warrant requirement for probation searches. The Court explained that probation officers had a special need to search probationers that would be foiled by a probable cause requirement. *Id.* at 878. The Court held that information from a police officer that indicated a likelihood of facts justifying the search was enough to satisfy the Fourth Amendment. *Id.* at 880. Because this exception to the warrant requirement rested on the specific needs of probation officers, some courts found that it does not apply when a probation officer acts as a "stalking horse" to help other law enforcement agents conduct a search. *See United States v. Martin*, 25 F.3d 293, 296 (6th Cir. 1994).

But the Supreme Court took a different approach in *United States v. Knights*. In *Knights*, the defendant argued that, in light of *Griffin*, a warrantless search of a probationer satisfied the Fourth Amendment only if it was a special needs search conducted by a probation officer monitoring whether the probationer is complying with probation restrictions. 534 U.S. 112, 117. The Supreme Court called this "dubious logic." *Id.* The Court explained that the "touchstone of the Fourth Amendment is reasonableness" and that the proper way to evaluate a search is to compare the degree it intrudes on the individual's privacy with the need for the

promotion of legitimate governmental interests, with the defendant's status as a probationer affecting both sides of that balance. *Id.* at 118–19. On one side, probationers "do not enjoy the absolute liberty to which every citizen is entitled," reducing the degree of intrusion on their privacy from a search. On the other side, probation is based on the justified assumption that a "probationer is more likely than the ordinary citizen to violate the law," increasing the government's legitimate interest in conducting a search. *Id.* at 119–20. Weighing these factors thusly, the Court found that a search authorized by a mandatory probation condition and supported by reasonable suspicion satisfies the Fourth Amendment. *Id.* at 122.

The Supreme Court took the next step in *Samson v. California*, 547 U.S. 843, 848–49 (2006). *Samson* involved a suspicionless search of a parolee under California's parole search law. That law required state parolees to agree "to be subject to search or seizure by a parole officer or other peace officer . . . with or without a search warrant and with or without cause." Cal. Penal Code Ann. § 3067(a). The only qualification was a prohibition against "arbitrary, capricious or harassing searches." 547 U.S., at 856 (cleaned up). A police officer searched Samson based solely on his status as a parolee and found methamphetamine. Samson took his case to the Supreme Court.

As in *Knights*, the Supreme Court took a totality-of-the-circumstances approach, comparing the degree to which a search intrudes upon privacy with the degree it is necessary to promote legitimate government interests. 547 U.S. at 848. The Court explained that parolees like Samson and Naser have even "fewer expectations of

privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment." *Samson,* 547 U.S., at 850. The Court also found "salient" that the parole search condition was clearly expressed to Samson, as it was to Knights. *Id.* at 852. Accordingly, the Court determined that Samson "did not have an expectation of privacy that society would recognize as legitimate." *Id.* The State, on the other hand, had substantial interests involved including an "overwhelming interest in supervising parolees" and an interest in reducing recidivism that "warrants privacy incursions that would not otherwise be tolerated." *Id.* at 853 (cleaned up). Based on the balancing of these interests, the Court held that "the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee." *Id.* at 857.

"In *Samson*'s wake, Michigan enacted a law imposing a parole condition like the one in California." *United States v. Henderson*, No. 22-1561, 2024 WL 51319, at *2 (6th Cir. Jan. 4, 2024). Like the California law the Supreme Court blessed in *Samson*, Michigan's law requires probationers to submit to searches of their person or property "upon demand by a peace officer or parole officer," but "does not authorize a search that is conducted with the sole intent to intimidate or harass." Mich. Comp. Laws § 761.236(19). Every district court to consider a parolee search under that statute has determined that the State of Michigan's interest in closely supervising parolees

outweighs the parolee's limited expectations of privacy and therefore that the searches satisfy *Samson*.[13] This Court should follow their lead.

Like in all the other parole searches reviewed in this district under Section 791.236, the search in Naser's case was reasonable and not meant to harass. The State had a strong interest in closely monitoring Naser as a parolee, especially since he had a violent history, had recently bragged about having committed a murder abroad, and was suspected of involvement with terrorists. On the other hand, Naser had no legitimate expectation of privacy as a parolee who had provided written consent to a

---

[13] *See, e.g., United States v. Abraham*, 643 F. Supp. 3d 786, 789 (E.D. Mich. 2022) ("Based on the totality of these circumstances, the 'nighthawk' compliance search was reasonable and therefore did not violate Abraham's Fourth Amendment rights."); *United States v. Davis*, No. 18-CR-20085-02, 2021 WL 3473246, at *4 (E.D. Mich. Aug. 6, 2021)("The Court further concludes that Defendant Davis' diminished expectation of privacy applied equally to the seizure and search of his seized three cell phones in this case."); *United States v. Lynn*, No. 19-CR-20084, 2019 WL 4187354, at *5 (E.D. Mich. Sept. 4, 2019) ("In sum, given the State of Michigan's strong interest in monitoring Lynn's behavior and Lynn's lack of a reasonable expectation of privacy in his trailer, the warrantless search of the trailer did not violate Lynn's Fourth Amendment rights."); *United States v. Mann*, No. 17-CR-20644, 2018 WL 3036404, at *13 (E.D. Mich. June 19, 2018) ("[T]he Court finds no basis on the facts of this case to deviate from [*Knights* and *Samson*] because the search of Mann and his residence satisfies the Fourth Amendment under the 'totality of the circumstances' approach applied in *Samson*."); *Dixon v. Kraft*, No. 16-14439, 2018 WL 636243, at *2 (E.D. Mich. Jan. 31, 2018)("Defendants had the right to search Plaintiff, as a matter of law, due to his written consent given upon being paroled."); *United States v. Stevenson*, No. 14-20219, 2015 WL 3651016, at *3 (E.D. Mich. June 11, 2015)("The Court adheres to its finding that Defendant provided written consent, authorized by Michigan Compiled Laws § 791.236(19), to searches of his property on demand. Defendant's legitimate expectations of privacy were therefore diminished like those of the parolee in *Samson*, who provided written consent, authorized by California law, to searches without cause.").

search. Under the totality-of-the-circumstances test from *Samson*, this Court's inquiry should end there.

Naser cites a Michigan Supreme Court case to suggest that there are "concerns about the constitutionality of the provision," but the case does not help him. [R. 94: Motion at 16, PageID 588]. The opinion Naser quotes was a two-judge statement concurring in a unanimous order rejecting leave to appeal a lower court decision finding a search constitutional based on the parole provision. But the two justices' concerns related to the Michigan Constitution, not to the Fourth Amendment. Considering the United States Constitution, the justices noted that they concurred in the decision because "*Samson* appears to foreclose the arguments that the defendant has raised." *People v. Montgomery*, 508 Mich. 978, 965 N.W.2d 549, 550 (2021). Moreover, the justices were concerned in that case because "it appears that the law enforcement officers who conducted the search did not justify their actions on the basis of defendant's parole status." *Id.* Notably, the search was of two defendants, only one of whom was on parole, and the search was wholly unrelated to the administration of the parole system. The search of Naser was nothing like that. And Naser does not and cannot make any arguments under Michigan's constitution. Naser's lone case questioning Section 791.236 is therefore inapposite, and he has no counter to the numerous federal cases applying it.

23

Naser claims to have failed to locate any Sixth Circuit cases upholding a suspicionless search. [R. 94: Motion at 17, PageID 589.] However, *United States v. Tessier*, 814 F.3d 432, 433 (6th Cir. 2016), and several other cases do just that. *Tessier* involved a suspicionless search based on a Tennessee standard search condition that stated: "I agree to a search, without a warrant, of my person, vehicle, property, or place of residence by any Probation/Parole officer or law enforcement officer, at any time." The parties agreed that the search was conducted without reasonable suspicion. The Sixth Circuit, applying *Knights*, upheld the search. *Id.* Tessier was a probationer, not a parolee. But parolees have "fewer expectations of privacy than probationers," *Samson*, 547 U.S., at 850, so the outcome cannot be more favorable to the defendant here.

*Tessier* is not unique. The Sixth Circuit revisited Tennessee's standard search condition in *United States v. Brown*, 832 F. App'x 397, 401 (6th Cir. 2020). Brown was searched because he was a parolee and "a person of interest" in a homicide. 832 F. App'x at 401. While this search was not completely suspicionless, there was no argument that a tip that he was "a person of interest" rose to the level of reasonable suspicion. Nevertheless, the Sixth Circuit upheld the search based on *Samson. Id.* The same thing happened in *United States v. Tucker*, 795 F. App'x 963, 965 (6th Cir. 2020), which likewise considered Tennessee's standard search condition.

24

Naser's arguments closely mirror those made by the defendant in *United States v. Sweeney*, 891 F.2d 232, 235–36 (6th Cir. 2018). Sweeney was on parole in Ohio, which also has a warrantless search condition for parolees. Sweeney acknowledged that the Ohio law was constitutional and that the search was conducted pursuant to the requirements of the statute. But Sweeney argued that the search should nevertheless be disallowed "because the parole officer who searched Sweeney's domicile was impermissibly acting as a 'stalking horse' to help the DHS officers evade the Fourth Amendment's warrant requirement in their investigation into Sweeney." 891 F.3d, at 236. The Sixth Circuit made quick work of that argument, explaining that it does not apply "when the government relies on the totality-of-the-circumstances doctrine as articulated in *Samson*." *Id.* If the search is reasonable under the totality of the circumstances, the stalking-horse argument must fail. *Id.* at 237. *Sweeney* forecloses Naser's primary argument.

Nor does the search of a cell phone materially affect the calculus. Naser argues that the Court should weigh the nature of the contents of a cell phone in its totality-of-the-circumstances calculation in his favor, citing *United States v. Fletcher*, 978 F.3d 1009, 1018 (6th Cir. 2020). In *Fletcher*, the Sixth Circuit found that a probation officer's search of a cell phone was unreasonable and did not satisfy *Knights*. But there are two key differences between Fletcher and Naser. Fletcher was a probationer, and the Sixth Circuit found important that his "expectation of privacy is greater than that of a parolee." *Id.* More importantly, Fletcher's conditions of probation required him

25

to agree to a warrantless search of his "person, [his] motor vehicle, or [his] place of residence." It did not clearly or unambiguously include his cell phone. *Id.* at 1019. Naser's search condition, on the other hand, encompasses a search of his "person or property." There can be no argument that a cell phone does not fall under that condition. Like in *United States v. Davis*, the initial warrantless search here was followed by federal search warrants allowing for the extraction and search of the cell phones. No. 18-CR-20085-02, 2021 WL 3473246, at *4 (E.D. Mich. Aug. 6, 2021). In *Davis*, the District Court found that Davis's diminished expectation of privacy as a parolee applied equally to the seizure and search of his cell phones. It does here too. Naser does not claim that these warrants lacked probable cause; he argues only that they were invalid because they relied on the probation searches.

Naser next argues that his consent was not voluntary, so the consent exception does not apply. Knight and Samson made the same argument in the Supreme Court, as did Lynn here in the Eastern District. The Supreme Court declined to address it "[b]ecause we find that the search at issue here is reasonable under our general Fourth Amendment approach." *Samson v. California*, 547 U.S., at 852 n. 3. The District Court in *Lynn* followed the Supreme Court's lead. *Lynn*, No. 19-CR-20084, 2019 WL 4187354, at *7, n. 3. While the consent exception is another justification for the searches here, the Court need not rely on it to deny Naser's motion.

Evaluating the totality of the circumstances under the *Samson* framework, the probation search was more than reasonable. The State's legitimate interest in conducting the search was great: Naser was a national security concern who had been lying to his probation officers about social media accounts where he was interacting with ISIS supporters and encouraging them to take their support off the internet and into the real world. On the other side, Naser, as a parolee with an unambiguous search condition, had no legitimate privacy interest. The scale is tilted heavily, if not entirely, toward the state here.

In a suppression motion, the "burden of production and persuasion rests on the person seeking to suppress evidence." *United States v. Smith*, 783 F.2d 648 (6th Cir. 1986). Thus, Naser must produce evidence to support his inferences and must persuade the Court that the totality of the circumstances warrants suppression. He cannot do either.

Finally, even if the Court finds the Michigan statute unconstitutional, the Court should not invalidate the searches pursuant to the *United States v. Leon*, 468 U.S. 897 (1984), good faith exception. *Leon's* good-faith exception recognizes that "[t]he substantial social costs exacted by the exclusionary rule" are too great to suppress evidence "seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." *Id.* at 905, 907; *Herring v. United States*, 555. U.S. 135, 142 (2009); see *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017). Although termed "good faith," the exception's applicability is measured objectively. *Leon*, 468

U.S. at 923. *Leon* considered four circumstances in which an officer's reliance on an issued warrant would not be reasonable: (1) when the affidavit contains false information that the affiant either knew or should have known was false; (2) when the issuing magistrate abandons neutrality and serves as a rubber stamp for police activities; (3) when the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" and (4) when the warrant is so "facially deficient--i.e., in failing to particularize the place to be searched or the things to be seized-- that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923.

Here, none of these circumstances exist and the agents reasonably relied upon the court authorized warrants to seize evidence. They could not have anticipated that an underlying state statute could later be invalidated. "If the statute is subsequently declared unconstitutional, excluding evidence obtained pursuant to it prior to such a judicial declaration will not deter future Fourth Amendment violations by an officer who has simply fulfilled his responsibility to enforce the statute as written. To paraphrase the Court's comment in *Leon*: 'Penalizing the officer for the [legislature's] error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.'" *Illinois v. Krull*, 480 U.S. 340, 349–50 (1987) (quoting *Leon*, 468 U.S. at 921). *See also United States v. Peltier*, 422 U.S. 531, 539 (1975) ("The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent conduct.. . . Where the official action

28

was pursued in complete good faith, however, the deterrence rationale loses much of its force."). In this case, agents relied on warrants issued by neutral magistrates obtained through reliance on a state statute that the agents (and multiple judges in this district) presumed was constitutional. There are two layers of *Leon* good faith reliance backing up this search.

## **CONCLUSION**

Because resolving this motion calls for a straightforward application of *Samson*, there are no factual disputes that may affect the outcome and an evidentiary hearing is not warranted. *United States v. Ickes*, 922 F.3d 708, 710 (6th Cir. 2019). Naser suggests that an evidentiary hearing would be useful to confirm that PA Wright acted as a stalking horse for the FBI. [R. 94: Motion at 2, PageID 574]. But such confirmation would be useless as the Sixth Circuit has held "that the 'stalking horse' caveat does not apply when a parolee is subject to a search provision and the search is reasonable under the totality of the circumstances." *Ickes*, 922 F.3d, at 712 (citing *Sweeney*, 891 F.3d, at 232). Accordingly, an evidentiary hearing is unnecessary.

Weighing the Government's strong legitimate interest in conducting the parole searches against Naser's lack of a legitimate expectation of privacy, this Court should deny Naser's motion.

Respectfully submitted,

DAWN N. ISON

United States Attorney


*/s/Saima S. Mohsin*
SAIMA S. MOHSIN
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, MI 48226
Saima.Mohsin@usdoj.gov
(313) 226-9100


*/s/Dmitriy Slavin*
DMITRIY SLAVIN
Trial Attorney
National Security Division
Dmitriy.Slavin@usdoj.gov



Date:  March 18, 2024

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 18, 2024, I electronically filed the foregoing

paper with the Clerk of the Court using the ECF system which will send notification

of such filing to the parties of record.

*/s/ Saima S. Mohsin*
SAIMA S. MOHSIN
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, MI 48226
Saima.Mohsin@usdoj.gov
(313) 226-9100

Date: March 18, 2024

31