UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                    Plaintiff,              CRIMINAL NO. 22-CR-20504

v.                                          HON. JONATHAN J.C. GREY

AWS MOHAMMED NASER,


                    Defendant.
_____

**GOVERNMENT'S SUPPLEMENTAL BRIEF FOR ECF 94, 117, AND 137**
_____

Defendant Aws Naser asked for supplemental briefing "given the amount of time between [evidentiary] hearings," ostensibly to discuss how the information elicited in those hearings supports the arguments he made in his motion to suppress. [R. 185: Transcript (Gerometta) at 122.] But instead of discussing how the testimony elicited at the hearing affects the arguments made in his motion, Naser used his supplemental brief to raise entirely new arguments. This is inappropriate and the Court should ignore arguments not raised before. Nevertheless, the Government will briefly address them because, like his previous arguments, they lack merit. Naser's revolving door of arguments conclusively demonstrates one thing: there is no legitimate basis for suppression.

1

**1.  R. 94: Motion to Suppress Parole Searches**

Naser's motion to suppress was originally based on a theory that the Michigan Department of Corrections (MDOC) acted as a "stalking horse" for the FBI in this investigation. [R. 94]. The defense's "stalking horse" theory was purely speculative and immaterial as a matter of law. As the Government pointed out in its response, this theory has been soundly rejected by the Sixth Circuit. *See United States v. Ickes*, 922 F.3d 708, 712 (6th Cir. 2019).

At the hearing, despite having brought it up only as a footnote in his reply, Naser pivoted to an argument that the search did not satisfy Michigan's parole search condition because it was intended only to harass. After conducting an exhaustive three-day fishing expedition into the FBI's investigation of Naser starting four years before and continuing to three years after the challenged searches to prove this harassment theory, Naser again relegates it to a footnote in his supplemental brief. [R. 97 at 2 n.2] Then, disregarding this Court's clear instruction on page limits, Naser attaches as an "exhibit" additional argument couched as a timeline to support his footnote. This timeline has inaccuracies and reframes events in misleading ways. It includes an entry about a police stop of Naser that there was no testimony on, citing instead to his own previous submissions to support it. The Government attaches a fulsome and accurate timeline as an exhibit here, but the Court should simply ignore this attempt to circumvent its instructions.

Naser does not even attempt to define the term harassment to aid the Court. Naser had to show that the parole searches executed in 2017 were done "with the sole intent to intimidate or harass." Mich. Comp. Laws § 761.236(19). To meet that high burden, Naser must show that the search was "unrelated to rehabilitative, reformative or legitimate law enforcement purposes, or [that] the search is motivated by personal animosity toward the parolee." *United States v. Estrella*, 69 F.4th 958, 972 (9th Cir. 2023) (citing California state court cases). "This prohibition is decidedly narrow: 'It is only when the motivation for the search is wholly arbitrary, when it is based merely on a whim or caprice or when there is no reasonable claim of a legitimate law enforcement purpose ... that a search based on a probation search condition is unlawful.'" *Id.* (quoting *People v. Cervantes*, 103 Cal. App. 4th 1404, 1408, (Cal. Ct. App. 2002), as modified (Dec. 23, 2002)).[1]

Testimony proved the opposite –defense witnesses testified for a full day about the many reasons they had to suspect Naser was an ISIS supporter. Most importantly, he lied to his probation officers about his social media use while talking about his support of ISIS on Telegram and Paltalk. This testimony conclusively proved that the parole searches of Naser were not done on a whim or caprice but for a legitimate law enforcement purpose. Indeed, the investigation of the Paltalk account began as a lead

---

1. *Estrella* relies on California courts' interpretations of the state's parole search condition. As the Michigan legislature based its condition on California's, *United States v. Henderson*, No. 22-1561, 2024 WL 51319, at *2 (6th Cir. Jan. 4, 2024), it is a reasonable interpretation for this Court to follow.

from Los Angeles on an unidentified person. [R. 170: Transcript (McAteer) at 173.]
There could not have been any personal animosity or caprice animating an
investigation into a person known only by a username.

Naser now pivots to an entirely new theory: the search may have been fine, but
seizure of the phone was unlawful. Not so. Naser cites no case holding that
Michigan's parole search condition does not allow the officer to take the phone for a
forensic search. No such case exists. Such a holding would eviscerate the parole
search condition, as phones hold massive quantities of data that is impossible to
review through a cursory look.

On the other hand, there is a holding exactly on point from the Tenth Circuit:
*United States v. Pacheco.* Pacheco had a parole condition that stated he was "subject to
searches of the person and the person's effects, vehicle, residence and property by any
law enforcement officer based on reasonable suspicion." 884 F.3d 1031, 1041 (10th
Cir. 2018). Even though his condition, like Naser's, used only the word search, the
Tenth Circuit affirmed the seizure of his phone based on *Samson. Id.*

Naser's reliance on *United States v. Lewis* is misplaced. In *Lewis*, the defendant
consented to officers coming to take a "look through his laptop and cell phone, not to
engage in an exhaustive examination of all of Lewis's devices or to conduct a forensic
examination of them." 81 F.4th 640, 653 (6th Cir. 2023). After seeing pictures on
Lewis's phone that were potentially child pornography, the officers terminated the
consent search, seized the phone, and obtained a warrant to do a forensic

4

examination. The Court found the warrant invalid. Trying to save the search, the Government argued that Lewis consented to it. But the facts clearly demonstrated that the search Lewis consented to ended at his house, so the Court suppressed the results of a forensic search obtained through an invalid warrant. *Lewis* asked whether the subsequent forensic search was legal. It said nothing about the phone's seizure.

Here, on the other hand, Parole Officer Wright searched Naser's device based on a parole search condition that explicitly allowed a search of his property. Upon doing so, he saw images of ISIS propaganda on the phone. [R. 170: Transcript (Wright) at 127–28.] Once he did so, he appropriately seized the phone so that the evidence on it could not be destroyed before it could be extracted. *See United States v. Herndon*, 501 F.3d 683, 692–94 (6th Cir. 2007). The FBI did not do a forensic search of the phone until after it obtained a valid warrant for it. Unlike in *Lewis*, there is no argument here that the FBI's warrant was conclusory and lacked facts supporting it. While Michigan's parole search condition justifies the FBI's search of the phone, the Government does not even need to rely on it as there was a valid warrant in place.

Accepting Naser's arguments here would lead to ridiculous results. Under his approach, a law enforcement officer can legally search a parolee's home but upon finding evidence of a crime must return that evidence to the parolee and go obtain a warrant to seize and further exploit it. That cannot be what the Michigan legislature intended. As a Court in this district has noted, "to search a phone there must be a seizure . . . one cannot search a phone unless it is first seized, and in possession of the

searching authority." *United States v. Davis*, No. 18-CR-20085-02, 2021 WL 3473246, at *4 (E.D. Mich. Aug. 6, 2021)

Naser also argues, again for the first time, that his Fifth Amendment right was violated when Parole Officer Wright asked him for his passcode. A person who desires the protection of the Fifth Amendment "must claim it or he will not be considered to have been 'compelled'" *Minnesota v. Murphy*, 465 U.S. 420, 427 (1984). Naser does not argue that he was in custody when PO Wright asked for his passcode, that he was in any way threatened, or that his will was overborne. Because he gave the passcode without being compelled and failed to assert his Fifth Amendment right, he cannot now claim it was violated.

### 2.  R. 117:  Motion to Suppress for Exceeding Scope

"The ultimate touchstone of the Fourth Amendment is reasonableness." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). The hearing proved that the agents were careful and reasonable during the search of Naser's home. Suppression is not warranted.

As discussed above with relation to PO Wright's searches, Naser had no expectation of privacy. Accordingly, no search of his person or property could have been unreasonable. The carve out of two rooms in the warrant was never meant to protect him but to protect the privacy of his tenants. One of those tenants gave consent and the other had not moved in yet. Accordingly, no one had their privacy invaded and the Court's query should end there.

Nonetheless, the approach the FBI Special Agent Bomb Technicians took was eminently reasonable. In the same way that a protective sweep for "two-legged threats" needs to check for any place a person may be waiting in ambush, a protective sweep for explosives must check any place where a boobytrap may be waiting in ambush. [R.185: Transcript (Haug) at 22–23.] It is a quick, efficient scan that is just as thorough as necessary to ensure the safety of others. [Id. at 23.] In this case, the sweep of the room in question took <u>less than two minutes</u> and fulfilled the traditional purpose of a protective sweep. [Id.][2] A two-minute check to ensure that nothing in the room will explode and hurt or kill agents is far from the kind of flagrant behavior that merits suppression.

Naser incorrectly claims that SABT Haug "searched" an excluded room. This directly contradicts his testimony that he "didn't search those rooms." [R. 185: Transcript (Haug) at 38.] A full search of a room, as Supervisory Special Agent Sucevic described, is a comprehensive and exhaustive process that could take hours. To suggest that the only meaningful difference between the protective sweep and a search is the seizing of evidence is to ignore all the testimony at the hearings.

Just as the Supreme Court required in *Buie*, the "sweep last[ed] no longer than is necessary to dispel the reasonable suspicion of danger." *Maryland v. Buie*, 494 U.S. 325, 335–36 (1990). While *Buie* was focused on two-legged threats, the SABTs here

---

2. The sweep of the entire house, including ensuring the explosives laboratory Naser set up in between his children's toys was safe for agents to search, took less than 30 minutes. [R. 185: Transcript (Haug) at 24.]

followed this exact direction for explosive and chemical threats: doing no more than was necessary to dispel the reasonable suspicion of danger. As both SABT Davidson and SABT Haug explained, having had agents in the house with the defendant before the sweep did not alone dispel that danger because there could have been explosives that are remote detonated, on a timer or a tripwire, or dangerous chemicals that could hurt agents when handled. [R. 170: Transcript (Davidson) at 217–18; R. 185: Transcript (Haug) at 21–22.] After the protective sweep was done, agents entered the room again only briefly to collect a BB gun that was a clear violation of Naser's parole conditions. They could not leave a dangerous weapon behind. Even then, they consulted with an Assistant United States Attorney before seizing the gun. [R. 171: Transcript (Sucevic) at 39.] The agents took care to conduct themselves in a way that maximized protection of rights while ensuring that no one ended up in the hospital that day. It cannot be said that their actions were unreasonable—they were certainly not so flagrant that they need to be deterred through the extreme remedy of blanket suppression.

Naser does not cite a single comparable case where the entire warrant was suppressed. That's not a surprise. "[T]he Sixth Circuit has never authorized the remedy of blanket suppression." *United States v. Torres*, No. 21-6102, 2022 WL 13983627 at *4 (6th Cir., October 24, 2022). This Court should reject the invitation to break new ground to safeguard the privacy interests of a non-existent roommate.

### 3.  R. 137: Motion to Suppress Naser's January 2013 Statements

As the video evidence demonstrated, Naser was made fully aware of his rights before talking to the police on January 4, 2013. Detective Mark Davis provided Naser with a form listing his rights and Naser can be seen reviewing the form. [R. 185: Transcript (Wood) at 53.] While Naser claimed that he would remain silent, he showed a consistent interest in asking questions about the investigation into him, the search of his house, and FBI's involvement. The video showed Naser comfortable, competent, and in full control of the situation.

Naser cannot claim, and has not claimed, that he was coerced in any way. The only claim Naser makes is that he was not advised of his rights. The video shows conclusively that he was advised of his rights by Detective Davis and that he was fully aware of them. He was interviewed by the FBI 90 minutes later. He was told that the same *Miranda* warnings still applied, that he did not have to talk and that he was free to return to the lockup at any time. [R. 185: Transcript (Christensen) at 66.] Naser then started asking the agents questions about the search warrant. [Id. at 77.] He talked with the agents for 45 minutes without ever indicating that he did not want to speak with the FBI or that he wanted an attorney present. [Id. at 66–67.] Indeed, at the end of the interview, he told them that he had purposely ignored an attorney's advice not to speak to them so that he could tell them everything that he had figured out. [Id. at 67.]

Naser voluntarily, knowingly, and intelligently waived his rights to silence and counsel by talking with the FBI. Just as the video showed with Detective Davis, even though he claimed he would remain silent, Naser could not resist satisfying his curiosity by questioning law enforcement and demonstrating his superior knowledge of the facts, the law, and the moral order. In "some cases waiver can be clearly inferred from the actions and words of the person interrogated." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). In this case, Naser's actions and words clearly demonstrate that he knew his rights but wanted to interrogate and challenge law enforcement regardless.

For the reasons set forth herein, Naser's motions to suppress should all be denied.

Respectfully submitted,

DAWN N. ISON
United States Attorney

*/s/ Saima S. Mohsin*
SAIMA S. MOHSIN
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, MI 48226
Saima.Mohsin@usdoj.gov
(313) 226-9100

*/s/ Dmitriy Slavin*
DMITRIY SLAVIN
Trial Attorney
Dmitriy.Slavin@usdoj.gov

Date:   October 3, 2024

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on October 3, 2024, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the parties of record.

/s/ Dmitriy Slavin
DMITRIY SLAVIN
Trial Attorney


Date: October 3, 2024