UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,                   Case Nos.  22-CR-20504

      v.                        HON. JONATHAN J.C. GREY

                               HON. DAVID R. GRAND

AWS MOHAMMED NASER,

          Defendant.

---

## UNITED STATES' MOTION FOR PRETIAL DETENTION

---

Defendant Aws Mohammed Naser is a bombmaker and self-avowed "son of the Islamic State" (ISIS)—a vicious and brutal militant foreign terrorist organization. Naser's support for ISIS and its precursor stretches back at least to 2012. Naser sought to travel and fight as a terrorist in the Middle East. In early 2012, he traveled to Iraq with a radical convert who eventually died fighting for ISIS. Naser later bragged about his role a murder and robbery during that trip, and how the proceeds were given to other terrorists. Later in 2012, Naser twice purchased a one-way ticket to rejoin the fight, first to Iraq and then to Lebanon. Each time he checked-in for his flight but was denied boarding.

So, Naser turned his fight inward on America. With careful study and the aid of ISIS instruction, he gathered explosive materials and drones. Discovery of his ISIS

1

materials led to the execution of search warrants. Agents found him with dangerous weapons. Worse, they uncovered his basement bomb lab ready to assemble an improvised explosive device (IED)—a scourge of American soldiers and civilians alike. Because of Naser's actions, a grand jury indicted him on attempted material support for ISIS and for being a felon in possession of a destructive device.

Naser was on parole because his violence is more than aspirational. He is a convicted armed robber who practices aggression against those within his reach—his mother, ex-wife, coworkers, and school officials. He refused to comply with Court ordered supervision and has remained violent while on parole and in custody. While under parole supervision, Naser slashed his coworker's tires, possessed dangerous weapons, and lied to his parole agent. His parole was revoked and he responded to custody with dozens of misconducts for serious offenses like possessing dangerous weapons and refusing to follow prison rules. He hasn't changed. During his current detention, he was again cited for possessing a homemade weapon.

Naser's terrorism charge carries a presumption of detention under 18 U.S.C. § 3142(e)(3) and is a twenty-year felony. His felon in possession of a destructive device charge is a fifteen-year felony. With all of this—his galvanized support for ISIS, his determination to have weapons, his repeated physical violence, his bomb-making while on parole, his obstinate refusal to comply with any supervision (in and out of custody, state and federal), and the presumption against releasing him—he has asked this Court to trust him on its supervision.

2

Naser's violence, bomb-making, and meticulous plotting to support ISIS make him a danger to the community. He has also repeatedly said he wants to leave the US and earlier obtained an Iraqi passport in a different name. With his severe potential penalties and refusals to comply with supervision, his flight risk is extreme. He should be detained until trial this Spring.

What's more, he has moved this Court to apply the extraordinary relief of the All Writs Act. But he did so without making an argument, or even a motion with the required effort at concurrence. This Court should find this perfunctory argument to be waived or should strike it for non-compliance with the rules.

## I.    BACKGROUND

### The Islamic State of Iraq and al-Sham (ISIS)

ISIS is a well-known anti-American terrorist organization.

In 2004, the U.S. Secretary of State (the Secretary) designated al Qaeda in Iraq (AQI), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization (FTO) under section 219 of the Immigration and Nationality Act (INA) and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224. In 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS. To date, ISIS remains a designated FTO. Then Secretary of State John Kerry described ISIS's brutal tactics—which include beheadings and taking

slaves—as "more extreme even than al Qaeda."[1]

### Naser Radicalizes and Attempts to Travel to Syria to Fight for Terrorists

In his early 20s, Naser radicalized and vocally supported extremist Islamist ideology. For example, in 2011, Naser maintained a YouTube channel and frequently posted extreme content, including his self-description: "Jihad for the Sake of Allah is all i Want in this life. And if i Get Martydom ill Ask Allah if i can go Back and do it Agian."

Naser contemporaneously developed a close relationship with Russell Dennison, an aspiring Islamic Salafi-Jihadist preacher from Tampa, Florida. With their shared ideology, the pair made plans to leave the US in early 2012 and jointly travel to Iraq. Naser (an experienced translator) agreed to aid Dennison, a convert who did not speak or understand Arabic.

On January 7, 2012, Dennison's close friend, Sami Osmakac, was arrested by the FBI in Tampa and charged with attempting to use a weapon of mass destruction against persons and property in the United States in violation of 18 U.S.C. § 2332a. Fearing arrest, Dennison fled Tampa and flew to Detroit where he stayed with Naser in his home for about a week before going to Iraq. Naser followed Dennison to Iraq and the pair spent several weeks traveling to Erbil and Mosul. By April 2012, Dennison left Iraq and began his months-long journey through Jordan and Lebanon

---

[1] https://www.nbcnews.com/storyline/iraq-turmoil /more-extreme-al-qaeda-how-isis-compares-other-terror-groups-n135516.

to Syria, where he joined the foreign terrorist organization Al Nusrah Front, an Islamic State of Iraq-affiliated group that was a precursor to ISIS. Dennison pledged himself to Al Nusrah Front and later ISIS, and fought for them in Syria until approximately 2019, when it is believed he was killed.

Using a new Iraqi passport in the name Aws Naser Al-Ogaidi, Naser returned to his home in Michigan in August 2012 and immediately began preparations to join Dennison in Syria. The pair continued to communicate, sometimes using coded language. On September 11, 2012, Dennison wrote to Naser that he had "made it" to the place "where we talked about going." Dennison told Naser that he could come through Lebanon or Turkey and asked Naser to "save up some money to buy some nice things." Naser later told the FBI that that meant a weapon, most likely an AK-47, and that he agreed to give Dennison the funds. Dennison told Naser that "a nice thing" costs about $1,200, and asked Naser to bring enough money for them both to acquire the weapons. Dennison also old Naser that he should "pack really light, just enough for a small backpack because you have to travel through the mountains for about 5 hours." Finally, Dennison asked Naser to let him know when he was ready to travel. Naser replied on September 13, 2012, and told Dennison, "I need more time like 2 months or less" and "don't worry i will have enough by the will of Allah."

On September 14, 2012, Dennison told Naser he was in "a city near the border with Lebanon," where he arrived after a 5-hour march through the mountains. Dennison told Naser that he did not have the things he needed and again asked Naser

to bring enough money for them both to acquire firearms. Dennison explained that "the brothers just finished a big war" and were low on funds. Dennison reported they were bombed day and night and "it is really bad here." Dennison stated they were preparing for the next battle and "we really need funds for a weapon to take down the planes." Finally, Dennison asked Naser to "come soon and come prepared, get ready, it is real here and this place needs us more than anywhere else" and that many of the brothers there are "new to real islam just from the war."

Naser answered the same day and expressed frustration that he was not with Dennison, stating, "If i could be there now i would already be." Naser told Dennison he would bring the money they both needed, and "you Never have to pay anything back what i give & do is only for Allah." Naser explained, "i know 2 months is a long time but i promise you if it is less then that I will already be there. 1 month or 3 weeks insha allah. Akhi i will be there as soon as possible INSHA ALLAH!!"

Naser purchased a one-way plane ticket bound for Iraq and, on November 7, 2012, he traveled to Detroit Metropolitan Airport (DTW) and checked in for a flight to Erbil, Iraq via Chicago, Illinois and Istanbul, Turkey. Naser had a sword concealed in a cane, a four-inch tactical knife, and a Yardage Pro 4-12x42 Laser Rangefinder Riflescope in his checked luggage. Naser was not permitted to board the plane.

Undeterred, Naser searched the internet for alternative routes (airports in Mexico and Canada), entry requirements for Egypt, Lebanon, Tunisia, and Iraq, information about refugee seekers to Norway, and the cost of living in Lebanon and

Iraq.  On December 29, 2012, Naser purchased another one-way plane ticket departing from Chicago's O'Hare Airport at 9:30 p.m. on January 2, 2013, bound for Beirut, Lebanon via Amman, Jordan. Naser also purchased a Greyhound bus ticket from Detroit to Chicago departing at 7:00 a.m. on the morning of the flight.

Hours before his January 2, 2013, scheduled flight to Lebanon, Naser robbed one gas station and damaged property at another. The first occurred on January 1, 2013, at a Sunoco Gas Station in Detroit where Naser had recently worked and had been fired. At approximately 10:15 p.m. on January 1, 2013, Naser entered the Sunoco and purchased 6 quarts of motor oil. He poured oil all over candy bars and in the ATM machine, the EBT and credit card machines, causing significant damage.

Thirty-three minutes later, at 10:48 p.m., Naser entered a Mobil Gas Station in Bloomfield Township where, several weeks earlier, he had worked and been fired upon suspicion of theft. Naser walked directly to a store shelf and grabbed a package containing pepper spray. Armed with the pepper spray, Naser assaulted and robbed the cashier. The cashier suffered large bruises on his head, a scrape on the left side of his face, and injuries to his eyes from the pepper spray.

Naser then took a bus to Chicago and attempted to board his January 2, 2013, flight to Lebanon. He was again denied boarding and returned to Michigan. The following day, Naser recorded a video falsely labeling Dennison an FBI informant and posted the video on his YouTube channel.

**Naser is Imprisoned and ISIS Rises to Prominence**

On January 4, 2013, Naser was charged with armed robbery for his conduct at Mobil. He was convicted after a jury trial and sentenced to 3 to 20 years. During his incarceration, the Islamic State of Iraq became ISIS and its leader, Abu Bakr al-Baghdadi, announced a merger with Al Nusrah. ISIS seized territory and declared a Caliphate. Its leaders directed adherents to either (1) travel to the Islamic State (perform Hijrah), or (2) engage in attacks in their homelands. ISIS, described as "an organization whose brutality is shocking even by the standards of terrorism," *United States v. Ahmed*, 107 F.Supp.3d. 1002, 1005 (D. Minn. 2015), inspired numerous individuals to commit terrorist acts resulting in mass casualties in the United States and elsewhere. ISIS published articles in its propaganda news magazines, released wildly popular propaganda videos, and advised individual followers through social media to engage in attacks. Moreover, these same platforms often included information on how to conduct these attacks.

**Naser's Steadfast Support for ISIS Includes Building Explosives**

Naser had been ordered deported upon his release from state prison, but his deportation order was unexpectedly rescinded by an ILJ in March 2016. As a result, Naser was paroled on March 18, 2016. Unable to travel to join ISIS, Naser focused his attention on how to support ISIS in the United States. However, because he was under supervision, Naser was careful to hide his activities. Naser used two cellular phones—an iPhone 7 Plus, which he disclosed to his parole agent, and an LG phone,

which he kept hidden. Naser surreptitiously created social media accounts on Telegram and PalTalk. Using monikers like "MuslimX1" and "ISxxxIS", Naser joined invitation-only ISIS supporters' chatrooms, groups, and private rooms where he obtained and viewed official ISIS media reports, publications, and other jihadi propaganda. He voraciously consumed ISIS and other jihadi propaganda depicting and promoting violent extremism and he collaborated with ISIS supporters and bombmakers. He solicited and obtained information on explosives and experimented with manufacturing explosives and operating drones.

On May 27, 2016, Naser activated a Telegram bot called "ISxOne1Bot." Bots can be programmed to remind, connect, broadcast, and integrate with other services. Bots can also be used as a method of anonymizing messages and storing content. Naser used his bot as a secure way to store information, often forwarding important messages and content from his Telegram account to his Bot. For instance, on March 12, 2017, Naser forwarded a recipe for the explosive Copper Azide to his Bot. The recipe had been posted in the Telegram chatroom by a self-proclaimed ISIS bomb-maker via his Telegram account: "MUJAHIDEEN_SECRETS_BOT."  Naser also forwarded the ISIS *bayat* (oath) which begins in Arabic with "We renew our oath of allegiance to Caliph Abu-Bakr al-Baghdadi…" to his bot on July 7, 2017.

Naser actively solicited information on explosives. For instance, during an April 15, 2017, PalTalk chat, Naser asked a participant in Arabic, "do you know how to make explosives?" That same day, Naser downloaded and viewed an explosives

9

video which contains step-by-step instructions on how to use household products to assemble a homemade bomb for use in a terror attack. The video was produced by the Ibn Taymiyyah Media Center (ITMC), a Gaza-focused jihadi media group, and posted on its Telegram and Twitter accounts and elsewhere on April 26, 2016. This video demonstrated the process to make a homemade bomb from acetone peroxide, using metal balls for shrapnel. The video recommended using the bomb in closed spaces like busses, restaurants, or similar locations, where it would be most effective and cause the most harm. Naser downloaded the video from Telegram on April 15, 2017. Naser's explosives-making materials were in lock-step with the instructions detailed in the video.

Naser also experimented with manufacturing explosives. During an August 5, 2017, ISIS Supporters chatroom discussion, Naser told a user, "You taught me a very useful thing" … "How to cook a dish 😉" which was "a procedure to roast [or grill]." Between August and October 2017, Naser communicated in Arabic with a user who appeared to be instructing Naser on the manufacture of explosives. During one discussion in a private PalTalk chatroom on September 15, 2017, Naser was asked if he was able to successfully manufacture the detonator. When Naser agreed that he had, the instructor told Naser he would give him another recipe and the pair agreed to continue their discussion on Telegram.

In June-July 2017, Naser participated in a Telegram ISIS supporters chatroom in which numerous users sought information about explosives, detonators, and/or

explosives belts. For instance, one user "Islam is above all: Al-Ahwazi" posted a request (in Arabic) for a simple teaching about how to make a bomb to be planted in some place, or how to make an explosives belt. Another user "I will avenge God's religion" posted a link to a simplified course in manufacturing explosives. A user named "Al-Bihani" told participants in the chat in Arabic: "I want an explosive material but not tnt for an explosive belt and it can be obtained from easily-accessible material and it is of a strong effect." An unnamed user asked participants if there was a way to produce a detonator using acetone peroxide. In addition to discussions about explosives, there were posts on the use of the Kalashnikov weapon, and how to extract ricin poison from castor oil seed, its effects, and the amounts needed to kill a child or adult.

Naser came to the attention of law enforcement in California in April 2017 after an undercover DEA employee reported hearing a user (later identified as Naser) make statements in the PalTalk ISIS supporters chatroom, bragging about his real-world support for ISIS and encouraging others to do the same. Naser also bragged about his role in the murder and robbery of a Christian gold shop owner in Mosul, Iraq in 2012. According to his retelling, Naser and others watched the man, entered his store, killed him, stole his gold, and then gave the stolen gold to Mujahedin.

When parole agents conducted a home visit on May 19, 2017, they were concerned when they observed Naser was sleeping on the floor in a separate room from his wife (from whom he was not estranged at that time) in an effort to be pious;

11

a drone manual; and Arabic handwritten statements which when translated, included the statements:  "I am the son of the Islamic State. If the mountains swayed, I will not sway" and "We are soldiers of the Caliphate, we shoot with word and a bullet."

At the next home visit on August 16, 2017, parole agents learned that Naser had lied to them in violation of his parole conditions. Since his release from prison, Naser claimed he did not have any social media accounts and only disclosed his use of an iPhone 7 Plus. During the home visit, Naser attempted to hide another phone—an LG—from his parole agent by placing it behind his back as he sat down. When the agent examined the LG phone, he immediately recognized ISIS propaganda images and videos. Naser also stored on the LG phone numerous previously undisclosed social media accounts, including Facebook, Instagram, Snapchat, Skype, Twitter, PalTalk, Telegram, WhatsApp, and YouTube. Naser also had downloaded on the LG phone applications to securely browse the both the internet and the dark web with anonymity, including the Tor browser (for anonymity and access to the dark web), Orfox (an encrypted browser), and Orbot (another encryption aid).[2]

### Naser is Found with a Bomb-Making Lab While on Parole

On October 30, 2017, the FBI searched Naser's home and vehicle pursuant to federal search warrants. Naser had moved into the basement. He moved his wife and children out of the home and Naser had a tenant living in one of the upstairs

---

[2] *See* What is the Tor Browser?: A Guide to the Dark Web Browser (vpnoverview.com); Orfox - Guardian Project; What is Orbot and how to use its VPN (nerdschalk.com)

bedrooms. In the basement, agents located Naser's makeshift bed on the floor, a computer, weapons, drones, and other items. Specially trained FBI Special Agent Bomb Techs also located in a corner of the basement numerous chemicals and other components.

The FBI's Explosives Unit expert examined the evidence and concluded that Naser possessed the three key ingredients of the high explosive, triacetone triperoxide, or TATP[3]—acetone, sulfuric acid, and hydrogen peroxide, and that the items found during the search were components comprising a main explosive charge, precursor chemicals of a main explosive charge, main charge containers and components for an electrical fuzing system. If properly assembled, these items would comprise a destructive device. Naser had numerous mini light bulbs, like Christmas tree lights, which are commonly used by bombmakers as initiators in the fusing system. He had switches, digital timers, and two-way radios which can also be used as arming and/or firing switches, and power sources in the fusing system. And he had fragmentation—specifically hunting pellets and copper BBs. If attached to the main charge container, they can be propelled outward at great velocity once the bomb

---

[3] Islamic extremists often refer to TATP as "the Mother of Satan" for its devastating instability. TATP has been used in major terrorist attacks, including the attempted Christmas Day bombing of Delta airlines flight 253 over Detroit, Michigan in 2009. (*United States v. Abdulmutallab*, EDMI 10-20005, ECF No. 90, PgID.513), the March 2016 Brussels bombings, the November 2015 Paris attacks, and in the 2005 London bombings. *See* https://www.washingtonpost.com/news/checkpoint/wp/2016/03/23/the-type-of-bombs-used-in-brussels-have-been-seen-before/

explodes and can cause property damage, serious physical injury and/or death. Numerous other items, such as glass measuring cups and jars, coffee filters, gloves, a syringe, squeeze bottles, sandpaper, and tools, were also found co-located with wiring and electronic components. The FBI's explosives experts compared the materials found in Naser's basement with the materials used in the ITMC video and concluded that Naser possessed the same materials (and/or their functional equivalent) recommended for use in the video.

### Naser's Dangerous Handheld Weapons

Naser also possessed numerous dangerous weapons, including: a sword concealed in a cane, an airsoft gun and CO2 cartridges, a stun gun, several tactical knives, one round of .38 caliber ammunition, copper BBs, and hunting pellets. Here are photos some of his dangerous weapons from that day.



**Cane Sword**

 

**Smith & Wesson BB/air soft gun and**
**CO2 cartridge**                        **Stun-gun**

 

**Serated knife with hand guard**        **Knife with metal knuckle grip**

 

**Folding knife (Tanto blade)**                **Folding knife**





**.38 caliber ammunition**          **CO2 cartridges**

**Naser's Drones**

Naser had several drones of varying sizes, remote controls, and other materials related to drones. On a work bench adjacent to the explosives-making materials, he had been working on customizing drones (shown here).



16

**Naser Earns Dozens of Prison Misconducts**

Naser was arrested on October 30, 2017, and charged with 50 parole violations during the 18 months he was on parole. On January 18, 2018, Naser was found guilty of many of the most serious violations at a hearing, including for violating state law involving the malicious destruction of property; assaultive, abusive, threatening and/or intimidating conduct involving slashing vehicle tires; possession of dangerous weapons, including a firearm (airsoft gun), knives, a concealed sword, a stun gun, and ammunition; for failing to notify the police of his contact with law enforcement, and submitting a false and inaccurate report to his parole agent. Naser's parole was revoked was returned to custody for a period of 60 months. (Gov't Ex. 1). His maximum discharge date from state parole is January 3, 2033.

During the three years he was in custody for armed robbery (2014-2016), Naser accrued 8 misconduct violations, including for possessing dangerous contraband (a razor), disobeying a direct order, being out of place, and failing to follow the rules. During the time he was returned to custody after violating his parole (2017-2022) Naser accrued an astounding 31 additional misconducts in prison for: fighting, creating a disturbance, possession of contraband, destruction/misuse of property, possessing forged documents/forgery, possession of stolen property/theft, unauthorized occupation of a cell, disobeying a direct order and for being out of place. (Gov't Ex. 2)

Naser has been in federal custody at FCI Milan since his November 2022 arraignment. On January 20, 2023, Naser was given a 30-day disciplinary sentence in the Special Housing Unit, a 120-day loss of email and visitation privileges, and a loss of 41 days of Good Time Conduct after a 5-inch-long homemade weapon with a sharpened point at one end was found in his cell. (Gov't Ex. 3). On February 14, 2023, Naser was found to have engaged in phone abuse. As a result, he lost his ability to use the phone for the month of June 2023, lost commissary for 60 days, and lost 13 days of Good Time Conduct.

### Naser Intends to Leave the United States

Naser left the US in 2012. Later that year, he twice tried to travel to the Middle East to perform Hijrah. Since being denied that travel by air, he has repeatedly stated that he wants to leave the United States. He has researched driving into Canada and Mexico as methods to avoid future law enforcement efforts to prevent him from flying. Naser has also used an Iraqi passport in another name.

## II.   ARGUMENT

Under the Bail Reform Act, a defendant must be detained pending trial if "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). The Act requires detention whenever the defendant is either a risk of nonappearance or a danger to the community. *See id.*; *United States v. Hazime*, 762 F.2d 34, 37 (6th Cir. 1985). Dangerousness "must be

'supported by clear and convincing evidence.'" *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010) (quoting 18 U.S.C. § 3142(f)(2)). But the risk of nonappearance may be shown by a preponderance of the evidence. *Hazime*, 762 F.2d at 37.

### The Statutory Presumption Against Releasing Naser

"When a 'judicial officer finds that there is probable cause to believe' that a defendant committed one of the crimes listed in section 3142(e)(3), there is a presumption in favor of detention: 'Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community[.]'" *Stone*, 608 F.3d at 945 (quoting 18 U.S.C. § 3142(e)(3)). "A grand jury indictment, by itself, establishes probable cause [for] . . . the crime with which he is charged." *Hazime*, 762 F.2d at 37. The "presumption in favor of detention imposes only a 'burden of production' on the defendant, and the government retains the 'burden of persuasion.'" *Stone*, 608 F.3d at 945 (citations omitted). "Although a defendant's burden of production 'is not heavy,' he must introduce at least some evidence." *Id.*

"Even when a defendant satisfies his burden of production, however, the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." *Id.* (citations and quotations omitted). "The presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." *Id.* "To rebut the

19

presumption, therefore, a defendant should 'present all the special features of his case' that take it outside 'the congressional paradigm.'" *Id.* at 946.

Here, the grand jury indicted Naser for attempting to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B. So, there is probable cause. And there is a rebuttable presumption of detention for "an offense listed in section 2332b(g)(5)(B) of title 18, United States Code, for which a maximum term of imprisonment of 10 years or more is prescribed[.]" 18 U.S.C. § 3142(e)(3)(C). Title 18 U.S.C. § 2339B is listed in 18 U.S.C. § 2332b(g)(5)(B), carries a maximum term of imprisonment of 20 years or more, and triggers the presumption. *See United States v. Musaibli*, No. 18-20495, 2022 WL 1695765, at *10 (E.D. Mich. May 26, 2022) (where defendant was charged with providing or attempting to provide material support to a designated foreign terrorist organization, contrary to 18 U.S.C. § 2339B, the crimes are "so serious that they trigger a rebuttable presumption of pretrial detention under the Bail Reform Act."). Pursuant to 18 U.S.C. § 3142(e)(3), "it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community."

Naser cannot overcome the presumption of detention.

### The 18 U.S.C. § 3142(g) Factors Favor Detention

The relevant factors are in 18 U.S.C. § 3142(g) and include the nature and circumstances of the offense, the weight of the evidence of dangerousness, the

defendant's history and characteristics, and the nature and seriousness of the danger posed by the person's release." *United States v. Hoskins*, 181 F.3d 105 (6th Cir. 1999).

### *Nature and circumstances—18 U.S.C. § 3142(g)(1)*

Naser 's crimes implicate many express factors in 18 U.S.C. § 3142(g)(1).

To start, count one is a federal crime of terrorism, which is an express factor. *See* U.S.C. § 3142(g)(1) ("whether the offense is . . . a Federal crime of terrorism"). 18 U.S.C. § 2332b(g)(5)(B) specifically lists 18 U.S.C. § 2339B (relating to providing material support to terrorist organizations) as a "Federal crime of terrorism." "There is no question that the crimes here are among the most serious with which a defendant in federal court can be charged." *United States v. Musaibli*, No. 18-20495, 2022 WL 1695765, at *10 (E.D. Mich. May 26, 2022). And the "grave nature of the crimes charged in this case weighs heavily in favor of continued detention." *Id.  See also United States v. Ceasar*, 10 F.4th 66, 79 (2d Cir. 2021) ("Terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal."); *United States v. Hendricks*, No. 16-265, 2019 WL 1282222, at *4 (N.D. Ohio Mar. 19, 2019) ("There is no question that [the defendant] engaged in a serious criminal offense. ISIS. Terrorism. Those terms alone would likely be enough for an ordinary citizen to insist that [the defendant] spend the rest of his life in prison.").

Next, Naser's criminal activity involved his possession and willingness to use explosives, destructive devices, and firearms. This is another listed factor. *See* 18

U.S.C. § 3142(g)(1) ("whether the offense . . . involves a firearm, explosive, or destructive device "). Agents found him with dangerous weapons. Worse, they uncovered his basement bomb lab with a ready-to-assemble IED. When agents tested a replica of Naser's planned IED, it caused terrible damage.

Naser's offense carries a stiff penalty. Title 18 U.S.C. § 2339B carries a maximum term of imprisonment of 20 years. And his charge for being a felon in possession of a destructive device carries up to 15 years. These penalties reflect the serious nature of these crimes. *See, e.g., Baldwin v. N.Y.*, 399 U.S. 66, 68 (1970) ("In deciding whether an offense is 'petty,' we have sought objective criteria reflecting the seriousness with which society regards the offense . . . and we have found the most relevant such criteria in the severity of the maximum authorized penalty.").

### *Danger to community or anyone—18 U.S.C. § 3142(g)(4)*

Naser is a clear danger to the community. He is violent and has a long history of possessing dangerous weapons. He practices aggression against those within his reach—his mother, ex-wife, coworkers, and school officials. He refused to comply with Court supervision and has remained violent while on parole and in custody. While under parole supervision, Naser slashed his coworker's tires, and possessed dangerous weapons. His parole was revoked and he has earned numerous prison misconducts in for possessing dangerous weapons. The Sixth Circuit has upheld the pretrial detention of defendants on dangerousness grounds based in part on weapons found in the defendant's homes. *See United States v. Abboud*, 42 Fed. App'x 784 (6th

Cir. 2002); *United States v. Ramsey*, 110 F.3d 65 (table), 1997 WL 135443, at *1 (6th Cir. March 24, 1997).

He has committed himself to ISIS, and his commitment has never wavered. His "interest in committing actual, physical violence . . . and lack of concern about the likelihood of killing civilians, through the use of weapons of mass destruction, firearms, and other means . . . weigh in favor of detention." *Stone*, 608 F.3d at 948.

### Weight of the evidence—18 U.S.C. § 3142(g)(2)

This factor "goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt." *Stone*, 608 F.3d at 948. *See also Hazime*, 762 F.2d at 37 (the weight of evidence against the person "deals with the factors to be considered in determining whether there are conditions which will assure the appearance of the accused and safety of the community"). Here, the weight of the evidence of defendant' dangerousness and risk of non-appearance is strong. "The principal and most damning element of the government's case certainly is the defendant's own narrative of his service to the ISIS cause[.]" *United States v. Musaibli*, No. 18-20495, 2022 WL 1695765, at *10–11 (E.D. Mich. May 26, 2022). Naser's pro-ISIS statements are powerful evidence of his dangerousness. *Id.* ("the admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct.") (citing *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991)). And Naser's stated intentions are corroborated by his claimed actions in Iraq in 2012, his voracious consumption of terrorist propaganda, his

support of other terrorists, his accumulation of weapons and explosives, and his extraordinary efforts to hide his activities.

*History and characteristics—18 U.S.C. § 3142(g)(3)*

### a. Criminal history

Naser is 35 years old. And throughout his years, he has built a volatile and violent history. He has shown no regard for the law. He has repeatedly engaged in acts of aggression and violence to retaliate against those he perceives have wronged him. Naser's conduct on probation and parole show he is unwilling to comply with court ordered conditions of release.

On April 4, 2006, Naser (age 18) was charged with disorderly conduct on school property. After pleading guilty under advisement, Naser received a two-year diversionary sentence.  Naser violated the terms of his probation, his diversion was revoked, and he was convicted of the misdemeanor on December 12, 2006.

At age 19, Naser was arrested by the Dearborn Police Department for assault and battery. Naser's mother alleged that during an argument, he shoved her over the couch, flipping it, and caused her to fall to the floor. Naser stood over her, pointed his finger in her face, swore at her, and then grabbed an apple and threw it against the wall. She was not injured but told police Naser had physically assaulted her in the past. After Naser was arrested and charged with misdemeanor domestic violence, he failed to appear for a settlement conference and a warrant was issued. He was arrested on the warrant days later. Naser pleaded guilty to assault and battery on April 13, 2008,

and received a year of probation along with a diversionary disposition under the Holmes Youthful Training Act.

On March 8, 2011, Naser (age 22) was arrested and charged with driving with a suspended license. He pleaded guilty to this offense on September 25, 2012.

On January 4, 2013, Naser (age 24) was arrested and charged with armed robbery. On January 1, 2013, Naser stole money from a Mobil Gas station, and assaulted and pepper-sprayed the store clerk. Naser had previously been fired from this gas station on suspicion of theft. Naser was convicted after a jury trial and sentenced to a term of 3 to 20 years in prison.

Naser was paroled in March 2016. Just over a year into his parole on April 3, 2017, Naser slashed two tires of a co-worker's vehicle. The victim told police that he and Naser had worked together at a Citgo gas station. The victim reported that Naser held him responsible for making disparaging remarks about him to their boss and getting him fired. Naser retaliated against the victim by slashing his tires. Naser was arrested that July and then convicted of Breach of the Peace on October 11, 2017, and sentenced to three months' probation.

Naser was found guilty of having violated numerous parole conditions. His parole was revoked he was returned to custody for a period of 60 months. During his incarceration, he accrued dozens of misconducts. His maximum discharge date from state parole is January 3, 2033.

25

### b. Marital Status and Children

Naser is not currently married. Although not legally married, Naser lived as husband and wife with Noor Al-Bahiya in Westland, Michigan from 2010 until September 2017 (approximately). The couple has three young children, born in 2011, 2013, and 2017.

On August 10, 2017, when she was approximately 8 months pregnant, Ms. Al-Bahiya filed a petition for a Personal Protection Order (PPO) with Wayne County Third Circuit Court. Ms. Al-Bahiya described a history of domestic violence. Specifically, she alleged that in January 2017 [while he was on parole], Naser "punched me a couples [sic] times and choked me for a few seconds." In February 2017, Naser threatened to kill her and their daughter, and to take their son and leave. When seeking the PPO on August 9, 2017, Ms. Al-Bahiya alleged that Naser threatened to take their children to Iraq, whether she liked it or not.

Ms. Al-Bahiya gave birth to the couple's third child in late September 2017. At that time, Naser planned to rent out the three bedrooms of their home to tenants so he gave Al-Bahiya an ultimatum: she could either move into the basement with their three children or live with his brother and his family. A few days after the birth of their third child, Al-Bahiya moved out of the home In November 2017, Al-Bahiya dissolved her union with Naser though an Islamic divorce.

A review of jail calls shows Naser repeatedly attempted to persuade Al-Bahiya—directly and through his mother—to testify falsely at his December parole

revocation hearing and claim responsibility for the BB gun found in the home after she moved out. Al-Bahiya refused and Naser made threatening statements. For instance, in one call in Arabic on February 6, 2018, Naser told his mother, "She [Al-Bahiya] better pray and fast and wish that I don't get out of jail. I will not live in injustice. She has to go and testify." Later in the call, Naser told his mother, "I will not let her escape from this reality. The reality she put me in by not coming to testify. She will not escape this reality. I am not going anywhere, even for another five years. She can't escape me."  In another call with his mother in Arabic on February 6, 2018, Naser threatened, "She [Al-Bahiya] will regret it if she does this. She and everyone that helped her with this case, they will regret it." Aws says that he is destined by Allah to do something to Al-Bahiya, it might be good or it might be bad, only Allah knows, and added that Al-Bahiya will decide if what happens is good or bad.

### c.  Education and Employment

According to his 2013 MDOC Presentence Investigation Report (PSR), Naser dropped out of high school in the 11th grade and may have acquired a G.E.D. in 2007. He attended Henry Ford Community College until December 2010 but did not complete a degree. He was banned from the campus in March 2011 because he was loud and disruptive and refused to quiet down or leave, and because he was combative with Campus Safety personnel and made direct attempts to provoke the officers. While on parole, Naser briefly attended Schoolcraft Community College. He was a student in June 2016, but he did not re-enroll for the summer or fall of 2017.

Naser's employment history is sporadic and unstable. He has exhibited an inability to maintain stable employment and has had several serious and violent conflicts with former employers and co-workers. Prior to his armed robbery conviction, Naser quit his job as contractor linguist (having worked there from 2007-2008). He worked as a pizza delivery man from August through November 2012, and reportedly quit this job. Naser was employed for a few weeks at a Mobil gas station in November 2012, but he was fired and later robbed the business. He was an employee for Sunoco gas station from November to December 2012, and was also fired from this job for stealing lotto tickets, and later exacted retribution by damaging property. While on parole between March 2016 and October 30, 2017, Naser was again fired from a gas station.

### Naser is Also Flight Risk

Naser was born in Iraq in 1988 and has family there. Naser traveled to Iraq from February through August 2012. While there, he obtained a passport from the Republic of Iraq in the name Aws Mohammed Naser Al-Ogaidi. Later that year, he twice tried to travel to the Middle East to continue his terrorist activities. Since being denied that travel, he has repeatedly stated that he wants to leave the United States. He has researched driving into Canada and Mexico as methods to avoid future law enforcement efforts to prevent him from flying. Naser's consistent desire to leave the country undermines any reasonable assurance that he would not flee. *United States v. Musaibli*, No. 18-20495, 2022 WL 1695765, at *11 (E.D. Mich. May 26, 2022) ("The

record supplies no good grounds for any sound assurance that the defendant would

not employ any means at his disposal to flee the jurisdiction if released.").

### There are no Viable Alternatives to Custody

Additional conditions will not prevent him from continuing those activities.

For example, a "tether offers little assurance of an appearance or an intent to forego

activities that pose a danger to the community." *United States v. Tawfik*, No. 17-20183-

2, 2017 WL 1457494, at *8 (E.D. Mich. Apr. 25, 2017); *see also United States v. Edwards*,

No. 07-20605, 2010 WL 157516, at *5 (E.D. Mich. Jan. 13, 2010) (agreeing that tether

"would be entirely insufficient to either [e]nsure Defendant's appearance or protect

the community from the danger posed by Defendant"). Monitoring does nothing to

mitigate the risk he poses to (in his own words) the "savages" and "rabid dogs" in his

community. *See  United States v. Cureton*, No. 12-20287, 2013 WL 4496276, at *2 (E.D.

Mich. Aug. 21, 2013) (where a defendant is part of a violent organization, a GPS

tether "would not alleviate the danger that Defendant poses to the community").

The fact that Naser's passport was seized "merely makes it more difficult—not

impossible—to abscond internationally." *United States v. Tawfik*, No. 17-20183-2, 2017

WL 1457494, at *8 (E.D. Mich. Apr. 25, 2017). Plus, surrendering one's passport

"obviously does nothing to restrict one from engaging in behavior that endangers the

community." *United States v. Tawfik*, No. 17-20183-2, 2017 WL 1457494, at *8 (E.D.

Mich. Apr. 25, 2017).

A third-party custodian would not lessen Naser's dangerousness. *See, e.g., United States v. Wood*, No. 19-20216, 2020 WL 4791205, at *3 (E.D. Mich. Aug. 17, 2020) ("While [defendant's] third-party custodian may be well intentioned, the Court does not have confidence that [defendant] is."). And Naser's family would not be a suitable third-party custodian because defendant was already in relationship with them when he was committing his crimes. *United States v. Perry*, No. 16-20062, 2017 WL 1364083, at *10 (E.D. Mich. Apr. 7, 2017).

### Naser's Michigan Parole Board Allegations and Perfunctory Reference to the All Writs Act

Naser offers no evidence to rebut the presumption of detention. Instead, he makes passing reference to the All Writs Act (the Act) and asks for extraordinary relief. The Court should not consider this perfunctory request to interfere with the state criminal justice system by ordering his unconditional release from MDOC confinement. Naser does not bother to cite <u>any</u> case or make the effort to explain why it might apply here. This is not how one makes an argument; it is how it is waived. *See Thomas v. United States*, 849 F.3d 669, 679 (6th Cir. 2017) ("A party waives issues that he adverts to in a perfunctory manner, unaccompanied by some effort at developed argumentation."); *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones." (internal quotations omitted)).

And the Act does not apply. The Act provides, in relevant part, that "all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651. "Notably, the statute does not provide federal courts with an independent source of jurisdiction to issue writs, but only with the authority to issue writs in aid of their respective jurisdictions." *Baze v. Parker*, 632 F.3d 338, 345 (6th Cir. 2011) (citing *United States v. Perry*, 360 F.3d 519, 533 (6th Cir. 2004); *Clinton v. Goldsmith,* 526 U.S. 529, 534–35, 119 S.Ct. 1538, 143 L.Ed.2d 720 (1999) (All Writs Act does not "enlarge" federal court jurisdiction, but permits court to issue a writ of mandamus "in aid of its existing statutory jurisdiction.").

There is no federal jurisdiction over state parole decisions because there is no entitlement to parole. *See Crump v. Lafler*, 657 F.3d 393, 404 (6th Cir. 2011) ("There is no 'legitimate claim of entitlement to' parole, and thus no liberty interest in parole.") (citations omitted); *Ward v. Stegall*, 93 F. App'x 805, 806 (6th Cir. 2004) (the "Michigan parole scheme does not create an expectation regarding parole that is sufficient to trigger a constitutionally protected liberty interest.") (quoting *See Sweeton v. Brown,* 27 F.3d 1162, 1164–65 & n. 1 (6th Cir. 1994)); *Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1, 7 (1979) (There is no constitutional right of a lawfully convicted person to be conditionally released before the expiration of a valid sentence); *Singleton v. Michigan Parole Bd.*, No. 12-13748, 2013 WL 1703925, at *2 (E.D. Mich. Apr. 19, 2013) ("Plaintiff has no constitutionally protected liberty interest in

parole that would raise a federal cause of action. Without a basis for federal jurisdiction, this court is precluded from granting a writ of mandamus in this case."); Rather, "parole eligibility [is] a question of state law[.]" *Ward v. Howes*, No. 08-13051, 2011 WL 4527786, at *2 (E.D. Mich. Sept. 29, 2011) (quoting *Ward v. Stegall,* No. 03–60042 (E.D. Mich. May 20, 2003)). And "[a] federal court may not issue [a] writ on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984).

Plus, requesting relief under the Act would constitute a separate form of relief from federal bond. Naser mentions it here merely through an oblique reference. Parties should not be encouraged to file shadow motions in this fashion. *See* E.D. Mich. LR 7.1(a)(1) and (3) ("[t]he movant must ascertain whether the contemplated motion . . . will be opposed . . . [and the] court may impose sanctions for . . . violating this rule, which may include . . . striking the filing.); *United States v. Ramesh*, No. 02-80756, 2009 WL 817549, at *6 (E.D. Mich. Mar. 26, 2009) ("Seeking concurrence from the opponent is a mandatory directive of the Local Rules of this District. Inasmuch as [the defendant] has failed to comply with this Local Rule prior to filing this motion, the Court must deny the relief that he seeks to obtain.").

Moreover, Naser's shadow motion is littered with statements that misrepresent the record. FBI Special Agent Jeffrey O'Donnell testified at the September 5, 2024, evidentiary hearing that Naser's parole was revoked, and he was sentenced to serve a term of 60 months. (R. 185: Tr. 2103). Only 24 months into that term, FBI received information that Naser was "potentially" going to be released early. (*Id.* at 2105-106,

32

2122). O'Donnell testified that he emailed Eagen a PowerPoint presentation on January 23, 2020, which detailed evidence from the FBI's counterterrorism investigation of Naser. (R. 190: Sealed Def. Ex. L). O'Donnell provided this new information to "decision makers at that level" because the FBI assessed Naser continued to pose a threat. (R. 185: Tr. 2112-113).

Mr. Gerometta <u>repeatedly</u> asked O'Donnell if the FBI asked MDOC not to release Naser. O'Donnell testified each time that no such request was made. Likewise, there is absolutely no evidence that the FBI asked the MDOC to hold Naser until October 2022. While information from the FBI may have helped persuade decision makers that Naser's connections to ISIS and possession of explosives materials warranted additional scrutiny regarding the propriety of giving Naser an early parole, the evidence shows that the decision to suspend Naser's early release was an independent one made by the Parole Board, and <u>not</u>, as Naser claims, at the behest of the Department of Justice. (*Id.* at 2116).

## III.   **CONCLUSION**

The Court should detain Naser.

Respectfully Submitted,

DAWN N. ISON
United States Attorney


/s/ *Saima S. Mohsin*
/s/ *Jerome F. Gorgon Jr.*
Assistant United States Attorneys
Eastern District of Michigan
211 West Fort Street, Suite 2001
Detroit, MI 48226
Phone: (313) 226-9100
Email: Saima.Mohsin@usdoj.gov
Jerome.Gorgon@usdoj.gov


/s/ *Dmitriy Slavin*
Trial Attorney
National Security Division
Email: Dmitriy.Slavin@usdoj.gov

Date: October 15, 2024

## **Certificate of Service**

I hereby certify that on October 15, 2024, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the parties of record.

*/s/ Saima S. Mohsin*
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, MI 48226
Saima.Mohsin@usdoj.gov
(313) 226-9100

Date: October 15, 2024