## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,               Case No. 22-20504

v.                       HON. JONATHAN J.C. GREY

AWS MOHAMMED NASER,

      Defendant.

_____/

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (ECF No. 94) AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR BLANKET SUPPRESSION OF OCTOBER 2017 SEARCH (ECF No. 117)

## I.    INTRODUCTION

This Order addresses two motions to suppress filed by defendant Aws Naser. In the motion to suppress evidence obtained in violation of the Fourth Amendment (ECF No. 94), Naser alleges that FBI agents unlawfully used state law enforcement officers to conduct precusor searches to secure a federal search warrant at his residence and build a federal criminal case. Naser moves the Court to suppress evidence he believes was unlawfully seized by Charles Wright, a law enforcement official who worked as both a Michigan Department of Corrections

("MDOC") parole agent ("PA") and a member of the FBI Joint Terrorism Task Force ("JTTF") as a task force officer ("TFO"), as well as all evidence seized pursuant to the execution of a search warrant on October 30, 2017 as fruits of Wright's unlawful searches.

In the motion for blanket suppression of October 2017 search (ECF No. 117), Naser moves the Court to suppress all evidence obtained during an October 30, 2017 search, contending that officers exceeded the parameters of the search warrant when they conducted a comprehensive "protective sweep" of two rooms expressly excluded from the areas to be searched.

The government filed a response to each motion. (ECF Nos. 105, 144.) Naser filed a reply to the first motion to suppress evidence (ECF No. 108), but he did not reply to the second motion. The Court held a hearing on the motions on June 20, 2024, June 21, 2024, and September 5, 2024. For the reasons that follow, Naser's (1) motion to suppress evidence obtained in violation of the Fourth Amendment (ECF No. 94) is **DENIED**; and (2) motion for blanket suppression of October 2017 search (ECF No. 117) is **GRANTED IN PART** and **DENIED IN PART**.

## II.   BACKGROUND

A grand jury charged Naser in count one with attempting to provide material support and resources to a foreign terrorist organization and in count two with possessing a destructive device as a felon. (ECF Nos. 1, 158, 162.)

From 2013 to March 2016, Naser was incarcerated in the MDOC after his conviction for armed robbery. Before Naser could be paroled by the MDOC, he had to give "voluntary consent to a search of my person and property upon demand by a peace or parole officer." *See* M.C.L. § 791.236(19). Accordingly, when Naser was paroled by the MDOC in March 2016, he consented to a search of his "person and property upon demand by a peace or parole officer." M.C.L. § 791.236(19). Over the next 19 months, three different PAs supervised Naser; with Wright the last PA who supervised Naser.

Between May and October 2017, Wright conducted three warrantless searches of Naser's home and cell phones during MDOC parole supervision visits. After the third visit on October 19, 2017, the FBI obtained a search warrant for Naser's home and vehicle, and a search

was executed on October 30, 2017. An airsoft BB gun, knives, tasers, pellets, drones, and other materials were seized that day.

Between March 2016 and August 2017, Naser was supervised by two other PAs, Cynthia Simon and Derrick Bond. While supervised by Simon and Bond, Naser was subjected to numerous visits. Naser claims that neither Simon nor Bond (or any other PA) had asked or attempted to search the contents of his cell phones, seized any of his cell phones, or taken pictures of his home.

On May 19, 2017, Wright, who by this time also was assigned to the JTTF as a TFO, accompanied Bond on a supervised visit, months after the FBI had discovered that Naser had an active account on Telegram, an internet chatroom and social media application. After openly observing drone materials and index cards with Arabic writing, as well as Naser living out of and sleeping on the floor of a room separate from his wife, Wright told Naser that Wright would review Naser's iPhone 7 Plus for child pornography. A review of the iPhone's extraction report and photographs revealed several social media applications, but not Telegram (or Paltalk, which another FBI TFO learned was associated with Naser's IP address). Telegram and Paltalk are social media and

4

instant messaging apps which also feature chatrooms and allow direct messaging. Allegedly, Wright was advised of Naser being on Paltalk.

As of August 7, 2017, Wright took over supervision of Naser because Wright was concerned that Naser was a "Lone Wolf" for ISIS. On August 16, 2017, Wright conducted another home visit and observed two cell phones upon entering the house: the iPhone 7 which was previously reviewed and a grey and black LG phone that Naser attempted to conceal during the visit.

Naser consented to Wright's search of the LG phone, a phone he had never disclosed to Wright or any other PA. Upon Wright's search of the LG phone, he observed pictures of the ISIS flag and the ISIS leader, as well as numerous apps that Naser consistently denied using (including Paltalk, Telegram, Twitter, Tor Browser, Orobot, and Orfox). After obtaining a search warrant for the LG phone, the FBI found on the LG phone: (a) ISIS and other extremist content; (b) downloads related to explosives and the use of ricin as a poison; and (c) links to ISIS materials and chat rooms.

On October 19, 2017, Wright and other PAs conducted a third visit at Naser's residence. Wright found Naser living in the basement and

learned that the rest of Naser's family had moved out and the upstairs of the house had been rented out. Wright and other PAs observed drones apparently altered from their manufactured form.

Based upon its investigation and Wright's observations during the May 19, 2017, August 15, 2017 October 19, 2017 visits and searches, the FBI obtained a search warrant for Naser's home and vehicle. Agents executed the search warrant on October 30, 2017 and seized an airsoft BB gun, knives, tasers, pellets, drones, and other materials, including chemicals. The FBI asserts that Naser possessed the   to make an explosive device.

## III.   LEGAL STANDARD

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST., AMEND. IV. The amendment's primary focus pertains to physical entry of a person's home. *Payton v. New York*, 445 U.S. 573, 586 (1980); citing *United States v. United States District Court for the Eastern District of Michigan*, 407 U.S. 297 (1972). Police entrance into a home generally "is permissible only where justified

by a warrant, exigent circumstances, or valid consent." *Smith v. City of Wyoming*, 821 F.3d 697, 709 (6th Cir. 2016).

Not every search "is acceptable solely because a person is in custody." "[W]hen privacy-related concerns are weighty enough a search may require a warrant, notwithstanding the diminished expectations of privacy of the arrestee." *Riley v. California*, 573 U.S. 373, 392 (2014). "Modern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans the privacies of life." *Id.* at 403 (detailing the immense amount of personal information and data stored on cell phones in modern day).

It is well-settled that certain citizens, namely those persons on probation or parole, enjoy fewer rights to be free from certain searches and seizures. *See, e.g., United States v. Knights*, 534 U.S. 112 (2001) (probationer); *Samson v. California*, 547 U.S. 843 (2006) (parolee). Indeed, the Supreme Court has held that, when state law provides that a parolee must agree "to be subject to search or seizure by a parole officer or other peace officer . . . with or without a search warrant and with or without cause" (Cal. Penal Code. Ann. § 3067(a)), "the Fourth Amendment does not prohibit a police officer from conducting a

suspicionless search of a parolee," so long as the search is not "arbitrary, capricious or harassing." *Samson*, 547 U.S. at 857.

## IV.  ANALYSIS

The parties agree that the Court must evaluate the searches under the totality of the circumstances, which requires the Court to make factual findings. *Samson*, 547 U.S. at 852. Naser contends that Wright, who no longer works as a TFO, has stated that "the FBI was going to let the investigation go, but [Wright] got involved and worked to have the case prosecuted." (ECF No. 106-5, PageID.1073.) Naser believes that the evidence will show that when Wright conducted the searches, he did not conduct those searches to determine whether Naser was violating his parole conditions. Instead, Naser argues the evidence will show that Wright was working for the FBI to find specific information against Naser for a federal case. As evidence, Naser asserts that Wright was not Naser's PA until August 7, 2017, yet participated in the May 19, 2017 parole supervision visit with Naser's then-assigned PA. Naser argues that the forensic image taken of Naser's iPhone on May 19, 2017 contained no evidence of a parole violation or a federal offense. (ECF No. 108, PageID.1119–1120 (citing ECF No. 110, PageID.1139–1141).)

Naser claims that, aside from Wright, no PA had asked or attempted to search the contents of Naser's cell phones, seized any cell phones, or took any pictures of his home. Naser points to Wright's statement that Wright joined the May 19, 2017 search because "he wanted to have time to profile Naser." (ECF No. 106-5, PageID.1078.) Naser asserts that, but for Wright's three "illegitimate" searches, the FBI lacked probable cause to obtain the search warrant executed on October 30, 2017.

Naser identifies two other situations to demonstrate that the FBI used state law enforcement officers to violate his rights. The first was in early July 2017, when the FBI was surveilling Naser. FBI agents stopped Naser's vehicle and ordered him out of the vehicle before contacting a local sheriff to search Naser. No incriminating evidence was found, and Naser contends this was a search to intimidate or harass him. The second event involved FBI Agent Megan McAteer conducting an open search of an LG Model Phone believed to be Naser's on August 16, 2017, then Wright seizing an LG phone (but no other phones) three business days later (August 22, 2017). That LG phone was listed in the FBI log the same

day as an item collected by Wright and McAteer. (*Id.* at PageID.1133–35.)

## A.    Motion Related to TFO Wright (ECF No. 94)

It is undisputed that Naser was a parolee to the MDOC between March 18, 2016 and October 30, 2017, when his parole was revoked. Before he could be released on parole, Naser had to sign a document consenting to special conditions of parole, including:

> 4.2    Written consent to search [of] the parolee's person and/or property, MCL791.236(19):  **I voluntarily consent to a search of my person and property upon demand by a peace officer or parole officer**. If I do not sign this written consent, I understand that my parole may be rescinded or revoked.

(ECF No. 97-2, PageID.690 (emphasis added).) This parole condition, enacted as M.C.L. § 791.236(19), is based upon the underlying California parole condition in *Samson*. *See United States v. Henderson*, 2024 WL 51319, at *2 (6th Cir. Jan. 4, 2024). Like the California parole parameters, MDOC parolees are required to sign a parole document that gives the MDOC consent to search their "person and property upon demand by a peace or parole officer." M.C.L. § 791.236(19). Unlike the California statute, the Michigan statute does not explicitly prohibit arbitrary or capricious searches. The Michigan statute does, however, bar

10

"a search that is conducted with the sole intent to intimidate or harass."
*Id.*

Naser argues that, when evaluating his Fourth Amendment
interests and whether the searches were reasonable under the totality of
circumstances, the Court must consider: (a) the coercive nature of the
consent language in his parole conditions; (b) the lack of specificity and
clarity in the parole condition; (c) the manner in which the MDOC and
FBI utilized that condition; and (d) Naser's reasonable expectation of
privacy in his cell phone.

Naser argues that Section 791.236(19) is unconstitutional because:
(1) it has no reasonableness requirement; and (2) mandatory consent
under threat of imprisonment is not valid consent under the U.S.
Constitution. The Court finds that the Supreme Court and the courts in
this district have concluded otherwise.

As set forth in *Samson*, although a search may not be "arbitrary,
capricious, or harassing," the Supreme Court upheld a search by a police
officer based only on defendant's status as a parolee because he has
"fewer expectations of privacy than probationers." *Id.* at 850. Noting that
Samson was told upon commencing his parole that officers had a right to

11

search without a search warrant or cause, the Supreme Court found that Samson "did not have an expectation of privacy that society would recognize as legitimate." *Id.* at 852. The Court further concluded that "privacy incursions that otherwise would not be tolerated" are warranted for parolees because a state has an "overwhelming interest in supervising parolees" due to high rates of recidivism, among other factors. *Id.* at 853.

Naser claims that, in the Sixth Circuit, even cases that applied *Samson* have referenced the need for reasonable suspicion or cause. (ECF No. 94, PageID.589–590.) As the government states, however, courts in the Eastern District of Michigan have recognized that a warrantless search based upon a parolee's written consent to search pursuant to M.C.L. § 791.236(19) does not violate the Fourth Amendment. *See, e.g., United States v. Stevenson*, No. 14-20219, 2015 WL 3651016, at *3 (E.D. Mich. June 11, 2015) ("The Court adheres to its finding that Defendant provided written consent, authorized by Michigan Compiled Laws § 791.236(19), to searches of his property on demand. Defendant's legitimate expectations of privacy were therefore diminished like those of the parolee in *Samson*, who provided written consent, authorized by California law, to searches without cause."); *United States v. Lynn*, No.

19-20084, 2019 WL 4187354, at *5 (E.D. Mich. Sept. 4, 2019) ("In sum, given the State of Michigan's strong interest in monitoring Lynn's behavior and Lynn's lack of a reasonable expectation of privacy in his trailer, the warrantless search of the trailer did not violate Lynn's Fourth Amendment rights."). *See also United States v. Tessier*, 814 F.3d 432, 433 (6th Cir. 2020) (upholding a search without reasonable suspicion where probationer agreed "to a search, without a warrant, of my person, vehicle, property, or place of residence by any Probation/Parole officer or law enforcement officer, at any time").

The Court notes Naser's reliance on *Michigan v. Montgomery*, 965 N.W.2d 549 (2021), for the proposition that the use of Naser's parole status alone as a basis to conduct a search has not been condoned by the United States Supreme Court or Michigan Supreme Court. Naser argues that is especially true as it relates to cell phones, as set forth in a concurrence denying leave to appeal. *Id.* at 550–551. That concurrence, however: (a) recognized that "the United States Supreme Court has severely curtailed the Fourth Amendment protections afforded to parolees under the United States Constitution" in *Samson*, and (b) addressed the concern "for purposes of Michigan law" where the search

was "not 'directly and closely related' to the administration of the parole supervision system." *Id.* The Court does not find a statement that the issue should be considered under Michigan law to be persuasive in this case, particularly when it was made in a concurrence denying leave to appeal.

Naser next contends that, because a cell phone was searched, the nature of that instrument and its contents tilts the totality of the circumstances' calculation in his favor. *See United States v. Fletcher*, 978 F.3d 1009, 1018–1019 (6th Cir. 2020) (in a case involving a probationer, the court suggested that "the search of a cell phone is unique and–as compared to the search of a home–infringes far more on individual privacy"). Courts in this district, however, have recognized that a parolee's lack of reasonable expectation of privacy extends to cell phones. *See, e.g., United States v. Davis*, No. 18-20085, 2021 WL 3473246 (E.D. Mich. Aug. 6, 2021). In *Davis*, the court "conclude[d] that Defendant Davis's diminished expectation of privacy applied equally to the seizure and search of his seized three cell phones in this case." *Id*. at *2. As Naser notes, (a) the cell phones in *Davis* were not searched by non-FBI officers

until after a search warrant was obtained; and (b) defendant was under arrest for murder when the cell phones were taken from him. *Id*. at \*4.

Naser next contends that a parolee's consent is involuntary due to the threat of imprisonment if consent is not given, which renders the consent unconstitutional. All but one of the decisions cited by Naser to support this argument were decided prior to *Samson*.[1] The only post-*Samson* case cited by Naser was issued by the Iowa Supreme Court, *State v. Baldon*, 929 N.W.2d 785 (2013) ("When a constitutional right is at stake, more than a one-sided agreement is needed to establish waiver of the right").

---

[1] Naser cites the following authority: *Lefkowitz v. Turley*, 414 U.S. 70 (1973); *United States v. Calhoun*, 544 F.2d 291, 296–297 (6th Cir. 1976); *United States v. Jarrad*, 754 F.2d 1451, 1454 (9th Cir. 1985) ("The modification of Fourth Amendment protections afforded to parolees in their relationship with parole officials is not based on consent."); *United States v. Giannetta*, 909 F.2d 571, 576 n.4 (1st Cir. (1990); *United States v. Crawford*, 323 F.3d 700 (9th Cir. 2003); *United States v. Isiofia*, 370 F.3d 226, 232–233 (2d Cir. 2004); *United States ex rel. Coleman v. Smith*, 395 F. Supp. 1155 (E.D. NY 1975); *Smyth v. Lubbers*, 398 F. Supp. 777, 788 (W.D. Mich. 1975); *Dearth v. Florida*, 390 So. 2d 108, 109 (Fla. App. 1980) ("We do not believe it is reasonable to conclude that a probationer's consent to such a condition is voluntary when his only other alternative is incarceration."); Restatement (Second) of Conflict of Laws § 187, comment (b) (1981) (when a contract is "drafted unilaterally by the dominant party and then presented on a 'take-it-or-leave-it' basis to the weaker party who has no real opportunity to bargain about its terms," in may not be voluntary); 4 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 8.2(b) at 90 (quoting *United States v. Worley*, 193 F.3d 380, 387 (6th Cir. 1999) (5th ed. 2012) ("'the location and conditions' of even a brief detention may be such as to foreclose a finding of voluntary consent")). (ECF No. 94, PageID.591–594.)

The Supreme Court did not address this issue in *Samson* because it found that "the search issue here is reasonable under our general Fourth Amendment approach." 547 U.S. at 852 n.3. The *Lynn* court did not address the issue, either. 2019 WL 4187354, at *7 n.3. *See also United States v. Henry*, 429 F.3d 603, 614–615 (6th Cir. 2005) ("Although other circuits have addressed the issue, it remains an open question in this circuit.").

The government argues that, under the totality of the circumstances, the searches were reasonable. It maintains that the state had a legitimate interest in conducting a search of someone who was a national security concern and had been lying to his parole officers about social media accounts on which he shared support for ISIS. Further, as a parolee, Naser lacked any legitimate privacy interest. The government asserts that Naser has the "burden of production and persuasion" to suppress the evidence and hasn't done so. *United States v. Smith*, 783 F.2d 648, 650 (6th Cir. 1986).

*Samson* did not decide the issue of the voluntariness of the consent to search provision under the California statute (or, obviously, the Michigan statute). That court did, however, determine that a police

16

officer could conduct a search of a parolee in the absence of a warrant or suspicion, provided the search was not "arbitrary, capricious or harassing" because parolees lack a reasonable expectation of privacy. *Id.* at 547 U.S. 857.

*Samson* extended the totality of the circumstances analysis regarding probationers set forth in *Knights*. *Knights* "rejected the proposition that the government can search **all** probationers and parolees without a warrant and probable cause." *United States v. Carnes*, 309 F.3d 950, 961 (6th Cir. 2011) (citing *Knights*, 534 U.S. at 118–122) (emphasis added)). The *Knights* court, however, held that "no more than reasonable suspicion to conduct a search of th[e] probationer's house" was required and no warrant is required. *Knights*, 534 U.S. at 121.

The *Samson* court applied this analysis to parolees, determining that parolees have even "fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment," *Samson*, 547 U.S. at 850, especially as the parole search condition was clearly communicated to the parolee. *Id.* at 852. For that reason, such a parolee would "not have an expectation of privacy that society would recognize as legitimate." *Id.* Moreover, the state had a

substantial interest in supervising parolees, who are "more likely than the ordinary citizen to violate the law;" that interest justified intruding on a parolee's privacy in a manner not acceptable to other citizens. *See id.* at 853; *Knights*, 534 U.S. at 119–120. The *Samson* court then held that "the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee." *Samson*, 547 U.S. at 857.

Here, the Court declines to find that warrantless searches based upon a parolee's required prior consent to search are unconstitutional.

Further, the Court finds that the totality of the circumstances supports finding each of Wright's searches reasonable. In this case, Naser was a parolee, with lesser privacy rights than an ordinary citizen, and his written consent to a search meant he had no legitimate expectation of privacy–absent a search meant solely to intimidate or harass him. As declared in the search warrant affidavit, the government had reason to suspect Naser might harbor interests in terrorist and violent activity, including his history of violence and support for ISIS. Based on *Samson* and in the absence of any evidence of an intent to intimidate or harass by Wright or other officers, these factors support a finding that the searches

of Naser's home and phone were reasonable under a totality of the circumstances assessment.

Finally, Naser contends that the searches were illegal because Wright was acting as a "stalking horse" for the FBI. A probation officer "acts as a stalking horse if he conducts a probation search **on prior request of and in concert with law enforcement officers.**" *United States v. Price*, 2019 WL 5291015, at *3 (S.D. Ind. Oct. 18, 2019) (emphasis added), *aff'd*, 28 F.4th 739 (7th Cir. 2022). *See also United States v. Martin*, 25 F.3d 293, 296 (6th Cir. 1994) ("it is impermissible for a probation search to serve as subterfuge for a criminal investigation"). Naser argues that the evidence in this case establishes that the FBI sought the MDOC's assistance, not the converse.

At the hearing, Wright testified, and the Court had the opportunity to ascertain whether Wright was acting as a TFO or PA when he surveilled Naser. Based on the testimony at the hearings, it is evident to the Court that Wright began investigating Naser on his own and not at the FBI's direction.[2] In fact, Wright was not briefed by and did not have

---

[2] The Court finds that Wright testified very convincingly and credibly about his authority and initiative as a PA.

any information from the FBI at that time. (ECF No. 170, PageID.1711, 1751, 1760.) Furthermore, he understood that the FBI was winding down its investigation of Naser in the spring of 2017. (*Id.* at PageID.1711, 1751.) Moreover, when Wright was asked if the FBI directed him to go to the May 19, 2017 home visit, Wright testified, "No. No, no, no. Uh-uh." (ECF No. 170, PageID.1694.) As he stated, his purpose in going with Bond for the supervision visit on May 19, 2017 was because, "if they [the FBI] stop their investigation, . . . I still have to do the MDOC's part." (*Id.; see also* ECF No. 108, PageID.1117 (as Naser noted, Wright communicated to the government in 2024 that "The FBI was going to let the investigation go, but he [Wright] got involved and worked to have the case prosecuted."); ECF No. 170, PageID.1617, 1679, 1692–1694, 1710–1712, 1749–1751.)

As the Court concludes that the searches were reasonable under the totality of the circumstances, Naser's stalking horse argument fails. *United States v. Sweeney*, 891 F.2d 232, 236–237 (6th Cir. 2018) ("when the government relies on the totality-of-the-circumstances doctrine as articulated in *Samson*," the stalking horse argument fails).

Accordingly, for the reasons set forth above, the Court **DENIES** Naser's motion to suppress evidence related to Wright's involvement in the case.

### B.    Motion for Blanket Suppression (ECF No. 117)

Naser also moves to suppress all evidence seized during the October 30, 2017 search of his home because officers exceeded the express parameters of the search warrant. The search warrant states that the "south master bedroom and the southwest bedroom inside Location 1 are excluded from the property to be searched, as they are currently occupied by tenants." (ECF No. 97-3, PageID.867.) Among the seized items logged from the October 30, 2017 search, however, were: (a) a Smith & Wesson MSP BB gun, cal .177 S/N 16A25727 (the "airsoft BB gun"); (b) a magazine; and (c) BBs that were found in "Room E," i.e., the south master bedroom. (*See* ECF No. 119, PageID.1183–1184, 1191.)

Naser contends that, even where a search warrant may be valid, an invalid general search can transpire if the officers "flagrantly disregard the limitations of a warrant . . . [by] exceed[ing] the scope of the warrant in the places searched." *United States v. Garcia*, 496 F.3d 495, 507 (6th Cir. 2007) (citing *United States v. Lambert*, 771 F.2d 83, 93 (6th Cir.

1985); *Brindley v. Best*, 192 F.3d 525, 531 (6th Cir. 1999). And, where a significant Fourth Amendment violation rises to the level of an unjustified intrusion of privacy, "the suppression of all evidence seized during the search" may be a reasonable remedy. *United States v. Lambert*, 771 F.2d 83, 93 (6th Cir. 1985). Naser asserts that in this case, where the search warrant expressly excluded from the search the south master bedroom and the southwest bedroom, the "egregious disregard" for the limitations of the search warrant demands the suppression of all evidence seized during the search.

The government claims that it did not conduct a search of the south master bedroom and the southwest bedroom on October 30, 2017, but merely conducted a protective sweep. The government argues that the search warrant excluded those two bedrooms to protect the Fourth Amendment rights of persons other than Naser believed to occupy those rooms. Further, the search warrant authorized the search of "[a]ll other areas" of the house, i.e., all areas occupied by Naser.

The government states that those two bedrooms "were subject to a protective sweep for potential dangers–such as bomb making material– prior to agents commencing the search." (ECF No. 133, PageID.1253–

1254.)[3] The government argues that, as set forth in the search warrant affidavit, Naser was under investigation by the FBI: (a) for providing material support to ISIS; (b) participating in ISIS chat group activity; and (c) receiving from the ISIS chat group "detailed instructions on how to manufacture precursor explosive materials." (ECF No. 97-3, PageID.718–719, 783, 791–792, 916.) The affidavit further indicated that Naser had a history of violence, possessed several firearms, slept in the basement, and claimed to have rented out three bedrooms, two of which (the south master bedroom and the southwest bedroom) were occupied by tenants. (*Id.* at PageID.720–722, 760.)

Based on that danger, the government claims that officers had the right to "take reasonable action to secure the premises and to ensure their own safety and the efficacy of the search." *Los Angeles Cnty., CA v. Rettele*, 550 U.S. 609, 614 (2007). *See also Maryland v. Buie*, 494 U.S. 325

---

[3] The government contends that the basis for excluding the two bedrooms was Naser's representation that those rooms were occupied by tenants. The government argues that Naser lied about the south master bedroom where the airsoft BB gun, magazine, and BBs were found, as there was not a tenant occupying that room at the time of the search. The Court does not find this information relevant to the issue before the Court, however, because officers did not learn this until after the protective sweep of the room had been conducted. In addition, it is not clear that officers had reason to think that anyone had moved into that room based on their interviews with Naser. (See ECF No. 134, PageID.1266–1268; ECF No. 135, PageID.1275–1276.)

(1990) (allowing a protective sweep and a cursory inspection of the spaces within the residence where a person may be found if articulable facts support a reasonable belief of danger to the officer).

The government states that, during the protective sweep,

> [B]omb technicians observed a pistol (determined to be an airsoft pellet gun) **in a drawer** in the bedroom that Naser[] falsely claimed to have rented out. . . . After finding the airsoft gun, the bomb technicians left the drawer containing the gun open and visible. Bomb technicians alerted the search team leader of the results of their survey prior to the search. Agents seized the airsoft gun but did not thereafter conduct any search of that bedroom.

(ECF No. 133, PageID.1255 (emphasis added).) The government seeks to extrapolate the well-settled protective sweep risk-of-life exception to the facts of this case, arguing that the officers' search of excluded areas was justified because officers had reasonable concerns about potential explosives in Naser's house.

The Court is not persuaded by the government's arguments. First, government agents were talking to Naser *in the house* before the sweep search was conducted. (ECF No. 170, PageID.1793, 1802, 1808; ECF No. 185, PageID.2051.) Second, Naser was present and detained during the course of the protective sweep search (and general search).

Third, although the government's concern about potential explosives or trip wires was not unreasonable, the government goes too far when suggesting that a reasonable protective sweep could include a sweep of all rooms *and* that every drawer and cabinet in the home can be opened. (ECF No. 170, PageID.1791; ECF No. 185, PageID.2032–2033.) The Court finds inapplicable the government's reliance on *Buie*'s plain view exception during the course of a valid protective sweep. (ECF No. 133, PageID.1258 (citing *Buie*, 494 U.S. at 330).)

The protective sweep in this case took 20 to 30 minutes (ECF No. 170, PageID.1786), and less than two minutes for Stephen Haug, the bomb technician who conducted the sweep of the first floor, to sweep the south master bedroom. (ECF No. 185, PageID.2033.) There is nothing in the record that indicates that the airsoft BB gun or the magazine and BBs were "in plain view." At Naser's parole hearing, Wright testified "that drawer was closed" (ECF No. 134, PageID.1266), and Stephen Haug, the bomb technician conducting the protective sweep, testified that the dresser drawers were closed and he had to crack open the dresser drawers in which he found the airsoft BB gun. (ECF No. 185, PageID.2037–2038; ECF No. 133, PageID.1255) (the bomb technicians

"observed a pistol . . . in a drawer in the bedroom" and "[a]fter finding the airsoft gun, the bomb technicians left the drawer containing the gun open and visible.").)

The Court does not find, at least not in this case, that it was reasonable for the protective sweep to include opening *all* drawers in the house. If the Court sanctioned that conduct, it would, in essence, be legalizing a protective sweep that was as broad as a general search. Even if the Court accepts that the FBI's search execution "plan summary" reasonably included a "sweep" to "remove[] any other residents present" (ECF No. 135, PageID.1278) and allowed for a cursory inspection for bombs or related materials, such a sweep does not justify looking in closed drawers. If the Court sanctioned such thoroughness in a protective sweep, the protective sweep would be indistinguishable from–and equate to–a full-blown search. Further, to allow the government to admit evidence at trial by claiming it was seized under the guise of a protective sweep would strip the Fourth Amendment of any meaning.

Notably, the government has not offered any authority to support its argument that opening drawers in the south master bedroom, which was expressly excluded from the authorized search areas, during its

protective sweep was warranted. For the same reasons, namely, to
ensure the protections of the Fourth Amendment, the Court rejects the
government's inevitable discovery argument in this case, where agents
blatantly disregarded the express limitations of the search warrant by
opening drawers during a protective sweep.

For all the reasons set forth in this section, the Court suppresses
all evidence discovered and seized in the south master bedroom and the
southwest bedroom, including the airsoft BB gun, magazine, and BBs.
Contrary to Naser's request, however, the Court will not suppress all
evidence seized from Naser's residence pursuant to the execution of the
search warrant.

Although Naser correctly notes that the search warrant explicitly
prohibited a search of the south master bedroom and the southwest
bedroom, the Court finds that suppressing all evidence obtained as a
result of the October 30, 2017 search is not justified. First, there is no
dispute that the search warrant was valid. Second, there was probable
cause to search all areas officers believed that Naser occupied when the
search warrant was obtained. Third, had law enforcement officers
conducted a search consistent with the authorized parameters of the

search warrant, it would have been inevitable that the search would have yielded all evidence not found in the south master bedroom and the southwest bedroom.

For the reasons stated above, the Court will not suppress the evidence found in the areas authorized by the search warrant and found during the valid general search of those areas (i.e., the areas of Naser's residence outside of the south master bedroom and the southwest bedroom).

Accordingly, the Court **GRANTS** Naser's motion for blanket suppression of the 2017 search with respect to any evidence seized from the south master bedroom or the southwest bedroom. The Court **DENIES** Naser's motion for blanket suppression of the 2017 search with respect to any evidence seized from any area of Naser's residence other than the south master bedroom or the southwest bedroom.

## V.    CONCLUSION

Accordingly, and for the reasons stated above, **IT IS ORDERED** that Naser's motion to suppress evidence obtained in violation of the Fourth Amendment (ECF No. 94) is **DENIED**.

**IT IS FURTHER ORDERED** that Naser's motion for blanket suppression of October 2017 search (ECF No. 117) is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that the Court **GRANTS** Naser's motion for blanket suppression of October 2017 search with respect to any evidence seized from the south master bedroom and the southwest bedroom but **DENIES** Naser's motion for blanket suppression of October 2017 search as to all other evidence seized during that search, i.e., evidence seized from any area of Naser's residence other than the south master bedroom and the southwest bedroom.

**SO ORDERED.**

Dated: December 30, 2024          **s/Jonathan J.C. Grey**
                                                   Jonathan J.C. Grey
                                                   United States District Judge

## Certificate of Service

The undersigned certifies that the foregoing document was served upon counsel of record via the Court's ECF System to their respective email on the Notice of Electronic Filing on December 30, 2024.

<u>**s/ S. Osorio**</u>
Sandra Osorio
Case Manager