**United States District Court**
**Eastern District of Michigan**
**Southern Division**

United States of America,                     Criminal No. 22-20504

                            Plaintiff,        Hon. Jonathan J.C. Grey

v.

Aws Mohammed Naser,

                            Defendant.

_____/

**Government's Trial Brief**

The government submits this trial brief to (1) outline the charges against Defendant Aws Mohammed Naser, (2) provide the elements of their crimes, (3) sketch the expected trial evidence, and (4) provide case law on potential legal issues. There is a hyperlinked table of contents for ease of review.

**Table of Contents**

I.   Charges ................................................................................................5

II.  Elements of Naser's crimes .................................................................5

    A.   Attempting to provide material support and resources to a foreign
         terrorist organization in violation of 18 U.S.C. § 2339(B)(a)(1) ............... 5

         1.   Elements of material support ................................................. 5

         2.   Attempt ............................................................................. 10

    B.   Felon in possession of a destructive device ............................... 12

         1.   Elements ............................................................................ 12

III. Brief statement of expected evidence and facts ........................................14

IV.  Legal issues ...................................................................................28

    A.   Naser's statements are admissible by the government ........................... 28

         1.   Coconspirator statements made during and in furtherance
             of a conspiracy .................................................................... 28

         2.   Other statements are non-hearsay or hearsay exceptions ............. 32

         3.   The Confrontation Clause ................................................... 35

         4.   Naser's self-serving statements are inadmissible ........................... 36

         5.   Rule 106 is narrowly applied ................................................ 40

    B.   Law enforcement testimony ................................................... 42

         1.   Testimony about the initial investigation of the crimes or of
             a given act is not hearsay .................................................... 42

          2.   An agent can testify about general terrorism slang and
             jargon under Rule 702 (as an expert) ..................................... 43

3.      An agent can testify about coded language within a particular conspiracy under Rule 701 (the lay opinion testimony rule) ................................................................ 44

4.      Interpreting recorded conversations ................................................ 45

5.      Background information of investigation ........................................ 46

6.      Testimony about what the evidence does not contain ................. 47

7.      "Framing" references to prior testimony are appropriate ........... 47

8.      Installment testimony ................................................................ 47

9.      Opinion (expert) testimony ............................................................ 49

10.     Summary testimony of voluminous writings and recordings under Rule 1006 ................................................................ 50

11.     Testimony about another officer's contemporaneous observations ................................................................ 50

12.     Law enforcement reports may be read to the jury as a past recollection recorded ................................................................ 51

C.      Other evidence admissible by the government ........................................ 52

1.      Cellphone information is admissible and easily authenticated ................................................................ 52

2.      Concealment, false exculpatory statements ................................... 53

3.      Naser's intrinsic act evidence ........................................................ 53

4.      Naser's other acts evidence (Rule 404(b)) ..................................... 55

5.      No constructive amendment or variance if other acts are mentioned ................................................................ 57

D.      Limits on character evidence ................................................................ 57

1.      Rule 404(a) limits character evidence to that which is relevant to prove an element of the crime, or general law abidingness ................................................................ 57

3

2.      If Naser puts his character at issue, he opens cross-examination......................................................... 58

3.      Naser's general good character, beliefs, or discernment, is inadmissible ........................................... 59

4.      Rule 405 allows only opinion or reputation testimony ............... 60

5.      Rule 405 precludes testimony about specific good acts............... 60

E.    Inadmissible evidence and nullification arguments.................................... 60

1.      Possible penalties ........................................................... 62

2.      Motivations for investigating or prosecuting ..................... 63

3.      Naser's lawful behavior .................................................. 64

4.       "Outrageous" government conduct................................ 64

5.      Discovery comments in the Jury's presence................... 65

6.       Suppressed evidence.................................................... 66

F.    Impeachment ................................................................................. 67

1.      Proper impeachment....................................................... 67

2.      Impeachment with extrinsic evidence ............................. 69

3.      Impeachment with prior conduct—Rule 608(b) ......................... 71

4.      A witness cannot be impeached by another's statement ............. 72

5.      An agent's investigative decisions cannot be impeached by the lay opinion of another agent ....................................... 73

6.      Cross-examining Naser with his prior conviction ...................... 75

## I.      Charges

Naser faces two charges in the second superseding indictment (ECF No. 681). Attempting to provide material support and resources to a foreign terrorist organization in violation of 18 U.S.C. § 2339(B)(a)(1) (count one). And felon in possession of a destructive device in violation of 18 U.S.C. § 922(g)(1) (count two).

## II.     Elements of Naser's crimes

These elements and definitions are taken from the Sixth Circuit Pattern Jury Instructions, 2024 Edition, and other sources as indicated.

### A.      Attempting to provide material support and resources to a foreign terrorist organization in violation of 18 U.S.C. § 2339(B)(a)(1)

Naser is charged with attempting to provide material support and resources including personnel (including himself) and services to a foreign terrorist organization, the Islamic State of Iraq and al-Sham (ISIS) and its predecessors (including al-Qa'ida in Iraq (AQI), al-Nusra Front, the Islamic State of Iraq, and the Islamic State of Iraq and the Levant) which, at all times relevant to the Indictment, was designated by the United States Secretary of State as a foreign terrorist organization.

#### 1.      Elements of material support

There are four elements in attempted material support: (1) that Naser intended to commit the crime of providing **material support or resources** to ISIS; (2) that he intended to provide either services or **himself or other personnel** to ISIS to work under its direction and control; (3) that **he knew ISIS was a designated foreign**

**terrorist organization** or had engaged in terrorist activity; and (4) that he did some overt act which was **a substantial step** toward committing the crime. *United States v. Alebbini*, 979 F.3d 537, 546 (6th Cir. 2020).

### *Material support or resources*

The "term 'material support or resources' includes any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice, or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, and transportation, but does not include medicine or religious materials." 18 U.S.C. § 2339A. "Material support" in 18 U.S.C. § 2339B has the broadest possible reading.  So, "material" means "any contribution" whatsoever. *See Holder v. Humanitarian L. Project*, 561 U.S. 1, 7 (2010) ("Congress has prohibited the provision of 'material support or resources' to certain foreign organizations that engage in terrorist activity. 18 U.S.C. § 2339B(a)(1). That prohibition is based on a finding that the specified organizations 'are so tainted by their criminal conduct that *any* contribution to such an organization facilitates that conduct.'") (emphasis supplied) (quoting Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), § 301(a)(7), 110 Stat. 1247, note following 18 U.S.C. § 2339B (Findings and Purpose)). And contribution means any type of support—not just monetary. *See Holder*, 561 U.S. at 29 ("Plaintiffs argue that the reference to 'any contribution' in this finding meant only monetary support. There is no reason to read

6

the finding to be so limited, particularly because Congress expressly prohibited so much more than monetary support in § 2339B. Congress's use of the term 'contribution' is best read to reflect a determination that any form of material support furnished 'to' a foreign terrorist organization should be barred, which is precisely what the material-support statute does."); *Hosseini v. Nielsen,* 911 F.3d 366, 376 (6th Cir. 2018) ("the Supreme Court's interpretation of 'material support' adopts both the 'relevant' and 'significant' definitions of 'material.' Material support is relevant to the commission of terrorism to the extent that it 'frees up other resources within the organization that may be put to violent ends.' *Holder v. Humanitarian L. Project*, 561 U.S. 1, 30 (2010). And material support is important or significant because it 'helps lend legitimacy' to the terrorist organization.").

There is no threshold amount of support—because the statute does not contain any "de minimis exception" for "material" support. *See United States v. Carpenter*, No. 3:21-CR-38-KAC-DCP, 2022 WL 17450713, at *5, n3 (E.D. Tenn. Dec. 6, 2022) ("Defendant argued that attempting to provide one translation of a video is not 'material.' But the statute [18 U.S.C. § 2339B] does not contain any 'de minimis exception' for 'material.'"); *United States v. Hashmi*, No. 06 CRIM. 442 (LAP), 2009 WL 4042841, at *7 (S.D.N.Y. Nov. 18, 2009) ("to the extent [the defendant] seeks to create a de minimis exception for material that he deems without 'readily apparent dangerous, nefarious, or terroristic quality,' his argument is without merit.").

*Personnel*

The term "personnel" means one or more persons, which can include Naser's own person.  But no person can be convicted for a violation of this statute in connection with providing personnel unless that person has knowingly provided or attempted to provide a foreign terrorist organization with one or more individuals (who may include the defendant) to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization.  "Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives are not considered to be working under the foreign terrorist organization's *direction* and control." 18 U.S.C. § 2339B(h) (emphasis added). Notably, the statute "does not require coordination, but merely direction." *United States v. Ullah*, No. 18-CR-16, 2021 WL 21902, at *3 (S.D.N.Y. Jan. 4, 2021). So, a person need not "have communicated with a foreign terrorist organization in order to act at that organization's 'direction.'" *Id.*; *see also United States v. Jama*, 217 F. Supp. 3d 882, 892 (E.D. Va. 2016) ("Congress . . . did not intend to limit § 2339B's application to . . . those who operate under some identifiable command and control structure. Rather, Congress intended to reach all persons who act on behalf of an FTO to further its goals and objectives in significant ways."). Instead, a defendant acts "at ISIS's direction by heeding the call of the organization's propaganda and recruiting materials." *Ullah*, 2021 WL 21902, at *3. Same with the viewing of videos that "encourage[] attacks," including "ISIS propaganda videos,"

8

which ISIS uses "to inspire attacks to advance its cause." *Id.* Social media posts can also contain "language that serves as an ISIS 'rallying cry.'" *Id.*

### Foreign terrorist organization

The term "foreign terrorist organization" has a particular meaning under this statute. In order for an organization to qualify as a "foreign terrorist organization," the organization must have been designated as such by the Secretary of State through a process established by law and have been designated at the time the crime occurred.

### Knowledge of the FTO

The defendant knew that the organization was a designated terrorist organization, or that the organization had engaged or was engaging in terrorist activity or terrorism. Specifically, that at the time the defendant attempted to provide the material support or resources in question, he knew that they would be provided to ISIS. Further, the government must prove that either that the defendant knew that ISIS had been designated by the United States government as a foreign terrorist organization or that he knew that the organization had engaged in or was engaging in terrorist activity. The term "terrorist activity" includes: [enumerate applicable terrorist acts as embraced by 8 U.S.C. §1182(a)(3)(B) or 22 U.S.C. §2656f(d)(2)].

For a person to act "knowingly" means that he realized what he was doing and was aware of the nature of his conduct, and did not act through ignorance, mistake, or accident.

*Substantial step*

A substantial step must consist of "objective acts that mark the defendant's conduct as criminal in nature." *United States v. Wesley*, 417 F.3d 612, 618-619 (6th Cir. 2005). The jury should consider "whether any reasonable person could find that the acts committed would corroborate the firmness of a defendant's criminal intent." *Id.* at 619 (quoting *United States v. Bilderbeck*, 163 F.3d 971, 975 (6th Cir. 1999)). "A substantial step must be something more than mere preparation." *United States v. Bailey*, 228 F.3d 637, 640 (6th Cir. 2000) (internal quotation marks and citation omitted). "Evidence is sufficient to sustain a conviction for criminal attempt, if it shows that the defendant's conduct goes beyond preliminary activities, and a fragment of the crime [was] essentially ... in progress." *Alebbini*, 979 F.3d at 546-47 (internal citations and quotations omitted).

## 2.    Attempt

To be guilty of an attempt, the government must prove (1) that Naser intended to commit the crime (of material support), and (2) that he committed some act that was a substantial step towards committing the crime. *See* Sixth Circuit Pattern Instruction 5.01 (2024) (citing *United States v. Wesley*, 417 F.3d 612 (6th Cir. 2005) and *United States v. Bilderbeck*, 163 F.3d 971 (6th Cir. 1999)). Merely preparing to commit a crime is not a substantial step. *Id.* The defendant's conduct must go beyond mere preparation and must strongly confirm that he intended to commit the crime. *Id.*; *see also Alebbini*, 979 F.3d at 546-547 ("Evidence is sufficient to sustain a conviction for

10

criminal attempt, if it shows that the defendant's conduct goes beyond preliminary activities and a fragment of the crime was essentially in progress."). But the government does not have to prove that the defendant did everything except the last act necessary to complete the crime. Sixth Circuit Pattern Instruction 5.01 (2024). A substantial step beyond mere preparation is enough. *Id*; *see also Alebbini,* 979 F.3d at 546-47 (finding that defendant met the substantial step element when, having purchased two airline tickets to travel to Turkey, he went to the ticket counter at the Cincinnati airport, waited 30 minutes, obtained boarding passes, and headed toward the security area on his way to the gate.).

The main purpose of the substantial step element is to provide objective evidence to corroborate the defendant's intent to commit the substantive crime. *See* Sixth Circuit Pattern Instruction 5.01 (2024), cmty. (citing *Wesley*, 417 F.3d at 620 and *Alebbini*, 979 F.3d at 546). So, "the 'substantial step' requirement is an objective requirement, not a subjective one." *Id*. (citing *Bilderbeck* 163 F.3d at 975 and *United States v. Pennyman*, 889 F.2d 104, 106-107 (6th Cir. 1989)). Attempt "is to be construed in a broad and all-inclusive manner." *Id*. (quoting *United States v. Reeves*, 794 F.2d 1101, 1103 (6th Cir. 1986)). The proof of the substantial step need not be sufficient to prove the criminal intent, but only to corroborate it; the act and intent are ultimately separate inquiries. *Id*. (citing *Bilderbeck* 163 F.3d at 975). No defense of withdrawal, abandonment or renunciation exists after the crime of attempt is complete with proof

11

of intent and acts constituting a substantial step. *Id.* (citing *United States v. Shelton*, 30

F.3d 702, 706 (6th Cir. 1994) and *Alebbini*, 979 F.3d at 548).

### B.     Felon in possession of a destructive device

#### 1.     Elements

There are four elements for this crime: (1) the defendant has been convicted of

a crime punishable by imprisonment for more than one year; (2)  the defendant,

following his conviction, knowingly possessed a destructive device specified in the

indictment; (3) at the time the defendant possessed the destructive device, he knew he

had been convicted of a crime punishable by imprisonment for more than one year;

and (4) the specified destructive device crossed a state line prior to the alleged

possession. *See* Sixth Circuit Pattern Instruction 12.01 (2024).

#### *Destructive device*

Destructive devices are defined to include: "(A) any explosive, incendiary, or

poison gas: (i) bomb, (ii) grenade, rocket having a propellant charge of more than four

ounces . . . (vi) device similar to any of the devices described in the preceding clauses *

* * [and] (C) any combination of parts either designed or intended for use in converting

any device into any destructive device described in subparagraph (A) … and from which

a destructive device may be readily assembled." 18 U.S.C. § 922(a)(4).

"'To qualify under statute,' [the Sixth Circuit] 'does not require that the

destructive device operate as intended.'" *United States v. Crocker*, 260 F. App'x 794, 797

(6th Cir. 2008) (quoting *United States v. Langan*, 263 F.3d 613, 625 (6th Cir. 2001)). "It is

sufficient for the government to show that the device was 'readily convertible' to a destructive device." *Id.*

Subsection "(C) generally applies to a combination of parts that has not yet been assembled into a functional weapon." *United States v. Kirkland*, 909 F.3d 1049, 1052 (9th Cir. 2018). "Nothing in the text of § 921(a)(4)(C) states that a defendant must possess every component necessary to render a partially constructed device capable of detonating." *Id.* "The statute requires only that the defendant possess a combination of parts from which a functional device 'may be readily assembled.'" *Id.* "As used in this provision, the term 'readily' means quickly and easily: The combination of parts possessed by the defendant must be capable of being assembled into a functional device within a short period of time and with little difficulty—measures that may depend on the expertise of the defendant constructing the device." *Id.* And "if the defendant lacks a part necessary to render the device functional, the 'readily assembled' element can still be met so long as the defendant could acquire the missing part quickly and easily, and so long as the defendant could incorporate the part into the device quickly and easily." *Id.* (citing *United States v. Sheehan*, 838 F.3d 109, 125 (2d Cir. 2016) (upholding a conviction even though the device lacked a piece of tape needed to connect the wires to the battery) and *United States v. Russell*, 468 F.Supp. 322, 329–30 (S.D. Tex. 1979) (same where the device lacked a 1.5-volt battery)).

13

## III.   Brief statement of expected evidence and facts

The government expects to offer several categories of evidence and related testimony. (1) Audio and video recordings with transcripts and translations (Arabic to English). (2) Court and MDOC records. (3) Laboratory analysis. (4) Physical and photographic evidence from home visits and search warrants. (5) device extraction materials and summaries. (6) Social media materials, including from Paltalk, YouTube, and Telegram. (7) Travel records. (8) Email records. (9) Other digital media materials. (10) Summary exibits. (11) Demonstrative exhibits. (12) Defendant's statements and coconspirators' statements. And (13) Testimony from law enforcement, opinion (expert) witnesses, and cooperating witnesses.

### *The Islamic State of Iraq and al-Sham (ISIS)*

ISIS is a well-known terrorist organization.

In 2004, the U.S. Secretary of State (the Secretary) designated al Qaeda in Iraq (AQI), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization (FTO) under section 219 of the Immigration and Nationality Act (INA) and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224. In 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS. To date, ISIS remains a designated FTO.

### *Naser radicalizes and attempts to travel to Syria to fight for terrorists*

In his early 20s, Naser radicalized and vocally supported extremist Islamist ideology. For example, in 2011, Naser maintained a YouTube channel and frequently

14

posted extreme content, including his self-description: "Jihad for the Sake of Allah is all i Want in this life. And if i Get Martydom ill Ask Allah if i can go Back and do it Agian."

Naser contemporaneously developed a close relationship with Russell Dennison, an aspiring Islamic Salafi-Jihadist preacher from Tampa, Florida. With their shared ideology, the pair made plans to leave the US in early 2012 and jointly travel to Iraq. Naser (an experienced translator) agreed to aid Dennison, a convert who did not speak or understand Arabic.

On January 7, 2012, Dennison's close friend, Sami Osmakac, was arrested by the FBI in Tampa and charged with attempting to use a weapon of mass destruction against persons and property in the United States in violation of 18 U.S.C. § 2332a. Fearing arrest, Dennison fled Tampa and flew to Detroit where he stayed with Naser in his home for about a week before going to Iraq. Naser followed Dennison to Iraq and the pair spent several weeks traveling to Erbil and Mosul. By April 2012, Dennison left Iraq and began his months-long journey through Jordan and Lebanon to Syria, where he joined the foreign terrorist organization Al Nusrah Front, an Islamic State of Iraq-affiliated group that was a precursor to ISIS. Dennison pledged himself to Al Nusrah Front and later ISIS, and fought for them in Syria until approximately 2019, when it is believed he was killed.

Using a new Iraqi passport in the name Aws Naser Al-Ogaidi, Naser returned to his home in Michigan in August 2012 and immediately began preparations to join

15

Dennison in Syria. The pair continued to communicate, sometimes using coded language. On September 11, 2012, Dennison wrote to Naser that he had "made it" to the place "where we talked about going." Dennison told Naser that he could come through Lebanon or Turkey and asked Naser to "save up some money to buy some nice things." Naser later told the FBI that that meant a weapon, most likely an AK-47, and that he agreed to give Dennison the funds. Dennison told Naser that "a nice thing" costs about $1,200, and asked Naser to bring enough money for them both to acquire the weapons. Dennison also told Naser that he should "pack really light, just enough for a small backpack because you have to travel through the mountains for about 5 hours." Finally, Dennison asked Naser to let him know when he was ready to travel. Naser replied on September 13, 2012, and told Dennison, "I need more time like 2 months or less" and "don't worry i will have enough by the will of Allah."

On September 14, 2012, Dennison told Naser he was in "a city near the border with Lebanon," where he arrived after a 5-hour march through the mountains. Dennison told Naser that he did not have the things he needed and again asked Naser to bring enough money for them both to acquire firearms. Dennison explained that "the brothers just finished a big war" and were low on funds. Dennison reported they were bombed day and night and "it is really bad here." Dennison stated they were preparing for the next battle and "we really need funds for a weapon to take down the planes." Finally, Dennison asked Naser to "come soon and come prepared, get ready, it is real here and this place needs us more than anywhere else" and that many of the

16

brothers there are "new to real islam just from the war." Naser replied promptly and stated:

> Asalamualykum Akhi. May Allah protect you & all the brothers. Akhi I site here waiting Allah knows how frustrated i am that i am not with you. If i could be there now i would already be. Be patient my Brother & do not fear anything but Allah by Allah you have already dusted your feet for Allah's sake. I will have it insha Allah & Akhi you Never have to pay anything back what i give & do is only for Allah. & we are Brothers that's the least we can do. Akhi Insha Allah i will bring what we need & more. Jazak Allah khayer & i know 2 months is a long time but i promise you if it is less then that I will already be there. 1 month or 3 weeks insha allah. Akhi i will be there as soon as possible INSHA ALLAH!!

Naser purchased a one-way plane ticket bound for Iraq and, on November 7, 2012, he traveled to Detroit Metropolitan Airport (DTW) and checked in for a flight to Erbil, Iraq via Chicago, Illinois and Istanbul, Turkey. Naser had a sword concealed in a cane, a four-inch tactical knife, and a Yardage Pro 4-12x42 Laser Rangefinder Riflescope in his luggage. Naser was not permitted to board the plane.

Undeterred, Naser searched the internet for alternative routes (airports in Mexico and Canada), entry requirements for Egypt, Lebanon, Tunisia, and Iraq, information about refugee seekers to Norway, and the cost of living in Lebanon and Iraq. On December 29, 2012, Naser purchased another one-way plane ticket departing from Chicago's O'Hare Airport at 9:30 p.m. on January 2, 2013, bound for Beirut, Lebanon via Amman, Jordan. Naser also purchased a Greyhound bus ticket from Detroit to Chicago departing at 7:00 a.m. on the morning of the flight.

17

Hours before his January 2, 2013, scheduled flight to Lebanon, Naser robbed one gas station and damaged property at another. The first occurred on January 1, 2013, at a Sunoco Gas Station in Detroit where Naser had recently worked and had been fired. At approximately 10:15 p.m. on January 1, 2013, Naser entered the Sunoco and purchased 6 quarts of motor oil. He poured oil all over candy bars and in the ATM machine, the EBT and credit card machines, causing significant damage.

Thirty-three minutes later, at 10:48 p.m., Naser entered a Mobil Gas Station in Bloomfield Township where, several weeks earlier, he had worked and been fired upon suspicion of theft. Naser walked directly to a store shelf and grabbed a package containing pepper spray. Armed with the pepper spray, Naser assaulted and robbed the cashier. The cashier suffered large bruises on his head, a scrape on the left side of his face, and injuries to his eyes from the pepper spray.

Naser then took a bus to Chicago and attempted to board his January 2, 2013, flight to Lebanon. He was again denied boarding and returned to Michigan. The following day, Naser recorded a video falsely labeling Dennison an FBI informant and posted the video on his YouTube channel.

### Naser is paroled and ISIS rises to prominence

On January 4, 2013, Naser was charged with armed robbery for his conduct at Mobil. He was convicted after a jury trial and sentenced to 3 to 20 years. He had been ordered deported upon his release from state prison, but his deportation order was

unexpectedly rescinded by an ILJ in March 2016. As a result, Naser was paroled on March 18, 2016.

During his incarceration, the Islamic State of Iraq became ISIS and its leader, Abu Bakr al-Baghdadi, announced a merger with Al Nusrah. ISIS seized territory and declared a Caliphate. Its leaders directed adherents to either (1) travel to the Islamic State, or (2) engage in attacks in their homelands. ISIS, described as "an organization whose brutality is shocking even by the standards of terrorism," *United States v. Ahmed*, 107 F.Supp.3d. 1002, 1005 (D. Minn. 2015), caused numerous individuals to commit terrorist acts resulting in mass casualties in the United States and elsewhere. ISIS published articles in its propaganda news magazines, released wildly popular propaganda videos, and ordered individual followers through social media to engage in attacks. And these same platforms often included information on how to conduct these attacks.

Unable to travel to join ISIS, Naser focused his attention on how to support ISIS in the United States. However, because he was under supervision, Naser was careful to hide his activities. Naser used two cellular phones—an iPhone 7 Plus, which he disclosed to his parole agent, and an LG phone, which he kept hidden. Naser surreptitiously created social media accounts on Telegram and PalTalk. Using monikers like "MuslimX1" and "ISxxxIS", Naser joined invitation-only ISIS supporters' chatrooms, groups, and private rooms where he obtained and viewed official ISIS media reports, publications, and other jihadi propaganda. He voraciously

19

consumed ISIS and other jihadi propaganda depicting and promoting violent extremism and he collaborated with ISIS supporters and bombmakers. He solicited and obtained information on explosives and experimented with manufacturing explosives and operating drones.

### Naser supports ISIS and meticulously gathers and builds explosives

On May 27, 2016, Naser activated a Telegram bot called "ISxOne1Bot." Bots can be programmed to remind, connect, broadcast, and integrate with other services. Bots can also be used as a method of anonymizing messages and storing content. Naser used his bot as a secure way to store information, often forwarding important messages and content from his Telegram account to his Bot. For instance, on March 12, 2017, Naser forwarded a recipe for the explosive Copper Azide to his Bot. The recipe had been posted in the Telegram chatroom by a self-proclaimed ISIS bomb-maker via his Telegram account: "MUJAHIDEEN_SECRETS_BOT."  Naser then forwarded the ISIS *bayat* (oath) which begins in Arabic with "We renew our oath of allegiance to Caliph Abu-Bakr al-Baghdadi…" to his bot on July 7, 2017.

Naser actively solicited information on explosives. For instance, during an April 15, 2017, PalTalk chat, Naser asked a participant in Arabic, "do you know how to make explosives?" That same day, Naser downloaded and viewed an explosives video which contains step-by-step instructions on how to use household products to assemble a homemade bomb for use in a terror attack. The 22-minute video was produced by the Ibn Taymiyyah Media Center (ITMC), a Gaza-focused jihadi media

group, and posted on its Telegram and Twitter accounts and elsewhere on April 26,
2016. This video demonstrated the process to make a homemade bomb from acetone
peroxide, using metal balls for shrapnel. The video recommended using the bomb in
closed spaces like busses, restaurants, or similar locations, where it would be most
effective and cause the most harm. Naser downloaded the video from Telegram on
April 15, 2017. Naser's explosives-making materials were in lock-step with the
instructions detailed in the video.

Naser also experimented with manufacturing explosives. On August 5, 2017,
Naser chatted with PalTalk user, "Abu Yos Al Sa" (Al Sa) in Arabic in the ISIS
Supporters chatroom. Erroneously believing Al Sa to be another user called "the
Moroccan" who had been tutoring Naser on the manufacture of explosives, Naser
told Al Sa, "You taught me a very useful thing" … "How to cook a dish 😉" which
was "a procedure to roast [or grill].".

The next day, on August 6, 2017, in the same PalTalk chatroom, Naser
encountered the Moroccan (user abouhamza_10). A series of communications
between Naser and that the Moroccan between August 6, 2017, and October 8, 2017,
show the Moroccan was instructing Naser on the manufacture of explosives. For
instance, on September 15, 2017, Naser and the Moroccan entered a private PalTalk
chatroom and discussed explosives in Arabic. During the discussion, Naser agreed
that he had been able to successfully manufacture "a detonator." The Moroccan
offered to give Naser another recipe for a sticky explosive charge, which the

Moroccan explained was comprised of four things, including a "detonator." The Moroccan suggested they continue their discussion on Telegram, and Naser provided the Moroccan with his Telegram username, "Hamzah Dabiq." On October 8, 2017, the Moroccan asked Naser, "do you want to continue today?" on PalTalk. Naser replied that he did, the Moroccan stated: "Okay, call me on Telegram and we will continue our work." The pair then arranged a time to connect on Telegram.

In June-July 2017, Naser participated in a Telegram ISIS supporters chatroom in which users sought information about explosives, detonators, and/or explosives belts. For instance, one user "Islam is above all: Al-Ahwazi" posted a request (in Arabic) for a simple teaching about how to make a bomb to be planted in some place, or how to make an explosives belt. Another user "I will avenge God's religion" posted a link to a simplified course in manufacturing explosives. A user named "Al-Bihani" told participants in the chat in Arabic: "I want an explosive material but not tnt for an explosive belt and it can be obtained from easily-accessible material and it is of a strong effect." An unnamed user asked participants if there was a way to produce a detonator using acetone peroxide. In addition to discussions about explosives, there were posts by a user named "Abu-Ayman al-Yemeni" describing an instructional video on the use of the Kalashnikov weapon, and how to extract ricin poison from castor oil seed, its effects, and the amounts needed to kill a child or adult.

Naser came to the attention of law enforcement in California in April 2017 after an undercover DEA employee reported hearing a user (later identified as Naser)

make statements in the PalTalk ISIS supporters chatroom, bragging about his real world support for ISIS and encouraging others to do the same. Naser also bragged about his role in the murder and robbery of a Christian gold shop owner in Mosul, Iraq in 2012. According to his retelling, Naser and others watched the man, entered his store, killed him, stole his gold, and then gave the stolen gold to Mujahedin.

When parole agents conducted a home visit on May 19, 2017, they were concerned when they observed Naser was sleeping on the floor in a separate room from his wife (from whom he was not estranged at that time) in an effort to be pious; a drone manual; and Arabic handwritten statements which when translated, including the statements:  "I am the son of the Islamic State. If the mountains swayed, I will not sway" and "We are soldiers of the Caliphate, we shoot with word and a bullet."

At the next home visit on August 16, 2017, parole agents learned that Naser had lied to them in violation of his parole conditions. Since his release from prison, Naser claimed he did not have any social media accounts and only disclosed his use of an iPhone 7 Plus. During the home visit, Naser attempted to hide another phone—an LG—from his parole agent by placing it behind his back as he sat down. When the agent examined the LG phone, he immediately recognized ISIS propaganda images and videos. Naser also stored on the LG phone numerous previously undisclosed social media accounts, including Facebook, Instagram, Snapchat, Skype, Twitter, PalTalk, Telegram, WhatsApp, and YouTube. Naser also had downloaded on the LG phone applications to securely browse both the internet and the dark web with

23

anonymity, including the Tor browser (for anonymity and access to the dark web), Orfox (an encrypted browser), and Orbot (another encryption aid).

### Naser is found with a bomb-making lab while on parole

On October 30, 2017, the FBI searched Naser's home and vehicle pursuant to federal search warrants. Naser had moved into the basement. His wife and children had been kicked out and Naser had a tenant living in one of the upstairs bedrooms. In the basement, agents located Naser's makeshift bed on the floor, a computer, weapons, drones, and other items. Specially trained FBI Special Agent Bomb Techs also located in a corner of the basement numerous chemicals and other components.

The FBI's Explosives Unit expert examined the evidence and concluded that the items found during the search were components comprising a main explosive charge, precursor chemicals of a main explosive charge, main charge containers and components for an electrical fuzing system. If properly assembled, these items would comprise a destructive device. Naser possessed the three key ingredients of the high explosive, triacetone triperoxide, or TATP—acetone, sulfuric acid, and hydrogen peroxide. Islamic extremists often refer to TATP as "the Mother of Satan" for its devastating instability. TATP has been used in major terrorist attacks, including the attempted Christmas Day bombing of Delta airlines flight 253 over Detroit, Michigan in 2009. (*United States v. Abdulmutallab*, EDMI 10-20005, ECF No. 90, PgID.513), the March 2016 Brussels bombings, the November 2015 Paris attacks, and in the 2005 London bombings.

24

He also possessed main charge containers (glass jars) and an electrical fusing system. Naser had numerous mini light bulbs, like Christmas tree lights, which are commonly used by bombmakers as initiators in the fusing system. He had wires and electronics commonly used in bombs to connect a switch, power source, and initiator together in a fusing system. He had switches, digital timers, and two-way radios which can also be used as arming and/or firing switches, and power sources in the fusing system. And he had in his car fragmentation—specifically approximately 250 hunting pellets and 1500 copper BBs. If attached to the main charge container, they can be propelled outward at great velocity once the bomb explodes and can cause property damage, serious physical injury and/or death. Numerous other items, such as glass measuring cups and jars, coffee filters, gloves, a syringe, squeeze bottles, sandpaper, tools, were also found co-located with wiring and electronic components. The FBI's explosives experts compared the materials found in Naser's basement with the materials used in the ITMC video and concluded that Naser possessed the same materials (and/or their functional equivalent) recommended for use in the video.

### Naser's dangerous handheld weapons

Naser also possessed numerous dangerous weapons, including: a sword concealed in a cane, a stun gun, several tactical knives, one round of .38 caliber ammunition, copper BBs, and hunting pellets. Here are photos some of his dangerous weapons from that day.

25



**Cane Sword**



**Serated knife with hand guard**



**Knife with metal knuckle grip**



**Folding knife (Tanto blade)**



**Folding knife**


**.38 caliber ammunition**


**Stun-gun**

*Naser's drones*

Naser also had several drones of varying sizes, remote controls, and other

materials related to drones. On a work bench adjacent to the explosives-making

materials, he had been working on two custom build drones (shown here).





## IV.   <u>Legal issues</u>

## A.    **Naser's statements are admissible by the government**

### 1.    **Coconspirator statements made during and in furtherance of a conspiracy**

For out-of-court statements of a coconspirator to be admissible under Rule 801(d)(2)(E), the government must establish the following three foundational prerequisites (the "foundation") by a preponderance of the evidence: "(1) that a conspiracy existed, (2) that the defendant against whom the [statement] is offered was a member of the conspiracy, and (3) that the hearsay statement was made in the course and in furtherance of the conspiracy." *United States v. Vinson*, 606 F.2d 149, 152 (6th Cir. 1979); Fed. R. Evid. 801(d)(2)(E). And "the rule does not require that both parties be coconspirators; it merely requires the statement to be offered against a party and be made by a coconspirator of a party during the course and in furtherance of the conspiracy." *United States v. Pike*, 342 F. App'x 190, 193 (6th Cir. 2009) (cleaned up).

28

"An anonymous statement may be admissible under Rule 801(d)(2)(E) if circumstantial evidence permits a finding by a preponderance of the evidence that there was a conspiracy involving the author and the defendant, and the statement was made in the course and furtherance of the conspiracy." *United States v. Martinez*, 430 F.3d 317, 326 (6th Cir. 2005) (citation omitted). "What is essential is that the government show that the unknown declarant was more likely than not a conspirator." *Id.*

### Conspiracy existed

"Although this court has long held that the essence of conspiracy is agreement, proof of a formal agreement is not necessary; 'a tacit or material understanding among the parties will suffice.'" *United States v. Avery*, 128 F.3d 966, 970-71 (6th Cir. 1997) (quoting *United States v. Pearce*, 912 F.2d 159, 161 (6th Cir.1990)). "A conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan." *Id.* at 971 (quotation omitted). The elements of a conspiracy are (1) the existence of an agreement between two or more persons to violate the law, (2) the defendant's knowing and voluntary joinder in the conspiracy, and (3) the defendant's specific intent to further the conspiracy's common unlawful objective. *United States v. Trevino*, 7 F.4th 414, 424-25 (6th Cir. 2021). The challenged statements may be considered in determining if a conspiracy existed. *Bourjaily v. United States*, 483 U.S. 171, 181 (1987).

### During

"Sixth Circuit law provides that '[w]here a conspiracy contemplates a continuity of purpose and a continued performance of acts, it is presumed to exist until there has been an affirmative showing that it has terminated; and its members continue to be conspirators until there has been an affirmative showing that they have withdrawn.'" *United States v. Galicia*, 609 F. App'x 302, 305-06 (6th Cir. 2015) (quoting *Rios*, 842 F.2d at 873). And even if a coconspirator is "no longer an active participant in the conspiracy . . . he is nonetheless presumed to be a continuing member, and is chargeable for subsequent acts of co-conspirators, so long as the conspiracy was ongoing and [the defendant] did not establish his affirmative withdrawal from the conspiracy." *United States v. Robinson*, 390 F.3d 853, 882 (6th Cir. 2004) (affirming admission of statements under Rule 801(d) (2)(E) against incarcerated defendant). To that end, "[m]ere cessation of activity is not sufficient to establish withdrawal from a conspiracy . . . and a defendant's arrest or incarceration does not qualify as an affirmative, volitional act of withdrawal." *Id.*; *see also United States v. Blake–Saldivar*, 505 F. App'x 400, 410 (6th Cir. 2012) (holding that coconspirator statements may be admissible under Rule 801(d)(2)(E) even if defendant was incarcerated at the time the statement was made).

### In furtherance

"A statement is made in furtherance of a conspiracy if it was intended to promote conspiratorial objectives; it need not actually further the conspiracy." *United States v. Zertuche*, 565 F. App'x 377, 384 (6th Cir. 2014) (quotation marks and citation omitted).

30

"Moreover, a statement may be in furtherance of a conspiracy even if not exclusively, or even primarily, made to further the conspiracy." *United States v. Warman*, 578 F.3d 320, 338 (6th Cir. 2009) (internal citation omitted). Courts have set forth some examples of statements that meet the "in furtherance" requirement: "[S]tatements identifying other conspirators and their roles in the conspiracy, statements to inform other conspirators of the activities or status of the conspiracy, and statements as to the source or purchaser of controlled substances." *Zertuche*, 565 F. App'x at 385. "Statements designed to conceal an ongoing conspiracy are made in furtherance of the conspiracy for purposes of Rule 801(d)(2)(E)." *United States v. Payne*, 437 F.3d 540, 546 (6th Cir. 2006). Even a statement to an undercover agent is "clearly made in furtherance of the conspiracy because it was directed at a potentially recurring customer ([the] agent) with the intention of reassuring him of [the defendant's] reliability as a supplier." *See United States v. Mooneyham*, 473 F.3d 280, 286 (6th Cir. 2007); *see also United States v. Swidan*, 888 F.2d 1076, 1081 (6th Cir.1989) (co-conspirator statements made to an undercover admissible under Rule 801(d)(2)(E)).

Naser's statements are admissible, non-hearsay statements only when offered by the government. *See* Fed. R. Evid. 801(d)(2)(A) ("A statement that meets the following conditions is not hearsay . . . The statement is offered against an opposing party and was made by the party."). A statement against interest includes any statement, which at the time of its making, "so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the

31

statement unless believing it to be true." Fed.R.Evid. 804(b)(3). This applies to admissions by Naser to acts that are part of a conspiracy. It also applies to online and other statements by Naser and conspirators. So, 801(d)(2)(E) is a means—but not the only means—of introducing statements which are evidence of the conspiracy.

### 2.      Other statements are non-hearsay or hearsay exceptions

The following matrix contains *additional* non-hearsay or hearsay exceptions for admission. Each applicable basis includes the supporting Rule of Evidence, case law, or both. More discussion of the case law follows.

| Basis | Rule (case) |
|---|---|
| **1. Non-Hearsay** | |
| A. Not for truth—for other reason | 801(c)(2) |
| B. Verbal acts | *United States v. Rodriguez-Lopez*, 565 F.3d 312, 314 (6th Cir. 2009) ("offered as evidence of the bare fact that it was said, rather than for its truth, is not hearsay") |
| questions | *United States v. Wright*, 343 F.3d 849, 865 (6th Cir. 2003) |
| commands | *Rodriguez–Lopez*, 565 F.3d at 314-15 |
| threats | *Neal v. Morris*, 972 F.2d 675, 679 (6th Cir. 1992) |
| acquisitions (order for drugs or rooms) | *United States v. Hamilton*, 689 F.2d 1262, 1270 n.4 (6th Cir. 1982) |
| operative words constituting a crime (solicitations for weapons, explosives, conspiracy) | *United States v. Moss*, 9 F.3d 543, 550 (6th Cir. 1993); *Rodriguez–Lopez*, 565 F.3d at 314 |
| C. Statements to provide context for non-hearsay (rest of conversation) | *United States v. Henderson*, 626 F.3d 326, 337 (6th Cir. 2010) |
| D. **Opposing party statement made by coconspirator** | 801(d)(2)(E); *United States v. Vinson*, 606 F.2d 149, 152 (6th Cir. 1979); *United States v. Zertuche*, 565 F. App'x 377, 384 (6th Cir. 2014) (identifying coconspirators and their |

| Basis | Rule (case) |
|---|---|
| | roles, informing of conspiracy acts, and statements for drug source or purchase) |
| E. Opposing party statement made by servant or agent within scope of agency | 801(d)(2)(D); *United States v. Wiedyk*, 71 F.3d 602, 605 (6th Cir. 1995) |
| 2. Hearsay—exceptions | 803, 804, 807 |
| Availability immaterial | 803 (+ non-testimonial) |
| Present sense impression (perceived + described + contemporaneous "I just saw") | 803(1) |
| Excited utterance (truly startled reaction) | 803(2) |
| Then-existing mental, emotional, physical condition ("baby I'm dope sick," etc.) | 803(3) |
| Statements for the purpose of medical diagnosis or treatment | Rule 803(4) |
| Unavailable witness (can't find, dead, privilege) | 804(a) (+ non-testimonial) |
| Against penal interest (self-inculpatory + trustworthy corroboration) | 804(b)(3); *Neuman v. Rivers*, 125 F.3d 315, 319 (6th Cir. 1997) |
| *Residual exception (must file notice): circumstantial trustworthiness + a material fact + more probative than any other obtainable evidence + will serve the rules and interests of justice.* | *807* |

Certain statements are admissible as non-hearsay—the government will offer them simply because they were made, not for their truth. Fed.R.Evid. 801(c)(2).

An out-of-court statement or assertion is hearsay only if "offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c)(2). Any statement offered for a purpose other than to prove the truth of the matter asserted is not hearsay. *See id.* It is only once a statement is considered hearsay that a court is required to consider the applicability of hearsay exclusions (Fed.R.Evid. 801(d)) or exceptions (Fed.R.Evid. 803,

804, 807). Any statement offered for another purpose is not hearsay. Frequently, "it is the fact that the declaration was made, and not the truth of the declaration, which is relevant." *United States v. Childs*, 539 F.3d 552, 559 (6th Cir. 2008) (in prosecution for conspiracy to commit murder for hire, the solicitation seeking an accomplice to murder was not hearsay, but rather a verbal act); *see also United States v. Rodriguez-Lopez*, 565 F.3d 312, 314 (6th Cir. 2009) ("[a] statement offered as evidence of the bare fact that it was said, rather than for its truth, is not hearsay").

Some of the evidence offered at trial will consist of recorded and other statements. Many of these statements will not be offered for the truth of any matter, but rather as verbal acts—or other non-hearsay evidence—constituting direct evidence of the charged crimes. *Rodriguez-Lopez*, 565 F.3d at 314. They will not be hearsay—and will not implicate the coconspirator hearsay rule. Specific (but non-exhaustive) examples of non-hearsay coconspirator statements include the following. **1. Questions**. *See United States v. Wright*, 343 F.3d 849, 865 (6th Cir. 2003) (a question is not typically hearsay because it lacks factual content and does not assert anything). **2. Commands**. *See Rodriguez–Lopez*, 565 F.3d at 314-15) (holding that "commands" are not hearsay because they are not "assertive speech"); *Michigan First Credit Union v. Cumis Ins. Soc., Inc.*, 641 F.3d 240, 251 (6th Cir. 2011) ("This statement is not hearsay because it is a command, a verbal act without truth value."). **3. Threats**. *See Neal v. Morris*, 972 F.2d 675, 679 (6th Cir. 1992) ("there is no question that the threat is not hearsay evidence and is admissible."); *United States v. Horton*, 847 F.2d 313, 324 (6th Cir. 1988)

("statements were properly admissible because they were not offered to prove the truth of the matters asserted but were admitted to show their effect[.]"); *United States v. Norwood*, No. 12-CR-20287, 2015 WL 2250481, at *10 (E.D. Mich. May 13, 2015) ("threats generally are not hearsay because they are not assertions; rather threats are generally considered 'verbal acts' not admitted for the truth of the matter asserted."). **4. Acquisitions**. *See United States v. Hamilton*, 689 F.2d 1262, 1270 n.4 (6th Cir. 1982) (orders for contraband "constitute verbal acts and would not be hearsay at all[.]").

### 3.    The Confrontation Clause

The government may seek to admit statements from video recordings, witness testimony, and cellphone or other records. All of these statements are nontestimonial and do not implicate *Bruton v. United States*, 391 U.S. 123 (1968), or the Confrontation Clause. *Bruton* and the Confrontation Clause only apply to testimonial evidence. *See United States v. Johnson*, 581 F.3d 320, 325 (6th Cir. 2009) ("Because it is premised on the Confrontation Clause, the Bruton rule, like the Confrontation Clause itself, does not apply to nontestimonial statements.")).

"The threshold question . . . is 'whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime.'" *Mooneyham*, 473 F.3d at 286-87 (quoting *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004)). When "statements [a]re admitted into evidence under the theory that they were statements made by a co-conspirator in furtherance of the conspiracy. . . [b]y definition, such statements are not by their nature

35

testimonial[.]" *Id.* (internal quotation omitted). "Indeed, the *Crawford [v. Washington*, 541 U.S. 36 (2004),] court specifically identified statements in furtherance of a conspiracy as examples of statements that are inherently non-testimonial." *Id.* The statements the government may seek to admit are nontestimonial because there is no evidence that the declarants intended their statements as testimony against Naser. *Johnson*, 581 F.3d at 325. These statements would be admissible as coconspirator statements under Rule 801(d)(2)(E) or as statements against penal interest set forth in Rule 804(b)(3).

### 4.   Naser's self-serving statements are inadmissible

Naser has been interviewed by federal law enforcement on several occasions. During these interviews, Naser made many self-serving statements which at times, he co-mingled with admissions. At trial, Naser may seek to elicit testimony regarding these exculpatory, self-serving statements from the interviewing agents, and offer them in evidence as truthful explanations.

But self-serving statements are inadmissible hearsay because they are statements made outside of the trial that would be offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c). They lack the indicia of reliability afforded to statements against interest, which are premised "on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." *Williamson v. United States,* 512 U.S. 594, 600 (1994).

The only hearsay exception that Naser may try to fit these types of statements into is Federal Rule of Evidence 804(b)(3), "Statement Against Interest," which provides a hearsay exception for statements made against the interest of the declarant. Rule 804(b)(3) has three requirements for statements to qualify as declarations against a penal interest: "(1) whether the declarant is unavailable; (2) whether, from the perspective of the average, reasonable person, the statements were truly adverse to the declarant's penal interest, and (3) whether corroborating circumstances truly establish the trustworthiness of the statement." *United States v. Tocco*, 200 F.3d 401, 414 (6th Cir. 2000).

A declarant is unavailable under Rule 804(a) if he is exempted from testifying because the court rules that a privilege applies, or he is absent from the trial and the statement's proponent has been unable to procure the declarant's testimony. Fed. R. E. 804(a).

Courts must look at the surrounding context of a statement to determine if it is self-inculpatory. *Williamson v. United States,* 512 U.S. 594, 603 (1994). For example, statements that are neutral on their face may be against the declarant's penal interest when put in context. *Id.* And determining whether a statement is self-inculpatory "can only be answered in light of all the surrounding circumstances." *Id.* at 604.

The statement against interest must be "supported by corroborating circumstances that clearly indicate its trustworthiness." Fed. R. of Evid. 804(b)(3). This requirement may be satisfied by independent evidence or "when the

37

circumstances in which the statement was made suggesting that the statement is trustworthy[.]" *United States v. Henderson*, 736 F.3d 1128, 1131 (7th Cir. 2013). For example, statements made to a friend in confidence may be more trustworthy than statements made to law enforcement. *Tocco*, 200 F.3d at 416.

The statements Naser may seek to admit meet neither the unavailability requirement nor the credibility requirement of that exception. While he is unavailable to the government as a witness under the Fifth Amendment, he is in full control of his own decision to testify and therefore he is available as witnesses to himself. The Rule does not allow statements to be introduced "if the statement's proponent procured or wrongfully caused declarant's unavailability to prevent declarant's testimony." Fed. R. Evid. 804(a). Naser cannot cause his own unavailability by exercising his right not to testify and then use that unavailability to introduce his prior statements under Rule 804. *See United States v. Kimball*, 15 F.3d 54, 55–56 (5th Cir. 1994.) ("The sponsor of a declarant's former testimony may not create the condition of unavailability and then benefit therefrom. . . . In the instant case, [the defendant] created his own unavailability by invoking his fifth amendment privilege against self-incrimination.");*United States v. Peterson*, 100 F.3d 7, 13 (2nd Cir. 1996) (When a defendant chooses not to testify, "he has made himself unavailable to any other party, but he is not unavailable to himself.").

The statements are also incredible and uncorroborated, so they can't be admitted as statements against interest. Naser's motivation in making these statements

is clear: if the jury believes, for instance, that Naser was joking when he described himself as a "Mujahideen Sniper," and that Naser was attempting to "expose" FBI informants when agreed to provide Russell Dennison, a member of al-Nusra Front (an alias of ISIS until May 2014) with funds to purchase an AK-47, then Naser is not guilty of attempting to provide material support to ISIS. These self-serving statements are not supported by corroborating circumstances clearly indicating trustworthiness under 804(b)(3)(B). And statement made by a declarant who may have been motivated to lie is not admissible because it lacks "corroborating circumstances clearly indicating trustworthiness." *See United States v. Caldwell,* 760 F.3d 267, 290 (3rd Cir. 2014).

Plus, Rule 804(b)(3) "does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory." *Williamson,* 512 U.S. at 600-601. Thus, "when determining the admissibility of a narrative, [a court] must examine it sentence by sentence, in order to determine what sentences are self-inculpatory and what sentences are collateral." *United States v. Cox*, 871 F.3d 479, 489 (6th Cir. 2017) (internal quotations and citations omitted). A defendant does not have "an unfettered right to offer evidence that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *United States v. Blackwell*, 459 F.3d 739, 753 (6th Cir. 2006) (cleaned up). Naser should not be permitted to use these statements to avoid cross-examination.

### 5.      Rule 106 is narrowly applied

If the government decides to introduce certain of Naser's out-of-court

statements, this does not open the door for him introduce other statements he

made—either through his own testimony or through the examination of other

witnesses.  *See United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005) ("Rule

801(d)(2), however, does not extend to a party's attempt to introduce his or her own

statements through the testimony of other witnesses.") (internal citations omitted and

emphasis in original); *United States v. Gallagher*, 57 F. App'x 622, 628-29 (6th Cir. 2003)

("The trial court properly concluded that the admitted part of Gallagher's statement—

his admissions that he was a felon, knew that he was not to possess a firearm, and that

his female companion had nothing to do with the crime—did not require appellant's

additional self-serving exculpatory comments for completeness. . . . As this circuit has

observed, 'the completeness doctrine embodied in Rule 106 should not be used to

make something admissible that would otherwise be excluded.'") (internal citations

omitted).

Amended Rule 106 provides that "[i]f a party introduces all or part of a

statement, an adverse party may require the introduction, at that time, of any other

part—or any other statement—that in fairness ought to be considered at the same

time. The adverse party may do so over a hearsay objection."  Fed. R. Evid. 106.  But

the amended Rule "does not require the United States to play entire

recordings."  *United States v. Mayfield*, No. 3:22-CR-31, 2020 WL 86864, at *2 (S.D.

Miss. Jan. 8, 2024). Rule 106 "does not give a green light of admissibility to all excised portions of statements. It does not change the basic rule, which applies only to the *narrow* circumstances in which a party has created a *misimpression* about the statement, and the adverse party proffers a statement that in fact *corrects* the misimpression." *Id.* (quoting Fed. R. Evid. 106 cmt.). "The mere fact that a statement is probative and contradicts a statement offered by the opponent is not enough to justify completion under Rule 106." *Id.*

In other words, "Rule 106 requires the introduction of a . . . recorded statement only when the omitted portion is necessary to qualify, explain, or place into context the portion already introduced." *Id.* (internal citations and quotations omitted). The Rule "functions as a defensive shield against potentially misleading evidence proffered by an opposing party." *United States v. Covington*, 2023 WL 8481004, at *3 (E.D. Va. Dec. 7, 2023) (quoting *Echo Acceptance Corp. v. Household Retail Servs., Inc.*, 267 F.3d 1068, 1089 (10th Cir. 2001)). But it "does not permit a party to introduce recorded statements to affirmatively advance their own, alternative theory of the case." *Mayfield*, 2020 WL 86864, at *2 (internal citations and quotations omitted). Indeed, "the exculpatory nature of [an] excluded statement [] does not require its admission under Rule 106." *United States v. Branch*, 91 F.3d 699, 728 (5th Cir. 1996). To use Rule 106, the parties "must identify the specific statements they wish to introduce and explain with particularity why each satisfies Rule 106." *Mayfield*, 2024 WL at *2 (internal citations and quotations omitted). The amended Rule "still requires the creation of a misimpression before an

41

out-of-court statement will be admitted for completeness." *United States v. Crowell*, 2023 WL 8642213, at *1 (S.D. Ohio Dec. 14, 2023) (quoting Fed. R. Evid. 106 (2023 Adv. Committee Notes))

## B.    Law enforcement testimony

### 1.    Testimony about the initial investigation of the crimes or of a given act is not hearsay

The government may introduce testimony explaining why it undertook the investigation. Testimony about tips or eye-witness descriptions is not hearsay and does not violate the Confrontation Clause. *See Gibbs*, 506 F.3d at 486-87 (6th Cir. 2007). Tips are simple "background evidence." *Id.*

In *Gibbs*, the agent testified that another parolee told him that the defendant "had some long guns, shotguns and/or rifles hidden in his basement bedroom." *Id.* at 486. The agent "offered this testimony solely as background evidence to show why [the defendant]'s bedroom was searched." *Id.*  The Sixth Circuit held that the parolee's "statement was not hearsay, but instead testimony offered simply as background evidence." *Id.* at 487; *see also United States v. Martin*, 897 F.2d 1368, 1371 (6th Cir. 1990) ("out of court statements offered for the limited purpose of explaining why a government investigation was undertaken have been determined not to be hearsay."). The Sixth Circuit also held that admission of the out-of-court statement did not violate the Confrontation Clause, because it was not being used as hearsay. *Id.* at 486 ("The admission of a testimonial statement, however, does not necessarily trigger a violation

of the Confrontation Clause. To do so, the statement must be used as hearsay—in other words, it must be offered for the truth of the matter asserted."); *see also United States v. Pugh*, 405 F.3d 390, 399 (6th Cir. 2005) ("the Confrontation Clause does not bar the use of testimonial statements for purposes other than establishing the truth[.]").

Because the investigatory background information is not hearsay, it does not violate the Confrontation Clause and is admissible. The Court should give a limiting instruction to the jury to ensure that they do not use background information for the truth of the matter asserted.

## 2.   An agent can testify about general terrorism slang and jargon under Rule 702 (as an expert)

"Courts frequently qualify law enforcement officers as expert witnesses under Federal Rule of Evidence 702 to interpret intercepted conversations that use 'slang, street language, and . . . jargon[.]'" *United States v. Young*, 847 F.3d 328, 350-52 (6th Cir.), cert. denied, 137 S. Ct. 2200, (2017) (quoting *United States v. Kilpatrick*, 798 F.3d 365, 379 (6th Cir. 2015)). Rule 702 requires a district court to satisfy itself that the proposed expert testimony will assist the jury, before permitting the jury to assess such testimony. *Kumho Tire Company v. Carmichael*, 526 U.S. 137, 148-49 (1999). These same principles apply to a law enforcement officer in the criminal context. *United States v. Harris*, 192 F.3d 580, 588 (6th Cir.1999). Courts have consistently held that expert testimony is admissible where such testimony "will aid the jury's understanding of an area, such as drug dealing, not within the experience of the average juror." *United States v. Jemison*, 310

43

F. App'x 866, 875 (6th Cir. 2009). The same is true for terrorism cases. *See, e.g., United States v. Hassan*, 742 F.3d 104, 131 (4th Cir. 2014) (testimony satisfied Rule 702 because the witness possessed "the requisite knowledge, skill, experience, training, and education to testify on various aspects of the trend of decentralized terrorism and homegrown terrorism" and "his testimony would assist the trier of fact to understand the evidence or to determine a fact in issue" including "terminology and concepts that were likely to be unfamiliar to jurors." (citing *United States v. Benkahla,* 530 F.3d 300, 309 (4th Cir. 2008)); *United States v. Jayyousi,* 657 F.3d 1085, 1107 (11th Cir. 2011) (no error in admission of testimony "regarding the use of code words by violent radical groups . . . [where the witness] was able to testify regarding their method of communication. Further, his testimony related to trial evidence, helped the jury understand the unique use of certain words in the intercepted calls, and countered defendants' claim that these words did not have violent connotations."); *United States v. Damrah,* 412 F.3d 618, 625 (6th Cir. 2005) (affirming district court's decision to admit testimony of terrorism expert and materials relied upon by expert "[g]iven the secretive nature of terrorists").

### 3.   An agent can testify about coded language within a particular conspiracy under Rule 701 (the lay opinion testimony rule)

"Conversely, when a law enforcement officer is not an expert witness, the officer's lay opinion testimony is admissible 'only when the law enforcement officer is a participant in the conversation, has personal knowledge of the facts being related in the conversation, or observed the conversations as they occurred.'" *Id.* (quoting

*Kilpatrick*, 798 F.3d at 379). "Federal Rule of Evidence 701 states that if a witness is not testifying as an expert, 'an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.'" *Id.* (quoting Fed. R. Evid. 701). "The purpose of lay opinion testimony is to 'describ[e] something that the jurors could not otherwise experience for themselves by drawing upon the witness's sensory and experiential observations that were made as a first-hand witness to a particular event.'" *Id.* (quoting *United States v. Freeman*, 730 F.3d 590, 595 (6th Cir. 2013)).

Put another way, an "agent qualified as an expert may interpret coded . . . language . . . [while] a lay witness who has personal knowledge of a particular . . . crime conspiracy may similarly testify to the meaning of coded language within his knowledge. But a case agent testifying as a lay witness may not explain to a jury what inferences to draw from recorded conversations involving ordinary language." *United States v. Edwards*, 707 F. App'x 332, 336 (6th Cir. 2017) (quoting *Freeman*, 730 F.3d at 598).

### 4.    Interpreting recorded conversations

An agent who establishes "a personal knowledge for his testimony" can properly testify to the jury about the meaning of "slang and jargon" used by a defendant. *Id.* at 351; *see also Edwards*, 707 F. App'x at 336 ("law-enforcement officers who offer testimony under Rule 701—i.e., by interpreting recorded phone conversations—must specify the personal experiences that led the agent to obtain his or her information.").

45

An agent shows personal knowledge, for example, by involvement "in the investigation since its inception," having "interviewed witnesses," "conducted surveillance," and reviewed many "hours of phone calls." *Young*, 847 F.3d at 351; *see also United States v. Williamson*, 656 F. App'x 175, 187 (6th Cir. 2016) ("Although [the agent] testified that he had listened to 'over thousands of phone calls' and often used the pronoun 'we' when discussing the investigation, he made clear his active role in the surveillance . . . He had the firsthand knowledge necessary to give lay opinion testimony."), *cert. denied*, 580 U.S. 1120, 137 S.Ct. 1119 (2017); *United States v. Smith*, 609 F. App'x 340, 347 (6th Cir. 2015) (holding that agent who "interpreted the conversations based on personal knowledge as opposed to his general involvement in the investigation" gave permissible lay witness testimony).

### 5.     Background information of investigation

"Agents are permitted to testify regarding how they became involved in a case, what allegations they were investigating, who the suspects were, and similar background information." *Id.* (citing *Kilpatrick*, 798 F.3d at 381). "This sort of testimony, which is designed to set the stage for the introduction of evidence, differs substantively from problematic 'preview testimony' that 'purports to sum up (in advance of the evidence) the government's overall case.'" *Id.* (quoting *Kilpatrick*, 798 F.3d at 381-82). "Explaining the allegations underlying an investigation does not implicate Rule 701 or *Freeman*." *Id.*

### 6. Testimony about what the evidence does not contain

"It is also permissible for an agent who has reviewed the evidence to testify concerning what the evidence does not contain." *Kilpatrick*, 798 F.3d at 382. "A witness who has examined the records may testify that no record 'of a specific tenor is there contained.'" *Id.* (quoting *United States v. Scales*, 594 F.2d 558, 562 (6th Cir. 1979) "Testifying to the absence of evidence also does not implicate Rule 701 or *Freeman.*" *Id.*

### 7. "Framing" references to prior testimony are appropriate

"[E]specially in a complicated trial, a witness may make short 'framing' references to previously-admitted evidence." *Id.* The case agent can answer "whether they recalled certain details of prior witnesses' testimony." *Id.* "These short framing questions tied the evidence together in a manner that was helpful to the jury." *Id.; see also United States v. Smith*, 601 F.3d 530, 540 (6th Cir. 2010) (permitting summary-reference testimony in complex cases where the volume of evidence is "plausibly confusing to the jury").

### 8. Installment testimony

Federal Rule of Evidence 611(a) gives the district court "reasonable control over the mode and order of examining witnesses and presenting evidence." *United States v. Bailey*, 973 F.3d 548, 563 (6th Cir. 2020) (allowing witness to testify at three different points). This is to (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment. Fed. R. Evid. 611(a)(1)–(3). Applying Rule 611(a), the government may

call certain witnesses to testify in installments. Courts permit these measures in complicated cases like this one, with facts that span considerable time and involve dozens of witnesses and complex evidence. *See, e.g., Bailey*, 973 F.3d at 563 (allowing witness to testify at three different points); *United States v. Butera*, 677 F.2d 1376, 1381 (11th Cir. 1982) (allowing the government's case agent to take "the stand on four separate occasions to describe the underlying events in the case in chronological order"); *United States v. Jackson*, 549 F.2d 517, 528–529 (8th Cir. 1977) ("[T]he manner in which [the agent] . . . was called to testify lent a praiseworthy degree of order to this complicated trial . . . through the repeated recall of [the agent] . . . as a witness."); *United States v. Didani*, No. 21-20264, 2025 WL 452472, at *8 (E.D. Mich. Feb. 10, 2025) (Hood, J.) (permitting the government to recall its case agent or other witnesses to help present the events in an orderly, chronological manner); *United States v. Tawfik*, No. CR 17-20183, 2022 WL 866395, at *8 (E.D. Mich. Mar. 23, 2022) (Goldsmith, J.) ("in order to facilitate an orderly and comprehensible presentation of this complex case, avoid inefficient use of court time, and avoid jury confusion (and thereby prevent prejudice to the defendants), the government will be permitted to allow its case agent and other witnesses to testify in segments related to specific schemes during its case-in-chief.") (citing Rule 611(a)). As in those complex cases, allowing witnesses "to testify in installments may be the most effective method of presenting evidence." *United States v. Bailey*, No. 19-2280, 2022 WL 2444930, at *17 (6th Cir. July 5, 2022) (citing *Bailey*, 973 F.3d at 564)).

9.    **Opinion (expert) testimony**

The government intends to have one or more witness testify as an expert in various areas, including: (1) hazardous devices; (2) language specialist; (3) computers and software; (4) chemistry-metallurgy; (5) chemistry; (6) forensics; (7) intelligence analysis; and (8) Islamic terrorism. The government has complied with the expert witness disclosure notice requirements set forth in Fed. R. Crim. P. 16(a)(1)(G). Although the government has not received notice of any defense expert witnesses, it is possible that Naser will also offer expert witnesses. As the Court is aware, "the court should not, in the presence of the jury, declare that a witness is qualified as an expert or to render an expert opinion, and counsel should not ask the court to do so." *United States v. Johnson*, 488 F.3d 690, 697 (6th Cir. 2007). "Instead, the proponent of the witness should pose qualifying and foundational questions and proceed to elicit opinion testimony. If the opponent objects, the court should rule on the objection, allowing the objector to pose voir dire questions to the witness's qualifications if necessary and requested." *Id.*

In *Johnson*, the Sixth Circuit quoted approvingly from *Berry v. McDermid Transp., Inc.*, 2005 WL 2147946, at *4 (S.D. Ind. Aug.1, 2005), which stated that "counsel for both parties should know before trial that the court does not 'certify' or declare witnesses to be 'experts' when 'tendered' as such at trial. Instead, if there is an objection to an offered opinion, the court will consider the objection. The court's jury instructions will refer to 'opinion witnesses' rather than 'expert witnesses.'" The government's

49

proposed jury instructions will reflect this.

**10.   Summary testimony of voluminous writings and recordings under Rule 1006**

A witness can "summarize voluminous writings or recordings." *Kilpatrick*, 798 F.3d at 383. "Under Federal Rule of Evidence 1006, a party may 'use a summary . . . to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court,' provided that the other party has been given an opportunity to examine the entire record." *Id.* "The 'point of Rule 1006 is to avoid introducing all the documents.'" *Id.* (quoting *United States v. Faulkenberry*, 614 F.3d 573, 588–89 (6th Cir. 2010))*; see also* Sixth Circuit Pattern Criminal Jury Instructions, 2021 Edition, § 7.12A ("During the trial you have seen or heard summary evidence in the form of a chart, spreadsheet, or similar material. This summary was admitted in evidence, in addition to the material it summarizes, because it may assist you in understanding the evidence that has been presented. But the summary itself is not evidence of the material it summarizes, and is only as valid and reliable as the underlying material it summarizes.").

**11.   Testimony about another officer's contemporaneous observations**

The Sixth Circuit allows the government to introduce an agent's contemporaneous or almost-contemporaneous description of investigative activity, typically through the trial testimony of a second agent who overheard the declarant's description. *See*, *e.g.*, *United States v. Valeri*, 956 F. 2d 1164, 1992 WL 44868, *2 (6th Cir.

1992) (unpublished); *United States v. Allen*, 872 F.2d 1029, 1989 WL 31131, *1-2 (6th Cir. 1989) (unpublished). This means agents can testify about descriptive statements made by other agents.

The agent's contemporaneous or almost-contemporaneous descriptions are also admissible to rebut any claim, express or implied, that the officers fabricated their testimony. Under Federal Rule of Evidence 801(d)(1)(B), a statement is not hearsay if it "is consistent with the declarant's testimony and is offered . . . to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying." *Id.*

### 12. Law enforcement reports may be read to the jury as a past recollection recorded

"Federal Rule of Evidence 803(5) allows a document to be read to the jury as a past recollection recorded if (1) the witness once had knowledge about the facts in the document, (2) the witness now has insufficient memory to testify about the matters in the document, and (3) the document was recorded at a time when the matters were fresh in the witness' mind and the document correctly reflects the witness' knowledge of the matters." *United States v. Smith*, 197 F.3d 225, 231 (6th Cir. 1999) (citing *United States v. Porter*, 986 F.2d 1014, 1016 (6th Cir. 1993) (rehearing and rehearing en banc denied)). This applies to information from law enforcement reports. *See, e.g., United States v. Eason*, 188 F. App'x 383, 389 (6th Cir. 2006) (allowing coconspirator's phone number from police report under past-recollection-recorded exception); *United States v.*

*Picciandra*, 788 F.2d 39, 44 (1st Cir. 1986) (admission of DEA report proper under the past recollection recorded hearsay exception); *United States v. Green*, 258 F.3d 683, 689 (7th Cir. 2001) (trooper's report qualified as past recollection recorded); *United States v. Sawyer*, 607 F.2d 1190, 1193 (7th Cir. 1979) (Rule 803(8) concerning public records does not disqualify the recorded recollections of a testifying law enforcement officer when such recollections would otherwise be admissible as a recorded recollection under Rule 803(5)); *Terry v. City of Detroit*, No. 2:17-CV-11450, 2018 WL 2239559, at *2 (E.D. Mich. May 16, 2018) (the information contained in the report could plausibly be admitted at trial in several ways: (1) as personal knowledge under Fed. R. Evid. 602; (2) if [the officer']s memory fails, the police report could be used to refresh his recollection under Fed. R. Evid. 612; and (3) if the notes fail to refresh [the officer's] recollection, he could still possibly read his report into evidence as a past recollection recorded under Fed. R. Evid. 803(5)).

## C.   Other evidence admissible by the government

### 1.   Cellphone information is admissible and easily authenticated

The government will seek to admit relevant activities on cell phones. Cellphone evidence is simple to authenticate. "'To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.'" *United States v. Quintana*, No. 18-1231, 2019 WL 549575, at *3 (6th Cir. Feb. 12, 2019) (quoting Fed. R. Evid. 901(a)). "Evidence is authentic when the proponent offers 'sufficient proof . .

. that a reasonable juror could find in favor of authenticity.'" *Id.* (quoting *United States v. Jones*, 107 F.3d 1147, 1150 n.1 (6th Cir. 1997). "The rest is up to the jury." *United States v. Farrad*, 895 F.3d 859, 876 (6th Cir.), *cert. denied*, 139 S. Ct. 651 (2018). "Authentication is a 'relatively low[ ] hurdle[.]'" *Quintana*, 2019 WL 549575, at *3 (quoting *Farrad*, 895 F.3d at 878). It "may be proved through a variety of methods, including circumstantial evidence[.]" *Id.* (citing *United States v. Crosgrove*, 637 F.3d 646, 658 (6th Cir. 2011)). "This task can be accomplished in a number of ways—with testimony from someone with knowledge of the evidence offered, for example, or by pointing to distinctive characteristics that establish authenticity." *Id.* (citing Fed. R. Evid. 901(b)(1), (4)).

## 2. Concealment, false exculpatory statements

The jury will likely hear testimony that Naser concealed evidence or gave false exculpatory statements. "If the jury believes this testimony, then the jury may consider this conduct, along with all the other evidence, in deciding whether the government has proved beyond a reasonable doubt that the defendant committed the crime(s) charged. This conduct may indicate that he thought he was guilty and was trying to avoid punishment." *See* Sixth Circuit Pattern Criminal Jury Instructions, 2021 Edition, § 7.14.

## 3. Naser's intrinsic act evidence

A district court may admit uncharged background evidence as long as it is "inextricably intertwined" with the underlying offense. *United States v. Edmond*, 815 F.3d 1032, 1045 (6th Cir. 2016), *cert. granted, judgment vacated on other grounds*, 581 U.S. 912 (2017). Intrinsic acts may be admitted when evidence "provides background

information, establishes a nexus between individuals, or completes the story of the charged offense." *United States v. Gibbs*, 797 F.3d 416, 424 (6th Cir. 2015). This theory of admission goes by many, maybe too many, names: res gestae, background evidence, intrinsic acts, intrinsic evidence. *See United States v. Churn*, 800 F.3d 768, 779 (6th Cir. 2015). No matter the name (we prefer "intrinsic acts"), the idea is the same: Intrinsic acts "are part of a single criminal episode," *United States v. Barnes*, 49 F.3d 1144, 1149 (6th Cir. 1995), meaning they "ha[ve] a causal, temporal or spatial connection with the charged offense," *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000) Courts may admit evidence via this route if it (1) "is a prelude to the charged offense"; (2) "is directly probative of the charged offense"; (3) "arises from the same events as the charged offense"; (4) "forms an integral part of a witness's testimony"; or (5) "completes the story of the charged offense." *Id.* Because the evidence is proper intrinsic acts evidence, the evidence does not implicate Rule 404(b). *See United States v. Churn*, 800 F.3d 768, 779 (6th Cir. 2015) ("[Intrinsic acts] evidence does not implicate Federal Rule of Evidence 404(b), which generally bars evidence of past acts to prove character, but with some exceptions.") (citing *Hardy*, 228 F.3d at 748).

This is also true in the context of a terrorism case like Naser's. *See United States v. Ahmed*, No. 20-40713, 2022 WL 16914540, at *1-3 (5th Cir. Nov. 14, 2022) ("the evidence demonstrated that [the defendant] was familiar with the ideological roots of ISIS, supported its objectives, sought to further those objectives by attempting to train and recruit other inmates, and had at least some knowledge of bomb-making.* * * [So,]

evidence of [the defendant's] 2012 terrorism convictions was intrinsic because it was intertwined with the instant terrorism charge and helped tell the story of . . . why he wanted to bomb the Brooklyn detention center, how he obtained a terrorism training manual, why he wanted to help ISIS members travel to the United States, and why he attempted to recruit and train new members of the terrorist organization."). And any time gap between an intrinsic act and Naser's attempts is immaterial. *Id.* (the defendant "does not point out any case law citing time as a relevant factor when considering whether evidence is intrinsic.").

### 4.    Naser's other acts evidence (Rule 404(b))

The jury may hear that Naser committed crimes other than the ones charged in the Second Superseding Indictment. If the jury finds that he did those crimes, the jury can consider the evidence only as it relates to the government's claim on his relevant basis (intent, motive, opportunity, preparation, plan, knowledge, identity, or absence of mistake). The jury must not consider it for any other purpose. *See* Sixth Circuit Pattern Criminal Jury Instructions, 2021 Edition, § 7.13.

Rule 404(b) is a rule of inclusion, because it identifies several permissible uses for 404(b) evidence and prohibits only one. *United States v. Blankenship*, 775 F.2d 735, 739 (6th Cir. 1985). "Rule 404(b) governs the admissibility of extrinsic evidence of crimes, wrongs, or other acts that 'occurred at different times and under different circumstances from the offense charged.'" *United States v. Bell*, No. 17-CR-20183, ECF No. 501, 2020 WL 4726935, at *2 (E.D. Mich. Aug. 14, 2020) (quoting *United States v.*

*Barnes*, 49 F.3d 1144, 1149 (6th Cir. 1995)). "However, the Rule does not apply to intrinsic evidence of uncharged acts that are part and parcel of the misconduct charged in the indictment." *Id.* (citing *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000); *Barnes*, 49 F.3d at 1149). "That is, evidence of bad acts that are 'inextricably intertwined' with the charged offense or that relate to a continuing pattern of illegal activity does not implicate Rule 404(b)." *Id.* "Thus, courts may admit intrinsic evidence without reference to Rule 404(b) if it '(1) is a prelude to the charged offense; (2) is directly probative of the charged offense; (3) arises from the same events as the charged offense; (4) forms an integral part of a witness's testimony; or (5) completes the story of the charged offense.'" *Id.* (quoting *United States v. Edmond*, 815 F.3d 1032, 1045 (6th Cir. 2016), *vac' on other grounds*, 137 S. Ct. 1577 (2017)).

"Uncharged bad acts committed by a defendant in furtherance of a charged conspiracy have been held to constitute intrinsic evidence that does not implicate Rule 404(b)." *Id.* (citing *United States v. McGee*, 510 F. App'x 377, 381 (6th Cir. 2013) (holding that a prior, uncharged robbery that supplied firearms used in furtherance of the charged conspiracy was an intrinsic wrong such that Rule 404(b) analysis was not required)). "Furthermore, bad acts performed 'by other participants in a common scheme are admissible as long as [the acts] constitute part of the same criminal episode, whether or not a conspiracy is charged, and as long as independent evidence ties the defendant to that scheme.'" *Id.* (quoting *United States v. Hohn*, 293 F. App'x 395, 402 (6th Cir. 2008) (finding that admission of a shooting committed by co-defendants, but

56

not involving the defendant, was proper because it was intrinsic to the charged RICO conspiracy)).

A defendant is "not entitled under Rule 404(b) to pretrial disclosure of the intrinsic evidence the government intends to introduce." *Id.*

### 5. No constructive amendment or variance if other acts are mentioned

"When allegations of an overt act are not specifically listed in an indictment, there is no variance if the theory of the case [is] not changed, the defendant [is] not charged with a different substantive crime, and the elements of the crime charged [are] not altered." *See United States v. White*, 718 F. App'x 353, 358 (6th Cir. 2017) (citing *United States v. Smith*, 749 F.3d 465, 483 (6th Cir. 2014)).

## D. Limits on character evidence

### 1. Rule 404(a) limits character evidence to that which is relevant to prove an element of the crime, or general law abidingness

"Rule 404(a) states the general rule of excluding circumstantial use of character evidence." *United States v. Hazelwood*, 979 F.3d 398, 409 (6th Cir. 2020). "'Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait.'" *Id.* at 410 (quoting Fed. R. Evid. 404(a)(1)). "Notwithstanding, in a criminal case, if the defendant decides to offer evidence of a 'pertinent trait' 'the prosecutor may offer evidence to rebut it[.]'" *Id.* (quoting Fed. R. Evid. 404(a)(2)(A)).

"Pertinent" in 404(a) has been interpreted by several courts to be synonymous with "relevant." *United States v. Angelini*, 678 F.2d 380, 381 (1st Cir. 1982); *United States v. Hewitt*, 634 F. 2d 277, 279 (5th Cir. 1981); *United States v. Staggs*, 553 F.2d 1073, 1075-76 (7th Cir. 1977). In order to be "pertinent" or relevant, the character trait must "relate to some element at issue in the case." *United States v. Han*, 230 F.3d 560, 564 (2nd Cir. 2000). Any pertinent character trait in this case is confined to the elements of the charged crimes.

In addition,  courts have found that the character trait of "law abidingness" is "relevant." *Hewitt*, 634 F. 2d at 279-280; *see also, Angelini*, 678 F.2d at 382.

## 2.     If Naser puts his character at issue, he opens cross-examination

If Naser presents opinion or reputation evidence concerning general law-abidingness, the government has considerable latitude to explore that topic (including inquiry into specific instances of conduct) on cross. *See* Fed. R. Evid. 405(a) ("When evidence of a person's character or character trait is admissible, it may be proved by testimony about the person's reputation or by testimony in the form of an opinion. On cross-examination of the character witness, the court may allow an inquiry into relevant specific instances of the person's conduct."); *United States v. Green*, 305 F.3d 422, 431 (6th Cir. 2002) (noting that witnesses may opine as to a defendant's lawful character, or testify as to his reputation for lawfulness, but, if they do, the government may cross-examine the witnesses concerning their awareness of specific events); *United States v. McGuire*, 744 F.2d 1197, 1204 (6th Cir. 1984) ("Once a defendant's reputation

is in issue, the prosecution has wide latitude on cross-examination."); *Michelson v. United States*, 69 S. Ct. 213, 220 (1948) ("The price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him."); *United States v. Clark,* 26 F. App'x 422, 427 (6th Cir. 2001) ("while the law gives [the] defendant the option to show as a fact that his reputation reflects a life and habit incompatible with commission of the offense charged, it subjects his proof to tests of credibility designed to prevent him from profiting by a mere parade of partisans.").

### 3. Naser's general good character, beliefs, or discernment, is inadmissible

Evidence relating to Naser's kindness, peacefulness, family relationships, empathy, or similar issues, is inadmissible as character evidence. *See United States v. Santana-Camacho*, 931 F.2d 966, 968 (1st Cir. 1991) ("evidence that [the defendant] is kind or a good family man would not make any fact of consequence to the determination' of the case [significantly] more or less probable than it would be without evidence of the trait.") (internal quote omitted). Same with his beliefs. *See Gov't of Virgin Islands v. Petersen*, 553 F.2d 324, 329 (3d Cir. 1977) ("this testimony [about religious beliefs] was not legally relevant. A person may or may not act in accordance with a professed belief; it is the observation of the defendant's behavior over a length of time which is the recognized basis for both reputation and opinion testimony."). And same with mental capacity or discernment. *See United States v. Nixon*, 694 F.3d 623, 636 (6th

Cir. 2012) ("other circuits have determined that the term 'character trait' does not encompass a witness's memory or mental capacity . . . We find our sister circuits' analysis on this issue persuasive[.]").

### 4. Rule 405 allows only opinion or reputation testimony

"Rule 405 limits the form of evidence that can be admitted under Rule 404(a)." *Hazelwood*, 979 F.3d at 410. "Where, as in this case, character is not an 'essential element' of a charge or defense, Rule 405 allows inquiry into prior acts *only* through testimony about a defendant's 'reputation' or 'opinion' to prove a person's character." *Hazelwood*, 979 F.3d at 410 (emphasis in original) (citing Fed. R. Evid. 405(a)). "Rule 404(b) precludes the use of other-acts evidence to 'prove a person's character[.]'" *United States v. Dimora*, 750 F.3d 619, 630 (6th Cir. 2014).

### 5. Rule 405 precludes testimony about specific good acts

So, "for the same reason that prior 'bad acts' may not be used to show a predisposition to commit crimes, prior 'good acts' generally may not be used to show a predisposition not to commit crimes." *Id.* Testimony as to specific instances of conduct is only admissible under limited circumstances—in response to cross-examination, or on direct examination where a trait of character is an essential element of the crime charged. *See* Fed. R. Evid. 405(a) and (b).

### E. Inadmissible evidence and nullification arguments

Naser may not present inadmissible evidence or pursue lines of inquiry to elicit jury nullification. Juries have the power, but not the right to nullify. *United States v.*

*Carr*, 424 F.3d 213, 220 (2d Cir. 2005) ("The power of juries to nullify or exercise a

power of lenity is just that—a power; it is by no means a right or something that a

judge should encourage or permit") (cleaned up). Courts have a duty to prevent

counsel from urging nullification. *United States v. Young*, 470 U.S. 1, 7-10 (1985). And

courts uniformly hold that "nullification instructions should not be allowed." *United*

*States v. Drefke*, 707 F.2d 978, 982 (8th Cir. 1983); *see also United States v. Krzyske*, 836

F.2d 1013, 1021 (6th Cir. 1988) (refusal to give nullification instruction).

A defendant may not suggest in any way that the jury should acquit even if it

finds that the government has met its burden. *Wofford v. Woods*, 969 F.3d 685, 709 (6th

Cir. 2020) ("jurors can vote to acquit in defiance of the law, and courts in general

cannot stop them—but courts will not encourage this, provide jury instructions

acknowledging it, or allow lawyers to argue overtly for it.") (internal citations omitted).

The court's duty to prevent nullification encompasses orders precluding the defense

from introducing irrelevant evidence; or, that is, evidence relevant to improper jury

nullification arguments. *See, e.g., United States v. Penn*, 969 F.3d 450, 458 (5th Cir. 2020),

(noting that evidence sought to be admitted solely for nullification is irrelevant and

inadmissible); *In Re United States,* 945 F.3d 616, 630–31 (2d Cir. 2019) (explaining that

evidence of sentencing consequences upon conviction would be irrelevant if offered

solely for purpose of nullification); *United States v. Peterson*, 945 F.3d 144, 157 (4th Cir.

2019) (holding trial court properly precluded defense evidence of his lengthy state

sentence given its "self-evident invitation to jury nullification"); *United States v. Lynch,*

903 F.3d 1061, 1080 (9th Cir. 2018) (noting that the jury "has no sentencing function"

and "should be admonished to reach its verdict without regard to what sentence

might be imposed"); *United States v. Walsh*, 654 Fed. App'x 689, 696–97 (6th Cir. 2016)

(affirming trial court's refusal to allow the defense to argue the legitimacy of federal

marijuana laws); *United States v. Dunkin*, 438 F.3d 778, 780 (7th Cir. 2006) (holding that

a defense unsupported by credible evidence should not be submitted to a jury since it

invites improper jury nullification); *United States v. Greer*, 620 F.2d 1383, 1384 (10th

Cir. 1980) ("presenting information to the jury about possible sentencing is

prejudicial"); *United States v. Gorham*, 523 F.2d 1088, 1097–98 (D.C. Cir. 1975) (no

evidence that might encourage a "conscience verdict" of acquittal).

The government cannot anticipate each form of potential jury nullification

argument or evidence. But each of the potential areas noted below are irrelevant to

the elements of the crime charged and, instead, encourage nullification or are

otherwise improper.

### 1.    Possible penalties

"Arguing punishment to a jury is taboo." *United States v. Richardson*,

130 F.3d 765, 778 (7th Cir. 1997), *vacated on other grounds*, 526 U.S. 813 (1999). "When a

jury has no sentencing role, providing sentencing information invites jurors to ponder

matters that are not within their province, distracts them from their factfinding

responsibilities, and creates a strong possibility of confusion." *United States v. Johnson,*

62 F.3d 849, 850 (6th Cir. 1995). Mention of the potential penalties faced by

defendant only would serve the improper purpose of jury nullification. *See, e.g., Johnson,* 62 F.3d at 850-51; *United States v. Calhoun,* 49 F.3d 231, 236 n.6 (6th Cir. 1995) (no "right to inform the jury of possible punishment or that the jury had the power to nullify the law"). This rule is in our jury instructions. *See* Sixth Circuit Pattern Instruction § 8.05 (2024) ("If you decide that the government has proved the defendant guilty, then it will be my job to decide what the appropriate punishment should be. Deciding what the punishment should be is my job, not yours. It would violate your oaths as jurors to even consider the possible punishment in deciding your verdict. Your job is to look at the evidence and decide if the government has proved the defendant guilty beyond a reasonable doubt.").

### 2.     Motivations for investigating or prosecuting

Evidence bearing on the government's motivations for investigating and prosecuting Naser are irrelevant and should be excluded from trial. *See United States v. Johnson,* 605 F.2d 1025, 1030 (7th Cir. 1979) (affirming the exclusion of evidence offered to show that the "indictment was a political instrument"). The subjective intentions or motivations of a government agent or investigating officer are irrelevant to determining the factual guilt or innocence of a defendant. *See, e.g., United States v. Goulding,* 26 F.3d 656, 667 (7th Cir. 1994) (noting that, even in the context of an entrapment defense, the trial court properly did not "allow the defense to mount an inquiry into the mental states of the investigating officers since such an inquiry was irrelevant").

### 3.      Naser's lawful behavior

Any evidence of Naser's lawfulness and good conduct, except in the form of reputation or opinion offered by character witnesses under Rule 405(a), is inadmissible. "Proof that a defendant acted lawfully on other occasions is not necessarily proof that he acted lawfully on the occasion alleged in the indictment." *United States v. Heidecke*, 900 F.2d 1155, 1162 (7th Cir. 1990). And acts of honesty do not prove an absence of unlawful acts. *See United States v. Burke*, 781 F.2d 1234, 1243 (7th Cir. 1985) ("Evidence that the defendant frequently performs lawful or laudable acts does not often establish that some subsequent act is also lawful or laudable."). Without this limit, Rule 405 would be meaningless. *See* Fed. R. Evid. 405.

### 4.      "Outrageous" government conduct

Naser alleges that the FBI's investigative techniques "entrap" innocent Muslims in terrorism cases. He also claims that his actions were designed to "expose" those techniques. And Naser is working to publish a documentary or podcast (which he has claimed is entitled "How the FBI Manufactures Terrorism"). None of this is admissible or proper before the jury.

First, outrageous government conduct is not a defense and there are "strong reasons for concluding that such a defense simply does not exist." *United States v. Amawi,* 659 F.3d 457, 483 (6th Cir. 2012). The claim affords no defense to a criminal prosecution as a matter of law, "no matter how . . . 'outrageous' the government's conduct." *United States v. Tucker*, 28 F.3d 1420, 1422 (6th Cir. 1994)*; see also United*

*States v. Blood*, 435 F.3d 612, 629 (6th Cir. 2006) ("the outrageous government conduct defense is not available where the defense is based either on a theory of government inducement . . . or on a theory that the 'undercover officer's involvement in creating [the] crime was so significant that criminal prosecution violates due process[.]'") (citation omitted)). So, "outrageous government conduct" is no defense to a criminal charge, and the jury thus should not be exposed to irrelevant allegations of this sort. *See Tucker*, 28 F.3d at 1427.

Second, government misconduct is a matter of law for determination by the court, so "the issue of outrageous government conduct is not an issue for the jury." *United States v. Swiatek*, 819 F.2d 721, 726 (7th Cir. 1987) (noting that every circuit which has considered the issue has held that it is not a jury question) (citations omitted); *United States v. Barger*, 931 F.2d 359, 363 (6h Cir. 1991) (setting forth four factors the court should consider in assessing whether governmental conduct is outrageous as a matter of law).

### 5. Discovery comments in the Jury's presence

It is improper for the parties to discuss discovery matters in the presence of the jury. These comments may distract the jury or create the impression that one side has suppressed information as a means of seeking an unfair advantage. *See e.g., United States v. Householder*, 645 F.Supp. 844, 849-850 (S.D. Oh. Dec. 13, 2022) (granting government's "motion to exclude references to the discovery process and discovery disputes").

6.       **Suppressed evidence**

Naser moved for the Court to suppress evidence recovered in two of his

bedrooms. And the Court did so. (*See* R. 209, Order). Specifically, "any evidence

seized from the south master bedroom or the southwest bedroom," (R. 209,

PageID.2559), and including "(a) a Smith & Wesson MSP BB gun . . . (the "airsoft

BB gun"); (b) a magazine; and (c) BBs that were found in "Room E," i.e., the south

master bedroom." (R. 209, PageID.2552). Now that evidence is excluded from trial

and cannot be used by either party. *See Michigan v. Harvey*, 494 U.S. 344, 361 (1990)

("The Court has held that evidence seized in violation of the Fourth Amendment is

excluded from a criminal trial not as a personal right of the criminal defendant but

rather as a remedy for a wrong that is fully accomplished at the time the evidence is

obtained.") (Stevens, Brennan, Marshall, and Blackmun, dissenting); *see also Stone v.*

*Powell*, 428 U.S. 465, 485 (1976) ("Logically extended this justification [for excluding

evidence] would require that courts exclude unconstitutionally seized evidence despite

lack of objection by the defendant, or even over his assent.") (citing *Henry v.*

*Mississippi*, 379 U.S. 443 (1965)); *United States v. Calandra*, 414 U.S. 338, 348 (1974) ("In

sum, the rule is a judicially created remedy designed to safeguard Fourth Amendment

rights generally through its deterrent effect, rather than a personal constitutional right

of the party aggrieved."). And that means Naser cannot now introduce that evidence.

*See Walder v. United States*, 347 U.S. 62, 65 (1954) (it would "be a perversion of the

Fourth Amendment" to allow a defendant to "turn the illegal method by which evidence in the Government's possession was obtained to his own advantage").

But there is an exception. "'Generally, evidence which is otherwise suppressed or excluded becomes admissible when the defendant opens the door to the issue.'" *United States v. Harvey*, 653 F.3d 388, 394–95 (6th Cir. 2011) (quoting *United States v. Crawford,* 86 Fed. App'x 834, 838 (6th Cir. 2004)). So, if "the defendant uses otherwise excluded evidence, the district court does not abuse its discretion by allowing the prosecution to use the inculpatory aspects of the excluded material to 'clear up' any false impressions created by the defense." *Id.* (quoting *United States v. Spikes,* 158 F.3d 913, 929 (6th Cir.1998)). If this situation were to arise, the Court should provide an instruction to the jury to ensure that it does not think that the government was hiding the evidence from those bedrooms.

## F.     Impeachment

### 1.     Proper impeachment

To properly impeach a witness, the inquisitor must (1) confirm a specific statement from the witness's testimony ("you just testified to 'A.'"). *See United States v. Johnson*, 965 F.2d 460, 465 (7th Cir. 1992) ("the overly broad question, '[w]ere there any errors in your statement?,' was insufficient to focus attention to the alleged discrepancy between the trial testimony and the [prior] statement.").

Then, (2) the inquisitor must ask the witness "did you say 'not A' at an earlier time"? *See United States v. Johnson*, 837 F. App'x 373, 382–83 (6th Cir. 2020), *cert. denied*,

141 S. Ct. 2542 (2021) (first "the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it.") (quoting Fed. R. Evid. 613(b)). The inquisitor must "present [the witness] with the *substance* of the [prior] statement and ask [the witness] to admit, deny, or explain the *substance* of the statement"—rather than merely asking the witness whether he made a statement at a particular time. *United States v. Lexington Ins. Co. v. Cooke's Seafood*, 835 F.2d 1364, 1369 (11th Cir. 1988) (emphasis in original); *see also Goins v. Hirsh*, 913 f.2d 1269, 1275 n,.6 (7th Cir. 1990). And the prior statement must contradict the specific testimony that is being attacked. *See United States v. McCafferty*, 801 F. Supp. 2d 605, 616 (N.D. Ohio 2011), *aff'd*, 482 F. App'x 117 (6th Cir. 2012) ("the recorded conversation . . . was not properly offered as impeachment because it did not contract [the witness's] testimony.").

If (3) the witness says "yes, I said 'not A' at an earlier time," then the impeachment is complete and extrinsic evidence is not permitted. *See Rush v. Illinois Cent. R. Co.*, 399 F.3d 705, 723 (6th Cir. 2005) ("We long have held that when a witness admits to making a prior inconsistent statement, extrinsic proof of the statement is inadmissible."). The prior out-of-court "not A" statement is not admitted as substantive evidence for the jury.

If (4) the witness says "no, I did not earlier say 'not A,'" then the inquisitor can confront the witness with a prior inconsistent statement where the witness said "not A." But—under either (3) or (4), the prior inconsistent statement is not substantive

evidence. A limiting instruction is then appropriate. *See* Fed. R. Evid. 105 (when evidence is admitted for a limited purpose, "the court, on timely request, must restrict the evidence to its proper scope and instruct the jury accordingly.").

### 2.   Impeachment with extrinsic evidence

Whether a piece of extrinsic evidence is appropriate for use as impeachment evidence must be determined on a question-by-question basis. And the proposed impeachment should be scrutinized to ensure it is not a vehicle for inadmissible evidence. There are several reasons that a given statement within extrinsic evidence may be inadmissible. *See United States v. Costner*, 684 F.2d 370, 373 (6th Cir. 1982) ("If offered to impeach [the witness], it was inadmissible on grounds of relevancy. If offered to prove the truth of the matter asserted, it was inadmissible as hearsay. Further, it may have been inadmissible as evidence of a similar bad act.").

Rule 608(b) does not change this. That rule provides:

> [E]xtrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of: (1) the witness; or (2) another witness whose character the witness being cross-examined has testified about.

Rule 608(b).

"Rule 608(b) by its terms prohibits the use of extrinsic evidence. Under that Rule, we have allowed a questioner to ask about extrinsic documents during cross-examination and show them to the witness, but not to publish the documents to the

jury." *Id.* (citing *United States v. Delaine*, 517 F. App'x 466, 470 (6th Cir. 2013) ("The checks that Defendant now claims should have been excluded were never admitted into evidence. The jury did not see them, nor were they available to the jury during deliberations.")). So, although Naser may be permitted to show a witness extrinsic evidence and question the witness about it, "Rule 608(b) d[oes] not authorize [presenting the evidence] to the jury." *Id.* (citing Roger Park & Tom Lininger, The New Wigmore: A Treatise on Evidence: Impeachment and Rehabilitation § 2.3 (1st ed. Supp. 2020) ("Inadmissible evidence [can] provide the good-faith basis for cross-examination. . . . Of course, the prosecution could not make that inadmissible evidence known to the jury under the guise of providing a good-faith basis for impeachment.")).

It is also improper for several reasons to apply a "hybrid of Rule 608(b) and Rule 613 [that] appears to be common-law impeachment by specific contradiction, which permits courts to admit extrinsic evidence that specific testimony is false, because contradicted by other evidence." *United States v. Craig*, 953 F.3d 898, 905 (6th Cir. 2020). First, the Sixth Circuit has "expressed skepticism as to whether impeachment by contradiction is permissible in this circuit." *Id.* (citing *United States v. Scott*, 693 F.3d 715, 721–22 (6th Cir. 2012) ("We have not recognized the doctrine of impeachment by contradiction, and we need not do so today." (citation omitted)); *United States v. Todd*, 431 F. App'x 412, 416 (6th Cir. 2011) (discussing use of impeachment by contradiction in other circuits and noting that this circuit has not adopted it). "Second, at least one circuit has limited impeachment by contradiction to statements made on direct

examination, not answers brought out on cross." *Id.* (citations omitted). Third, "and most importantly, such extrinsic evidence is still subject to ordinary rules of admissibility, which would include authentication." *Id.*

### 3.    Impeachment with prior conduct—Rule 608(b)

Rule 608(b) allows impeachment regarding specific instances of conduct only if the conduct is probative of the witness' character for truthfulness. Any party seeking to introduce conduct under Rule 608(b) must also satisfy the balancing test under Rule 403. Fed. R. Evid. 608(b), note to subdivision (b); *United States v. White*, 110 F.Supp.2d 641, 644 (S.D. Ohio 1999); Fed. R. Evid. 403 ("probative value [of the testimony] is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence").

By its very nature, impeachment based upon a witness' prior conduct that is not relevant to the matter at issue creates a risk of causing unfair prejudice to an opposing party. First, a party attempting to conduct such impeachment may erroneously believe that such impeachment is appropriate when it is not–the end result being that the impropriety of the impeachment is only discovered after the disparaging impeaching conduct is presented to the jury as part of an attorney's question. Second, even if some conduct may properly fall within the scope of Rule 608(b), counsel may exceed any limitations on the scope to which such matters may be addressed on cross-examination. Third, depending on the nature of the past

71

conduct, the jury may not be able to completely obey the Court's instruction to disregard the contents of an improper question heard by the jury. For these reasons, and to obviate any risk of unfair prejudice, impeachment under Rule 608(b) should require a prior offer of proof (away from the jury) concerning the alleged prior conduct. *See* Fed. R. Evid. 611.

And the parties are not required to divulge the alleged prior conduct prior to cross examination (thereby preserving any strategic value to the examining party). Rather, the Court could require each party first notify the Court and the other parties at sidebar of its intent to impeach under Rule 608(b). This procedure would ensure that any alleged prior bad acts are not improperly communicated to the jury before the Court has the opportunity to determine whether such alleged prior bad acts are the subject of proper impeachment under Rule 608(b).

### 4.    A witness cannot be impeached by another's statement

There are several reasons Naser cannot use an agent's report to impeach another witness who testifies at trial. First, the Sixth Circuit has held that "it would be grossly unfair to allow the defense to use a statement to impeach a witness which could not fairly be said to be the witness' own rather than a product of the investigator's selections, interpretations, and interpolations." *United States v. Carroll*, 26 F.3d 1380, 1391 (6th Cir. 1994). To permit cross-examination of witness using an agent's report (and vice-versa) would be unfair, and not "impeachment." A given report or statement is that speaker's prior statement, and not the statement of other witnesses.

72

Second, a report or statement would be hearsay when presented to another witness. A "declarant" is a person who makes a statement. Fed.R.Evid. 801(b). A statement other than one made by the declarant at the trial, offered to prove the truth of the matter asserted, is "hearsay." Fed.R.Evid. 801(c).

Third, Federal Rule of Evidence 613 deals with impeachment of a witness by reference to a prior statement by that witness. Rule 613 requires that the statement in question be "a prior statement made by the witness[.]" Fed. R. Evid. 613(a). Under Rule 613, a witness can be impeached by reference only to his own prior statement, and not a prior statement made by another. *United States v. Valentine*, 70 F. App'x 314, 323 (6th Cir. 2003) (citing *United States v. Saget*, 991 F.2d 702, 710 (11th Cir. 1993)).

### 5. An agent's investigative decisions cannot be impeached by the lay opinion of another agent

First, under "Federal Rule of Evidence 602, a 'witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.'" *United States v. Howard*, 124 F. App'x 415, 420 (6th Cir. 2005).

Second, what a witness has done in unrelated circumstances is not relevant to an agent's decision making here. Only relevant matters are proper subjects of testimony. *United States v. Bixler*, No. 21-5194, 2022 WL 247740, at *4 (6th Cir. Jan. 27, 2022) ("the Constitution . . . does not require the admission of irrelevant evidence (or other types of evidence whose relevance is outweighed by other important considerations)."); *see*

*also United States v. Gilbreath*, No. 21-5550, 2022 WL 819733, at *6 (6th Cir. Mar. 18, 2022) ("Rule 401 states that evidence is relevant and generally admissible if 'it has any tendency to make a fact more or less probable than it would be without the evidence' and 'the fact is of consequence in determining the action.'") (quoting and citing Fed. R. Evid. 401 and 402)). Any officer's lay *opinion* about an agent's investigative decisions does not make it more or less probable that Naser committed these crimes. *See United States v. Veal*, 23 F.3d 985, 989 (6th Cir. 1994) (evidence "offered to show that the government's investigation of the case had been, as the defendant put it, 'sloppy[,]' . . . was irrelevant [because] the jury would not be called upon to determine whether the government's investigation had been good or bad.").

Third, what a lay witness might have done if they had perceived what was going on, is speculation and violates Federal Rule of Evidence 701. "Rule 701 states: If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical or other specialized knowledge within the scope of Rule 702." *United States v. Murray*, 152 F. App'x 492, 495–96 (6th Cir. 2005) (quoting Rule 701). Courts preclude witnesses from speculating about the reasons why another witness acted or failed to act. *See, e.g., Giles v. Norman Noble, Inc.*, 88 F. App'x 890, 895 (6th Cir. 2004) (subjective beliefs of a witness regarding the treatment another person received were

inadmissible); *Crane v. Monterey Mushroom, Inc.*, 910 F. Supp. 2d 1032, 1041–42 (E.D. Tenn. 2012) (lay witness precluded from testifying as to why another person acted as he did; there was no evidence that this opinion was "rationally based on [lay witness'] perception"); *United States v. Olender*, 338 F.3d 629, 638 (6th Cir. 2003) ("the expert testimony will not assist the trier of fact in pointing out the loop holes in the Government's case in this particular case. Nor can I think the expert be called as a lay witness to give opinion on the police investigation of this offense or to repeat statements given to him in interviews with potential witnesses.").

### 6.     Cross-examining Naser with his prior conviction

If Naser testifies at trial, the government is able to cross examine him under Federal Rule of Evidence 609(a) for his 2013 armed robbery conviction, for which he received a 3 to 20-year term of imprisonment. Evidence of a prior conviction is admissible pursuant to Fed. R. Evid. 609 so long as less than ten years have passed since the witness was released from confinement, "or the period of his parole or probation had expired." *United States v. Gaines*, 105 F. App'x 682, 695 (6th Cir. 2004), *vacated on other grounds, Gaines v. United States*, 543 U.S. 1114 (2005). Naser was paroled in March 2016, but his parole was revoked on January 18, 2018, and Naser remains incarcerated for this conviction. So, this conviction falls within ten years.

In the event Naser testifies in this case, his credibility will be a central issue at trial. Naser may argue this his actions did not constitute an attempt to provide material support and resources to a foreign terrorist organization, and that he did not

possess a destructive device, or he may give some other explanation for why he should be acquitted. If Naser testifies at trial, the government should be permitted to cross examine him on his prior felony conviction for purposes of attacking his character for truthfulness under Fed. R. Evid. 609(a)(1)(B). The importance of Naser's testimony and the centrality of his credibility outweigh any prejudicial effect and permit proper impeachment.

Rule 609 permits the admission of evidence that a defendant has been convicted of a felony to attack his credibility if the Court determines that the probative value of the evidence outweighs its prejudicial effect. Fed. R. Evid. 609(a)(1)(B). To determine whether the probative value of a conviction outweighs its prejudicial effect, courts should consider the following factors: (i) the impeachment value of the prior crime; (ii) the point in time of the conviction and the witness's subsequent history; (iii) the similarity between the past crime and the charged crime; (iv) the importance of the defendant's testimony; and (v) the centrality of the credibility issue. *United States v. Moore*, 917 F.2d 215, 234 (6th Cir. 1990). These factors are merely a guide to the district court's exercise of its wide discretion. *Montgomery*, 390 F.3d at 1015. Here, the factors weigh in favor of allowing impeachment on Naser's prior convictions.

First, the impeachment value of Naser's prior conviction is high for several reasons. As the Seventh Circuit has observed, any prior felony conviction diminishes one's credibility:

> The rationale for…allowing a prior crime to be used to undermine
> testimony is that a person who has committed a serious crime is more
> likely than a law-abiding person to lie on the stand even if the case in
> which he is testifying has nothing to do with that crime. The rationale is
> underinclusive, since many people who have committed a felony have
> not been caught or if caught have not been convicted, because of the
> prosecution's heavy burden of proof. Moreover, every judge is aware
> that many people who do not have a criminal record will lie in a trial
> when it is to their advantage.

*Schmude v. Tricam Indus., Inc.*, 556 F.3d 624, 627-28 (7th Cir. 2009). Additionally,

Naser's status as a convicted felon will be proven as an element of the offense

charged in count two. Therefore, the prejudicial impact of the fact of his prior felony

convictions is lower than it otherwise would be. Naser's felony armed robbery

conviction is probative of credibility, the first factor of the balancing test favors

admissibility. See U*nited States v. Moore*, 917 F.2d 215, 235 (6th Cir. 1990) (holding that

an armed-robbery conviction "went to credibility, and had impeachment value").

Regarding the second factor, while Naser's conviction occurred approximately

eleven years ago, Naser does not have a long record of law-abiding conduct in the

community during that time. Rather, due to the seriousness of his prior conviction,

Naser was incarcerated between 2013 and March 2016, when he was paroled. While

under parole supervision in April 2017, Naser retaliated against a co-worker by

slashing his vehicle's tires. He was convicted of malicious destruction of property in

July 2017. In August 2017, Naser's partner, Noor Al-Bahiya, filed a petition for a

Personal Protection Order, alleging that earlier that year, Naser had punched and

choked her, threatened to kill her and their daughter, and take their son and leave. Al-

77

Bahiya also alleged that in August, Naser threatened to take their children away from her and to Iraq. In October 2017, Naser was found in possession of a destructive device and arrested for violating the terms of his parole. He was charged with 50 separate parole violations. His parole was revoked on January 18, 2018, after he was found guilty of many of the most serious violations at a hearing, including for violating state law, engaging in assaultive, abusive, threatening behavior, failing to notify his parole agent of his contact with law enforcement, submitting false and inaccurate reports to his parole agent, and for possessing weapons and ammunition. Naser's conduct suggests that he has little regard for the law or court-imposed conditions.

The third factor of the balancing test requires the court to consider the similarity of the past crimes and the charged crime. Naser's prior conviction involved armed robbery, an offense that is dissimilar to the charged offense. But even if that were not the case, the Sixth Circuit has upheld the use of prior convictions even where those convictions are similar to the charged offense. *See United States v. Cox*, 159 F. App'x 654, 658 (6th Cir. 2005) (upholding use of concealed weapon conviction to impeach defendant charged with possessing a concealed weapon); *see also United States v. Smith*, 131 F.3d 685, 687-88 (7th Cir. 1997) (affirming use of the defendants' prior convictions, including for robbery and armed robbery, in a bank robbery trial). The government would propose a limiting instruction similar to the Sixth Circuit Pattern Criminal Jury Instruction 7.05A. Limiting instructions can sufficiently temper the risk

that jurors might use the impeachment for impermissible purposes. *See Moore,* 917 F.2d at 235 (trial court's limiting instruction "provided an adequate safeguard against any potential prejudice possibly engendered by the admission of the prior conviction."); *Cox,* 159 F. App'x at 658 (risk of improper propensity inference mitigated by use of an immediate limiting instruction).

Most significantly, the fourth and fifth factors of the balancing test overwhelmingly support the admission of the convictions for the limited purpose of impeaching Naser's credibility. Presumably, Naser would assert or suggest during his direct examination that his travel plans in 2012-2013 were for reasons other than joining an FTO; that his 2016-2017 Telegram and PalTalk communications were for reasons other than supporting ISIS; that he did not possess the destructive device found in his home in 2017; and that the chemicals and other materials found in his home in 2017 were for a lawful purpose. As Naser's prior felony conviction speaks strongly to his incentive for truth telling and his respect for the oath administered by this Court, admission of this conviction is appropriate to allow the jurors to evaluate his credibility. Where conflicting accounts are offered by Naser and the government's witnesses, the credibility of Naser becomes the central issue in the trial. *See United States v. Arhebamen,* 197 F. App'x 461, 467 (6th Cir. 2006). The jury is entitled to have full and fair information to determine whether Naser is telling the truth, and this Court should permit the government to impeach him with his prior convictions. *Id.*

79

(Evidence of the defendant's prior conviction is "highly probative because Defendant's credibility was a central issue.").

Finally, if Naser testifies and the government impeaches him with his prior conviction and Naser tries to minimize, mischaracterize, or explain away his convictions, the government should be able to inquire into the details of the prior convictions. *See United States v. Villanueva*, 249 F. App'x 413, 418 (6th Cir. 2007) (defendant opens the door to questions regarding the nature and circumstances of his prior conviction when he "offer[s] testimony that is inconsistent with the facts underlying a conviction or attempts to explain away a conviction"); *United States v. Douglas*, 408 F.3d 922, 929 (7th Cir. 2005) (same).

Respectfully submitted,

JULIE BECK
Acting United States Attorney

/s/ *Saima S. Mohsin*
/s/ *Jerome F. Gorgon Jr.*
Assistant United States Attorney
Eastern District of Michigan
211 West Fort Street, Suite 2001
Detroit, MI 48226
Phone: (313) 226-9100
Email: Saima.Mohsin@usdoj.gov

/s/ *Dmitriy Slavin*
Trial Attorney
National Security Division
Email: Dmitriy.Slavin@usdoj.gov

Date:  March 11, 2025

**<u>Certificate of Service</u>**

I hereby certify that on March 11, 2025, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will provide a copy to the attorneys and parties of record: Amanda N. Bashi, Riyah Basha, and  James R. Gerometta.

<u>*/s Jerome F. Gorgon Jr.*</u>
JEROME F. GORGON JR.
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan  48226-3211
(313) 226-9676
jerome.gorgon@usdoj.gov