## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

                                Case No. 22-20504

v.                             HON. JONATHAN J.C. GREY

AWS MOHAMMED NASER,

     Defendant.

_____/

## ORDER DENYING DEFENDANT'S MOTION TO DISMISS SECOND SUPERSEDING INDICTMENT FOR OPPRESSIVE PREINDICTMENT DELAY (ECF No. 197) AND DENYING DEFENDANT'S MOTION TO STRIKE CERTAIN OVERT ACTS FROM SECOND SUPERSEDING INDICTMENT (ECF No. 198)

## I.   INTRODUCTION

A grand jury indicted Defendant Aws Naser in a second superseding indictment on July 9, 2024 on terrorism and destructive device charges. (ECF No. 162.) Defendant Aws Naser moves the Court to dismiss the second superseding indictment for oppressive preindictment delay. (ECF No. 197.) Alternatively, Naser moves the Court to strike certain overt acts from the second superseding indictment as time-barred and/or for failure to allege that he acted in support of a designated foreign terrorist organization ("FTO") prior to December 11, 2012. (ECF No. 198.)

The motions are fully briefed, and the Court held a hearing on the motions on February 7, 2025.

## II.   BACKGROUND

On October 5, 2022, a grand jury charged Naser in count one of an indictment with attempting to provide material support and resources to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1) (ECF No. 162, PageID.1508–1514), and in count two with possessing a destructive device as a felon, in violation of 18 U.S.C. § 922(g)(1). (ECF No. 1.) The indictment has been superseded twice, but every version of the indictment contains the same two charges and counts. (*See* ECF Nos. 158, 162.)

Although Naser was first indicted on October 5, 2022, the federal government began investigating into him no later than early 2011, and the earliest overt act alleged in the second superseding indictment occurred in March 2011. (ECF No. 94, PageID.573; ECF No. 162, PageID.1508 at ¶ 1.) Accordingly, the relevant preindictment period spans from at least March 2011 to October 5, 2022, more than eleven-and-a-half years.

Naser's alleged overt acts occurred in two time spans separated by

2

a period of 40 or 50 months. The first spanned from March 2011 to January 3, 2013 ("the pre-2014 overt acts"). (*Id.* at PageID.1508–1510.) As discussed below, the second period began either on May 27, 2016 or March 12, 2017 and ended on October 30, 2017 (the "parole overt acts"). (*Id.* at PageID.1510–1514.) Naser was detained between January 3, 2013 and March 18, 2016. He was imprisoned in MDOC custody from January 5, 2013 to January 2016, then was transferred to the custody of U.S. Immigration and Customs Enforcement ("ICE") until March 18, 2016.[1] The government does not allege any overt acts occurred during the custodial period.

Next, Naser was on parole to the MDOC from approximately March 18, 2016 to October 30, 2017. The government alleges that, during this parole period, Naser engaged in numerous overt acts. On October 30, 2017, Naser's house was searched pursuant to a search warrant, and he was arrested. Naser was convicted of numerous MDOC parole violations and sentenced to a second term of imprisonment in MDOC custody. Naser remained in MDOC custody from October 2017 until October 2022.

---

[1] Special Agent Jeffery O'Donnell, who oversaw the investigation for some period, testified that "originally the FBI thought that [Naser] would be removed from the country when he was done with his MDOC sentence" in January 2016. (ECF No. 185, PageID.2091–2092.)

In January 2020, MDOC planned to release Naser to a second parole term on February 6, 2020. (ECF No. 190-2, PageID.2196.) However, that decision was suspended on January 24, 2020, after the MDOC received new information regarding Naser. (ECF No. 190-4, PageID.2199.) Naser's anticipated January 2020 release was effectively rescinded on March 17, 2020, and he remained in MDOC custody. (ECF No. 190-7, PageID.2204.) In October 2022, following indictment, Naser entered federal custody.

## III. MOTION TO DISMISS SECOND SUPERSEDING INDICTMENT FOR OPPRESSIVE PREINDICTMENT DELAY

Naser argues that that the second superseding indictment must be dismissed because he has suffered substantial prejudice resulting from oppressive preindictment delay that, when coupled with the government's reckless disregard of his ability to mount a defense, violated his Fifth Amendment Due Process rights.

The first overt act alleged occurred in March 2011, and the last alleged overt act occurred on October 30, 2017. Naser argues that the five years between the last charged overt act and the October 5, 2022 indictment constitute unnecessary preindictment delay that only served

to provide the government a tactical advantage.[2] Naser notes that the five-year delay in this case far exceeds the sixteen-month delay found unacceptable by the court in *United States v. McLemore*, 447 F. Supp. 1229 (E.D. Mich. 1978). The *McLemore* court recognized that, "if not forgotten, defendant was, for all practical purposes ignored. The government's failure to act, under such circumstances, must be weighed against it." *Id.* at 1240. Naser asserts that, for at least the last three years of his second term in MDOC custody (January 2020 to October 2022), he and the MDOC both waited for the FBI to act, which should be weighed against the government.

## A.    Fifth Amendment Due Process Right

The Fifth Amendment protects an individual's due process right against "oppressive delay" before an indictment. *United States v. Lovasco*, 431 U.S. 783, 789 (1977); *see also* F. R. Cr. P. 48(b) ("If there is unnecessary delay in presenting the charge to a grand jury or in filing an information against a defendant who has been held to answer to the

---

[2] Naser states that, although the Government must prove his guilt beyond a reasonable doubt, the Court "must consider the realities of the situation," which is that he is an Arab Muslim accused of supporting terrorism and making a bomb. He contends that racial and religious prejudice effectively shift the burden to Mr. Naser to prove his innocence. The Court will ensure that a fair trial occurs, where the government bears the burden to prove every element of every charged offense.

district court, . . . the court may dismiss the indictment. . . ."). However, it is well-established law that:

> Dismissal for pre-indictment delay is warranted only when [1] the defendant shows substantial prejudice to his right to a fair trial and [2] that the delay was an intentional device by the government to gain a tactical advantage.

*United States v. Brown*, 667 F.2d 566, 568 (6th Cir. 1982) (citing *United States v. Marion*, 404 U.S. 307, 325 (1971).[3]

## B.   Substantial Prejudice

Naser argues that the preindictment delay substantially prejudiced his ability to effectively defend himself against the charges in three ways: (1) missing material witnesses; (2) deterioration of material evidence; and (3) loss of memory.

### 1.   *Missing Material Witnesses*

Naser believes that he will need to rebut the government's allegations about his travel to Iraq in 2012, including the allegation that he killed a Christian gold merchant in Mosul, Iraq that year. He insists that will be difficult to defend against more than 12 years after that trip.

---

[3] The *Brown* court did not engage in any detailed analysis regarding either requirement before it concluded: "We do not believe that the defendants in this case established the two requirements for dismissal on the basis of pre-indictment delay. *Brown*, 667 F.2d at 568.

Naser represents that some of his family members in Iraq have become ill, died, or moved away, whereas other family members are estranged due to his lengthy incarceration. For this reason, he states that they will be unwilling to participate at trial. The government maintains that it will not seek to prove that Naser killed anyone, but it acknowledges it will seek to introduce evidence that, during an online chat in April or May 2017, Naser claimed to have killed a Christian gold shop owner in Mosul in 2012. The government asserts that Naser will have the ability to dispute that claim.

Naser specifically identifies four witnesses he will not be able to call at trial due to the delayed indictment. The first is Mike Talia. Talia was Naser's tenant while Naser was on parole in 2017, and Talia was present when the FBI executed the search warrant of Naser's house on October 30, 2017. Talia also had access to the basement where Naser slept and was present during some of the parole visits. Naser asserts Talia (as well as his neighbors in 2016–2017) could confirm that Naser's use of drones was innocuous but that Talia (and many of the neighbors) have moved since 2017. Considering the technology and resources available today, the Court is not persuaded that Naser would be unable to track down Talia

and, perhaps, some of Naser's neighbors who lived in his well-populated neighborhood in 2017.

Naser next claims he is substantially prejudiced by the death of three allegedly material witnesses. Russell Dennison was an alleged agent of the Islamic State of Iraq and Syria ("ISIS") with whom Naser spent time in Iraq in 2012. Naser allegedly planned to reunite with Dennison in the same area in late 2012 or early 2013. The government believes that Dennison died in Syria in 2019. Billy Reilly, who died in 2016, was a person with whom Naser had contact. Reilly allegedly told Naser's parents that Naser was being unfairly targeted by the FBI. Finally, Shaykh Ali, a Dearborn imam and Naser's spiritual mentor, died in 2019.

Under Sixth Circuit law, a defendant can establish substantial prejudice by naming unavailable witnesses only if the defendant indicates that the testimony of those witnesses would be exculpatory or somehow help the defendant.

> Several circuits have held that the death of a potentially material witness during an undue pre-indictment delay may prove prejudice, but that it is not alone determinative. *E.g., United States v. Valona*, 834 F.2d 1334, 1338 (7th Cir. 1987) (holding that "**the death of a witness alone is insufficient to establish actual prejudice**") (citing cases); *United States*

*v. Beszborn*, 21 F.3d 62, 66–67 (5th Cir.) (holding that **the death of five potentially material witnesses did not prove actual prejudice because the defendant did not show that the testimony of any of the witnesses would have been exculpatory or would have actually aided the defense**), *cert. denied*, 513 U.S. 934, 115 S.Ct. 330, 130 L.Ed.2d 288 (1994). The death of a potential witness during the pre-indictment period may demonstrate the requisite prejudice if the defendant can demonstrate that exculpatory evidence was lost and could not be obtained through other means. *United States v. Corbin*, 734 F.2d 643, 648 (11th Cir. 1984). However, **a defendant does not show actual prejudice based on the death of a potential witness if he has not given an indication of what the witness's testimony would have been** and whether the substance of the testimony was otherwise available. *Id.*

*United States v. Rogers*, 118 F.3d 466, 475 (6th Cir. 1997) (emphasis added).

Naser contends that Talia could testify that Naser innocuously used drones, but  he does not specify what the other unavailable witnesses' testimony might be. Naser does not proffer any testimony that family members in Iraq (or elsewhere) might provide to support his defense. Likewise, with respect to Dennison, Reilly, and Ali, Naser does not specify what any of them could have said or how that testimony "would have been exculpatory or would have actually aided" Naser's defense. *Id.* Naser's limited, general statement that "[t]hese individuals all might have shed light on Naser's actions in the indictment period"

9

(ECF No. 197, PageID.2366) does "not show actual substantial prejudice." *Rogers*, 118 F.3d at 476.

Given the timeline of this case, namely the projected two-and-a-half-year period between indictment and trial, even if the government had indicted Naser shortly after the October 30, 2017 search of his home, it is more likely than not that Dennison and Ali would have died before the trial. Reilly definitely would have been available because he died in 2016, prior to the alleged second set of overt acts and the filing of the original indictment. Further, Dennison allegedly was living and fighting in Iraq and Syria while supporting ISIS between 2012 and 2019. He likely would have been subject to arrest and terrorism charges upon stepping foot in the courthouse or, more likely, simply upon entering the United States or any place under the United States' jurisdiction. Accordingly, there is little reason to believe Dennison would have appeared for trial to testify on Naser's behalf at any point, including in 2018 or 2019. *Id.* (finding that "it is not clear that the deceased [potential witness] would have testified, especially because he invoked his Fifth Amendment right in declining to testify before the grand jury.").

## 2.    *Deterioration of Material Evidence*

Naser asserts that the five-year delay between the execution of the search warrant and the initial indictment prejudiced his ability to identify and secure expert testing of the seized chemicals before their natural deterioration. At the time the motion was filed, Naser did not represent that he hired anyone to test how much the seized chemicals deteriorated, if at all. On April 11, 2025, Naser filed a supplement to his motion to dismiss the second superseding indictment (ECF No. 247), where he states, "On March 28, 2025, chemists employed by Mr. Naser obtained a sample of suspected hydrogen peroxide from the FBI in order to perform independent testing of the substance." (*Id.* at PageID.3075.) Naser indicates that the state, and miniscule amount, of the alleged hydrogen peroxide substance "makes effective testing impossible" and that his chemists "cannot perform valid tests to confirm or dispel their findings." (*Id.* at PageID.3075–3076.) Naser concludes that, as a result, he "is left without the ability to make a meaningful challenge to a central component of the government's case. (*Id.* at PageID.3077.) Naser's supplement does not identify the chemists or provide any supporting documentation, therefore, the Court cannot give much weight to this

belated argument in its consideration of Naser's motion to dismiss. Further, Naser does not provide any information on when he first sought to test the seized chemicals. Without more information, the deterioration argument does not weigh in Naser's favor.

### 3.  *Loss of Memory*

Naser argues that the preindictment delay will cause a prejudicial loss of memory. (ECF No. 197, PageID.2366–2367.) Naser cites testimony from June 20, 2024 and September 5, 2024 hearings by the bomb technicians involved in the October 5, 2022 protective sweep of Naser's home. The bomb technicians remarked that the search occurred "seven years ago" and there was uncertainty whether there was consent to search an excluded room. (*Id*. citing ECF No. 185, PageID.2048, 2057 and ECF No. 170, PageID.1791–1792.) Naser claims that both of those things are critical points in his defense, but the issue of whether certain aspects of the search were legal will not be presented to the jury. In addition, there is no reason to believe that the uncertainty of government witnesses will prejudice Naser; in fact, any uncertainty may be more likely to inhibit the government's ability to convict him. Finally, even the loss of memory is not, in itself, enough to support a claim of prejudice.

*See, e.g., United States v. Wright*, 343 F.3d 849, 860 (6th Cir. 2003) (the "loss of memory is an insufficient reason to establish prejudice.").

Naser also suggests that the delay and his time in custody "hampered [his] ability to secure accurate witness testimony[, which] further undermines the fairness of the trial and [his] ability to effectively defend himself." (ECF No. 197, PageID.2367.) The Court addressed this issue previously, in the context of unavailable material witnesses. Naser also does not suggest who those witnesses would be or explain how they would aid his defense in any way.

### 4.   *Resolution*

For the reasons stated above, the Court concludes that Naser cannot establish substantial prejudice due to the lengthy preindictment period in this case. This failure is fatal to his argument and his motion to dismiss the second superseding indictment for preindictment delay. In the interest of completeness, however, the Court also will analyze the second requirement for dismissal of an indictment for preindictment delay.

### C.   Intentional Delay by Government

The government argues that it is well-established that the

defendant must show that "the government purposely delayed in order to gain a tactical advantage over the defendant." *United States v. Lash,* 937 F.2d 1077, 1088 (6th Cir.1991), *cert. denied,* 502 U.S. 949 (1991), and *cert. denied,* 502 U.S. 1061 (1992); *see also Brown,* 959 F.2d at 66; *United States v. Duncan,* 763 F.2d 220, 222 (6th Cir.1985).

Naser contends that some "Sixth Circuit decisions suggest that showing government culpability short of intent 'may still be sufficient to trigger a due process violation.'" (ECF No. 197, PageID.2367 (quoting *United States v. Mask*, 154 F. Supp. 2d 1344, 1351 (W.D. Tenn. 2001) (citing *United States v. Alred*, 513 F.3d 330, 331 (6th Cir. 1975) and *United States v. Giacalone*, 477 F.2d 1273, 1276–1277 (6th Cir. 1973))).) *See also United States v. Richburg,* 478 F. Supp. 535, 543 (M.D. Tenn. 1979) (stating that the second prong of the *Marion* test may be satisfied where pre-indictment delay was in "reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense").

For the reasons that follow, the Court concludes that Naser cannot meet his burden, whether it is an intentional delay or reckless disregard of circumstances standard. Naser first argues that all overt acts were

14

completed five years before the indictment was filed. He contends that this is not a case where: (1) he was eluding prosecution; (2) there was continuing conduct; or (3) a delay could be attributed to Naser conspiring to travel overseas in support of an FTO, such as occurred when a court found no tactical advantage from a seven-year pre-indictment delay. (ECF No. 197, PageID.2368 (citing *United States v. Abdi*, 498 F. Supp. 2d 1048, 1053 (S.D. Ohio 2007)).)

Naser next cites a question Magistrate Judge David Grand posed to the government at an October 16, 2024 detention hearing. Judge Grand asked why the government was still investigating Naser in 2020 when Naser was "already in [state] custody for the alleged possession of the bomb-making materials and his videos and – that was all in 2017." (ECF No. 197, PageID.2369 (citing ECF No. 195, PageID.2327–2328).) At the same hearing, government counsel acknowledged that Special Agent O'Donnell, who was in charge for a portion of the investigation, and the FBI wanted the MDOC to keep the FBI's investigation secret. (ECF No. 195, PageID.2327 (the FBI had "a federal investigation . . [and] preferred for [Naser] not to know about it.").)

Naser also argues that the government's delay "is more troubling"

because the government: (a) was not ready to produce discovery when Naser was arraigned on November 12, 2022, six weeks after the indictment; (b) did not produce laboratory analysis of some of the chemicals until June 29, 2023; (c) did not conduct an analysis of the explosive device instructions until February 8, 2024; and (d) provided defense with 275 pages of chat translations in late October 2024. Naser contends that these delays further show that the government has not fulfilled its "responsibility to get on with the prosecution." (ECF No. 197, PageID.2369–2370 (quoting *Dickey v. Florida*, 398 U.S. 30, 50 (1970).)

None of these observations, circumstances, or concerns, however, demonstrate any intent or reckless disregard by the government to gain a tactical advantage by waiting to indict Naser until October 2022, in the last month before the five-year statute of limitations expired on the felon in possession of an explosive device charge (count two). Nor does he show how the government gained a tactical advantage by allegedly engaging "in reckless disregard of circumstances, known to the prosecution, [that] suggest[ed] that there existed an appreciable risk that delay would impair the ability to mount an effective defense." *Lovasco*, 431 U.S. at 795 n.17.

Further, it is well-established that a delay resulting from investigative efforts "does not deprive [a defendant] of due process, even if his defense may have been somewhat prejudiced by the lapse of time." *United States v. Atisha,* 804 F.2d 920, 928 (6th Cir. 1986) (citations omitted), *cert. denied,* 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987); *see also Lovasco,* 431 U.S. at 796 (holding that "to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time"). As the government notes, the Supreme Court has stated that "the applicable statute of limitations . . . is . . . the primary guarantee against bringing overly stale criminal charges," and it is undisputed the government  timely filed the original indictment as to count two. *Marion*, 404 U.S. at 322 (quoting *United States v. Ewell*, 386 U.S. 116, 122 (1966)). *See also Lovasco*, 431 U.S. at 789.

Accordingly, even if Naser could establish the substantial prejudice requirement due to preindictment delay, the Court concludes that he has not established: (a) "that the delay was an intentional device by the government to gain a tactical advantage," *Brown,* 959 F.2d at 66, or (b) that the delay reflected reckless disregard for Naser's ability to mount an

effective defense. *Richburg*, 478 F. Supp. at 543.

### D.    Conclusion

Naser cannot satisfy either *Marion/Brown* requirement for dismissal of the second superseding indictment due to preindictment delay. Accordingly, his motion to dismiss the second superseding indictment is **DENIED**.

## IV. MOTION TO STRIKE OVERT ACTS FROM SECOND SUPERSEDING INDICTMENT

In count one of the second superseding indictment, Naser is charged with violating 18 U.S.C. § 2339B(a)(1), which provides:

> **(1)** Whoever knowingly provides **material support** or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 20 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in **terrorist activity** (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).

(emphasis added).

As set forth in 18 U.S.C. § 2339A (providing material support to

terrorists):

> [T]he term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials; . . ."

"Terrorist activity" means:

> [A]ny activity which is unlawful under the laws of the place where it is committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any State) and which involves any of the following:

> **(I)** The highjacking or sabotage of any conveyance (including an aircraft, vessel, or vehicle).

> **(II)** The seizing or detaining, and threatening to kill, injure, or continue to detain, another individual in order to compel a third person (including a governmental organization) to do or abstain from doing any act as an explicit or implicit condition for the release of the individual seized or detained.

> **(III)** A violent attack upon an internationally protected person (as defined in section 1116(b)(4) of title 18) or upon the liberty of such a person.

> **(IV)** An assassination.

> **(V)** The use of any—
> **(a)** biological agent, chemical agent, or nuclear weapon or

device, or

**(b)** explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain),with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property.

**(VI)** A threat, attempt, or conspiracy to do any of the foregoing.

8 U.S.C. § 1182(a)(3)(B)(iii).

## A.    Foreign Terrorist Organization

Naser argues that the pre-2014 overt acts should be stricken from the second superseding indictment for failure to allege that he acted in support of a "designated FTO." (ECF No. 198, PageID.2376 at ¶ 10.) However, 18 U.S.C. § 2339B(a)(1) expressly prohibits providing material support to a "foreign terrorist organization." The statute then provides that there are three different types of organizations that qualify as such an organization: (1) a designated terrorist organization; (2) an organization that has engaged or engages in terrorist activity; **or** (3) an organization that has engaged or engages in terrorism. *Id.* In other words, the organization to which a defendant allegedly provides material support or resources need not be a "designated" FTO. It is enough that the defendant allegedly provided material support or resources to an organization that "has engaged or engages in terrorist activity[.]" *Id.*

20

Therefore, although the U.S. Department of State did not designate Al-Nusra Front as an FTO until December 11, 2012, based on the breadth of what constitutes terrorist activity and the allegations related to the organization(s) to which Naser allegedly provided material support prior to 2014, the applicable organization (whether it was Al-Nusra Front, ISIS, or some other organization) had engaged or were engaging in terrorism or terrorist activity. In other words, it was an organization that "engaged or engages in terrorist activity" for purposes of § 2339B(a)(1). Accordingly, the Court rejects Naser's argument that any overt activities should be stricken for failure to allege that he acted in support of a "designated FTO."

## B.    Section 3286

The original indictment in this case was filed on October 5, 2022. (ECF No. 1.) Naser moves the Court to strike as time-barred all the pre-2014 overt acts. (ECF No. 198, PageID.2375, 2380–2382.) Naser relies on 18 U.S.C. § 3286(a), which provides for an eight-year statute of limitations on a charge that a defendant violated 18 U.S.C. § 2339B. The government challenges Naser's § 3286(a) argument, asserting that the charges against Naser are governed by 18 U.S.C. § 3286(b). § 3286(b)

provides that there is no statute of limitation if a defendant's activities resulted in or created a foreseeable risk of death or serious bodily injury to another person. (ECF No. 204, PageID.2490.) § 3286 provides:

**(a)   Eight-Year Limitation.—**

Notwithstanding section 3282, no person shall be prosecuted, tried, or punished for any noncapital offense involving a violation of any provision listed in section 2332b(g)(5)(B),[4] or a violation of section 112, 351(e), 1361, or 1751(e) of this title, or section 46504, 46505, or 46506 of title 49, unless the indictment is found or the information is instituted within 8 years after the offense was committed. Notwithstanding the preceding sentence, offenses listed in section 3295 are subject to the statute of limitations set forth in that section.

**(b)   No Limitation.—**

Notwithstanding any other law, an indictment may be found or an information instituted at any time without limitation for any offense listed in section 2332b(g)(5)(B), if the commission of such offense resulted in, or created a forseeable [sic] risk of, death or serious bodily injury to another person.

---

[4] 18 U.S.C. § 2332b(g)(5)(B) provides:

(5) the term "Federal crime of terrorism" means an offense that--

(A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and

(B) is a violation of--

(i) . . .  2339B (relating to providing material support to terrorist organizations), . . .

In his motion and supporting brief, Naser did not: (1) address §
3286(b); (2) discuss the nature of the charges and overt acts set forth in
count one of the second superseding indictment; or (3) address any
alleged conduct that occurred prior to October 5, 2014. The absence of
any discussion of § 3286(b) or related issues was reasonable, however,
because neither the second superseding indictment nor the first two
indictments mentioned § 3286(b). Moreover, the government does not
identify any filing or hearing prior to its response where it indicated this
case was proceeding under § 3286(b). Indeed, the government cited §
3286(a) when it discussed the statute of limitations in an October 2023
reply brief. It stated:

> Terrorism investigations present unique challenges. It is for
> this reason that **Congress expanded the statute of
> limitations period from five to eight years for certain
> terrorism offenses**—including 18 U.S.C. § 2339B, provision
> of material support and resources to foreign terrorist
> organizations—with the enactment of the Violent Crime
> Control and Law Enforcement Act of 1994, Pub.L. 103-322,
> Tit. XII, 120001, 108 Stat. 2021 (1994). **18 U.S.C. § 3286(a).**

(ECF No. 83, PageID.429 (emphasis added).) Understandably, Naser
proceeded on the premise that the eight-year statute of limitations under
§ 3286(a) applied.

### C.   § 3286(b)

Despite the  history of the case, the government now contends that § 3286(b) applies to the provision of material support charges against Naser in count one of the second superseding indictment and claims that the pre-2014 overt acts could be filed at any time. The government argues that, prior to October 2014, Naser attempted to travel and fight as a soldier for ISIS, which created a foreseeable risk of death or serious bodily injury to others, especially as Naser's alleged stated purpose was to fight and kill. (*See* ECF No. 204, PageID.2490–2491.)

### 1.   *Limited Legal Standard*

The government asserts that the unlimited statute of limitations period in § 3286(b) applies to this case because it can satisfy two requisite elements: (1) the offense is listed in 18 U.S.C. § 2332b(g)(5)(B); and (2) the alleged offense conduct resulted in or created a foreseeable risk of death or serious bodily injury to another person. *See, e.g., Basic v. Steck*, No. 12-cv-274, 2015 WL 4164901, at *9 (E.D. Ky. July 9, 2015) ("Because Basic is alleged to have committed numerous acts of torture that created a foreseeable risk of serious injury, prosecution . . . is not barred by a limitations period."), *aff'd*, 819 F.3d 897 (6th Cir. 2016); *Nezirovic v. Holt*,

990 F. Supp. 2d 606, 618 (W.D. Va. 2014) ("Because the allegations in this case concern a foreseeable risk of death or serious bodily injury to another person, 18 U.S.C. § 3286(b), no limitation applies."), *aff'd*, 779 F.3d 233, 238 (4th Cir. 2015). There is no dispute that the first element is satisfied.

The government argues that "a count is timely under § 3286(b) if the defendant's specific commission of the offense, as a question of fact, created a foreseeable risk of serious bodily injury" or death. *United States v. Pham*, No. 12-cr-423, 2022 WL 993119, at *7 (S.D.N.Y. Apr. 1, 2022). "[T]he statute's structure dictates a case-specific approach . . . [otherwise] there would be no reason to list the same § 2332b(g)(5)(B) offenses, with the same elements, under both subparts (a) and (b)." *Id.* at *8. The "limited case law that interprets § 3286(b) itself does not follow a categorical approach but instead focuses on defendants' particular conduct." *Id.* (citation omitted). *See also Basic*, 2015 WL 4164901, at *9 (noting that the defendant "is alleged to have committed numerous acts of torture that created a foreseeable risk of serious injury"); *United States v. Mohamud*, 148 F. Supp. 3d 232, 236 (E.D.N.Y. 2015) (explaining that the defendant's crime "involved shooting [a U.S. soldier] with an AK-47

assault rifle[,] which created a foreseeable risk of such injury"); *Nezirovic v. Holt*, 779 F.3d 233, 238 (4th Cir. 2015) (no statute of limitations pursuant to § 3286(b) or 18 U.S.S.C. § 2332b(g)(5)(B)(i) where defendant was alleged to have engaged in the "individual and group torture and inhuman treatment of civilians of Serb nationality" detained at the camp, "causing great physical and emotional suffering and serious injuries").

For the "government to charge [the defendant] with attempted [material support of terrorism], [the defendant] necessarily had '(a) an intent to complete the substantive crime . . . and (b) [took] a substantial step towards completing the crime[,] which logically means a substantial step towards completion of all of that crime's elements.'" *Pham*, 2022 WL 993119, at *10 (citation omitted).

According to the *Pham* court, "[s]erious bodily injury to another person could have been a foreseeable risk of [the defendant']s commission of the offense, even if that risk rested on a chain of events and ultimately did not materialize because law enforcement intervened." *Id.* (citing *United States v. Allen*, 51 F.3d 273 (Table), 1995 WL 140837, at **3–4 (6th Cir. 1995)). The *Pham* court continued, "Especially when the offenses at issue are serious allegations of terrorism, 'dangerous persons

may be apprehended at an earlier stage without immunizing them from attempt liability.'" *Id.* (citing *United States v. Yousef*, 327 F.3d 56, 134 (2d Cir. 2003), and *United States v. Jackson*, 560 F.2d 112, 120 (2d Cir. 1977)).

### 2.   *Analysis*

The government contends that Naser took substantial steps toward completing the crime of attempting to provide material support for an FTO that would satisfy §3286(b) (i.e., his conduct created a foreseeable risk of death or serious bodily injury) when he "twice head[ed] to the airport in 2012[5] to travel and fight for ISIS" or was "making a bomb a few years later to fight for them in the US," all of which were part of a continuous course of terroristic conduct. (ECF No. 204, PageID.2502–2503.)[6] It makes numerous arguments to support its contention.

---

[5] Naser traveled to the airport for the alleged purpose of traveling to meet Dennison on two occasions, but once was in November 2012 (Detroit) and once was in January 2013 (Chicago).

[6] The Court's analysis is limited to the government's argument that it believed in 2012 and 2013 that Naser wanted to provide material support to an FTO by joining and fighting for an FTO in Syria and Iraq. The government has offered no evidence, and has not argued, that Naser sought to do this in the United States in 2012 or 2013. The only allegations presented to the Court relative to Naser's purpose in 2012 and 2013 are that he desired to fight for an FTO abroad with Dennison, in Iraq and Syria. Therefore, the government may have believed there was little risk—and no foreseeable risk—that Naser would engage in a terrorist act causing death or serious bodily injury to any person in the United States during that time period. The government's argument at the hearing supports that theory. (*See* ECF No. 218,

### a.    Purpose

The government argues that Naser's very purpose—not just the "risk"—behind his attempt to travel to Syria in November 2012 was to fight and kill for ISIS there, and that purpose is relevant to show how that Naser's action created or resulted in a foreseeable risk of serious bodily injury or death. (ECF No. 204, PageID.2501–2502.) It contends that Naser was armed with weapons for combat, as reflected by his alleged statements, purchase of a tactical knife ,cane sword, and rifle scope (each of which were in his checked luggage when he went to the airport in November 2012), and plan to bring money to Syria to purchase guns so that he could kill on behalf of ISIS. (*Id.* at PageID.2496, 2501.)

The Court is not persuaded by the government's interpretation of the significance of Naser's alleged purpose. As the *Pham* court recognized, purpose or intent is relevant to the first (mens rea) element of an attempting to provide material support and resources to an FTO charge. *Pham*, 2022 WL 993119, at *10.  However, the Court does not

---

PageID.2652–2653 (when addressing the alleged risk that Naser would cause death or serious bodily injury in 2012/2013, government counsel stated, "But I'm saying it is clear what his purpose was and how dangerous it was if he actually made it over there[,]" i.e., Syria and Iraq).)

find that Naser's purpose is relevant when determining whether his actions "resulted in, or created a for[e]seeable risk of, death or serious bodily injury to another person" pursuant to § 3286(b).

Even if a defendant wants to engage in or take an action, that desire or intent may not make that action more foreseeable if some requisite conditions do not or cannot exist. *See, e.g., Watts v. United States*, 394 U.S. 705, 708 (1969) (reversing a defendant's conviction for threatening the life of the President of the United States). In *Watts*, the defendant, upon receiving notification that he had to report for his physical before the draft board, stated at a political debate, "I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J." *Id.* at 706. The Supreme Court noted that "[t]he judges in the Court of Appeals differed over whether or not the 'willfullness' requirement of the statute implied that a defendant must have intended to carry out his 'threat.'" (*Id.* at 707). The Supreme Court concluded "whatever the 'willfulness' requirement implies, the statute initially requires the Government to prove a true 'threat.'" (*Id.* at 708). The Supreme Court also noted that, a statement must be taken in context and "the expressly conditional nature of the statement" is relevant. *Id.*

In this case, stated in simple terms, numerous events would have had to transpire before Naser could accomplish his goal to fight and kill on behalf of an FTO in Syria or Iraq. Most importantly, Naser would have had to leave the United States to travel to those countries, a condition that he contends was not possible.

### b.   April 2017 Internet Chatroom Claims

The Court next turns to the government's reliance on Naser's alleged April 2017 Paltalk chatroom statements. The government primarily focuses on Naser's alleged claim that he and others entered a shop in Mosul, Iraq in 2012, killed its Christian owner, stole gold from the shop, and then gave the stolen gold to Mujahedin. (ECF No. 204, PageID.2494 (citing ECF No. 200, PageID.2454); ECF No. 191, PageID.2221.) In April 2017, Naser also allegedly commented or posted in Paltalk that he was "a beheader" and had "killed a number of Shi'ite." (ECF No. 204, PageID.2497.)

However, although the alleged Christian shop owner killing occurred in 2012, Naser did not claim that killing until April 2017. (*See* ECF No. 191, PageID.2221.) The "beheader" and Shi'ite killing claims also were not made until April 2017. Since these alleged claims were not

made until April 2017, they cannot factor into any assessment of whether there was a foreseeable risk of death or serious bodily injury to any person in 2012, 2013, or 2014.

### c.    Other § 3286(b) cases

The Court reviewed each of the cases the government cited to support its claim that courts focus on a defendant's particular conduct. As the government states, "[f]ew courts have interpreted § 3286(b), but it speaks in familiar terms." (ECF No. 204, PageID.2500.) The Court agrees that those few cases do speak in familiar terms. In every one of those cases, the defendant's detailed conduct was far more advanced than Naser's and involved numerous affirmative and physical acts that constituted substantial steps toward actual completion of the crime (involving either acts of violence or detonation of a test bomb). Moreover, the intended death or serious bodily injury had already been, or imminently could have been, accomplished.

As noted above, in *Mohamud* and *Nezirovic*, the defendant was accused of killing and/or torturing others. In *Basic*, the defendant was accused of torturing at least two people, murdering another, and supervising an ethnic cleansing carried out by military troops. *Basic*,

2015 WL 4164901, at *1. In *Correa*, the defendant was accused of torture and conspiracy to commit torture. *United States v. Correa*, No. 20-cr-00148, 2024 WL 4267866, at *1 (D. Colo. Sept. 23, 2024). In *Pham*, the court described the defendant's conduct as follows:

> In or about December 2010, Defendant Minh Quang Pham travelled from the United Kingdom to Yemen and, while in Yemen, associated with al Qa'ida in the Arabian Peninsula ("AQAP"), which the United States designates as a foreign terrorist organization. Pham agreed with others to provide, and actually did provide, material support and his personal services to AQAP. This support included the production of online propaganda. Further, while in Yemen, Pham agreed to receive, and actually did receive, military-type training from and on behalf of AQAP.
>
> Additionally, in 2011, Pham received instructions to conduct a suicide bombing at Heathrow International Airport, in the United Kingdom, with the intent of targeting U.S. nationals. Pham constructed and detonated an explosive device as a test of the design he would use to carry out this planned attack. In July 2011, Pham travelled to the United Kingdom to carry out the attack, but he did not complete it.

*Pham*, 2022 WL 993119, at *1.[7] Stated more succinctly, "the superseding

---

[7] Even the cases cited by the *Pham* court involved: (a) harsher, more violent conduct; (b) significantly more advanced planning; and (c) greater execution of substantial steps toward completion of the alleged crime than are alleged in this case. In *Yousef*, the government established at trial that:

> Yousef acting alone or with his co-conspirators: (i) rented an apartment in a suburb of Manila for the purposes of manufacturing bombs therein; (ii) purchased chemicals suitable for the manufacture of bombs; (iii) manufactured bombs, timers, and related devices; (iv) detonated a bomb in a movie theater in Manila; and (v) detonated a bomb on a Philippine

indictment alleges that Pham received military-style training, was instructed by AQAP to conduct a suicide bombing at Heathrow International Airport, constructed and detonated an explosive device to use in the attack, and traveled to the United Kingdom to carry out the attack." *Id.* at *10.

Further, in each of those cases, at least one act of violence perpetrated by the defendant and the defendant's substantial planning steps were alleged **in the indictment or charging document**—and

---

airliner, killing one passenger." In 1994, All in preparation for bombing U.S. airliners in Southeast Asia, in 1994 and 1995.

*Yousef*, 327 F.3d at 79–80. In *Jackson*, the Court described the defendant's conduct as follows:

On Friday morning, January 23, Campbell and company assembled with a revolver, sawed-off shotgun, and other paraphernalia for a hold-up. On their way to the bank in the undercover vehicle they covered their fingers with bandaids, their hands with the surgical gloves, and put on the ski masks. Gasoline-soaked newspapers were placed under the seats of the car in preparation for its destruction after the getaway.

The car entered the parking lot of the shopping center in which the bank was located and one Sellers got out. He strolled past the bank several times, peeking in at each opportunity, while the car circled the shopping center. Finally, the vehicle pulled up directly in front of the bank and Sellers, armed with the sawed-off shotgun and positioned at an adjacent liquor store, started to approach the bank. Campbell said "let's go," and the occupants of the car reached for the doors. Immediately, FBI agents and New York City policemen who had staked out the parking lot and were monitoring the gang's conversations moved in and arrested the men.

*Jackson*, 560 F.2d at 117.

the courts noted that the allegations of violence and substantial planning steps were set forth in the indictment or charging document. *See, e.g., Basic*, 2015 WL 4164901, at *9 ("Because Basic is alleged to have committed numerous acts of torture that created a foreseeable risk of serious injury, prosecution . . . is not barred by a limitations period."); *Nezirovic*, 990 F. Supp. 2d at 618 ("Because Nezirovic is charged under the laws of Bosnia and Herzegovina with war crimes against civilians, including torture and inhuman treatment, the Torture Act, which criminalizes acts of torture and attempted torture, is the United States statute most closely analogous to the charged offenses."); *Pham*, 2022 WL 993119, at *9 ("The superseding indictment includes ample allegations that, if proven at trial, would permit a reasonable jury to find that the conspiracy counts satisfy § 3286(b).").

The same cannot be said in this case, which appears to be unlike any other case that has applied § 3286(b). There is no allegation[8] in the second superseding indictment that Naser actually harmed anyone, detonated a bomb, trained in any manner, had any concrete contacts or

---

[8] At this stage of the proceedings, the Court must accept as true the factual allegations in the second superseding indictment. *See, e.g., United States v. McAuliffe*, 490 F.3d 526 (6th Cir. 2007).

plans (or had any contacts he could reach in Syria or Iraq, once he was there), or otherwise had personally engaged in the types of conduct alleged in those cases. Neither the alleged 2012 killing of the Christian gold shop owner in Mosul, nor any other attempted or completed act of torture, violence, or actual material support for an FTO, is identified as an overt act in the second superseding indictment (or any prior indictment). In fact, the indictments do not mention: (a) the alleged 2012 Mosul, Iraq killing; (b) Naser's claims to have participated in that killing, that he is a beheader, or that he had killed a number of Shi'ite; or (c) any alleged specific threat by Naser that he would cause the torture, death, or serious bodily injury of any person.

As such, this is a unique case, where foreseeable risk of death or serious bodily injury is not clearly established by any alleged prior act(s) of violence by the defendant.

### d.    Continuous course of conduct/single plan

The government contends that Naser's alleged actions from 2011 to 2017 constituted a continuous course of terroristic conduct, such that all the overt acts should be treated as a single plan. The Supreme Court stated long ago, "A continuing offense is a continuous, unlawful act or

series of acts set on foot by **a single impulse and operated by an uninterrupted force**, however long a time it may occupy." *United States v. Midstate Horticultural Co.*, 306 U.S. 161, 166 (1939) (citation and internal quotations omitted) (emphasis added). The Court is not persuaded that the record supports the government's view.

First, the government argues that the Court should ignore the 40-month interruption between January 2013 and May 2016 because Naser was in MDOC and ICE custody and incarceration until March 2016. However, the pre-2014 overt acts involved much different conduct than the parole overt acts. As the government stated, during the former period, Naser purchased weapons and sought "to travel and fight for ISIS" in Syria and Iraq. (ECF No. 204, PageID.2494, 2502; *see also* ECF No. 162, PageID.1508–1510.) But, as the government also stated, during the latter period, Naser wanted "to fight for them in the US" by posting in internet chatrooms, conducting internet research, and buying chemicals to allegedly make an explosive device. (*Id.* at PageID.2503; *see also* ECF No. 162, PageID.1510–1511.) Further, there has been no indication that Naser wanted to travel to Iraq or Syria to fight for ISIS in 2016 or 2017.

Second, there is no allegation or evidence that Naser was providing

any support to an FTO during his three years in MDOC custody, let alone material support. Even if every day he was in MDOC custody Naser had thoughts or wishes or prayers that ISIS succeeded in its mission, none of those activities would constitute providing "material support" to ISIS. Such conduct does not rise to the "broad legal concept" of material support that would be satisfied if, as the government argued, a person was to "give a penny to ISIS . . . [or] translate a single video for ISIS[.]" (*See* ECF No. 218, PageID.2633.)

Third, the government alleges that Naser created a Telegram account and a Telegram bot on May 17, 2016. (ECF No. 162, PageID.1510.) Although such conduct violated Naser's parole, the government has not cited any authority for the proposition that the creation of a Telegram account (i.e., a cloud-based, secure message and audio calling application on which one can send messages, photos, videos, and files for free) or Telegram bot (whose purpose is to simulate human interaction and conversation) supports terrorism or constitutes a step toward providing material support for an FTO. In addition, the second superseding indictment does not allege any overt act involving either the Telegram account or bot. Further, the government has not argued that

Naser used either the Telegram account or bot for any purpose that constituted material support for ISIS, prior to March 12, 2017.

As such, in addition to the 38 months Naser spent in MDOC/ICE custody for which there is no evidence that Naser engaged in any overt acts to provide material support for an FTO, the Court finds that there is no evidence that Naser engaged in any overt acts to provide material support for an FTO during the 12-month period between March 2016 and April 2017, when Naser was not in custody.

For all these reasons, the Court finds that the government's allegations regarding Naser's conduct, as reflected in the overt acts set forth in the second superseding indictment, do not establish a continuous course of conduct, such that the pre-2014 overt acts and the parole overt acts constituted a single plan "set on foot by a single impulse and operated by an unintermittent force." *Midstate Horticultural*, 306 U.S. at 166.

Accordingly, in assessing whether Naser took any substantial step(s) toward completing the crime of attempting to provide material support for an FTO that would satisfy § 3286(b) by creating a foreseeable risk of death or serious bodily injury, the Court considers only the pre-

2014 overt acts.

### e.    The alleged pre-2014 overt acts

As to the pre-2014 overt acts, the government expressly argues that Naser took substantial steps toward completing the offense of providing material support to ISIS when he "twice head[ed] to the airport . . . to travel and fight for ISIS." (ECF No. 204, PageID.2502.)

The pre-2014 overt acts in the second superseding indictment allege that Naser: (1) between March 2011 and January 3, 2013, allegedly maintained a YouTube account that stated "Jihad for the sake of Allah" and that he was a "Full time Mujahd A.K.A. Slave of Allah . . . Mujahdeen Sniper" (ECF No. 162, PageID.1508 at ¶ 1); (2) discussed traveling to Syria to join Dennison, who had joined Al-Nusra Front, and Naser said he would "bring what we need & more" (*id.* at PageID.1509 at ¶¶ 2–3); (3) purchased a tactical knife, cane sword, and rifle scope and searched the internet for firearms, ammunition, scopes, and "The Black Flag of Islam" (*id.* at ¶¶ 4–7); (4) traveled to Detroit Metropolitan Airport and attempted to board a flight to Turkey with a tactical knife, cane sword, and rifle scope in his checked luggage, searched the internet for airports in Canada and Mexico, and traveled to Chicago O'Hare Airport and

attempted to board a flight to Lebanon (*id.* at PageID.1509–1510 at ¶¶ 8–10); and (5) posted on his YouTube account that Dennison was not a "real Muslim" because, after being denied access to a flight in Chicago, Naser suddenly believed that Dennison was a government agent or informant with the FBI. (*Id.* at PageID.1510 at ¶ 11.)

Naser argues that his alleged pre-October 5, 2014 actions did not create a foreseeable risk of great bodily injury or death because he did not take any substantial steps. Naser contends he: (a) never made it out of an airport in the United States; (b) did not have any concrete plans to harm anyone; and (c) did not go through any training. Consistent with the government's arguments, Naser claims that the only possible tangible acts or substantial steps were the two attempts to board airplanes to travel to meet Dennison, including one flight where he allegedly packed a tactical knife, cane sword, and rifle scope in his checked luggage. Otherwise, Naser claims that, prior to 2014, he is only accused of: (1) making statements pledging his allegiance to Allah; (2) stating that he is a "Mujahdeen Sniper" on his YouTube account channel; and (3) searching for a firearm, scopes, and a Black Flag of Islam. He argues that none of his actions created a foreseeable risk of death or

serious bodily injury to anyone. The Court agrees with much of Naser's argument.

First, Naser's alleged conduct is not comparable to the conduct of the defendants in *Basic*, *Pham*, *Mohamud*, *Nezirovic*, *Yousef*, and *Jackson*. The second superseding indictment does not allege that he killed, seriously injured, or tortured anyone, nor does it allege he was trained, detonated a bomb, or traveled to another country to commit violence.

Second, aside from his trips to the airport in November 2012 and January 2013, the steps the Naser took, as alleged in the pre-2014 overt acts, were not substantial. Having a YouTube channel where he writes that he is a slave of Allah, is willing to be a martyr, and is in the "Mujahdeen Sniper" company did not create a foreseeable risk of death or serious bodily injury to anyone. Nor did the allegations that Naser told Dennison in 2012 that Naser would bring money to Dennison in Syria constitute a substantial step. The government has not offered any allegation, argument, or evidence that Naser sent any money to Dennison or any FTO, or that he possessed any money when he traveled to the airports in November 2012 and January 2013. When asked by the Court

at the February 7, 2025 hearing how much money Naser possessed when he went to the airport, the government never answered the Court's question. (*See* ECF No. 218, PageID.2653–2654.) As such, it is unclear whether Naser possessed any money, let alone an amount equal to his alleged representation to Dennison that Naser would "*bring what [money] we need and more.*" (ECF No. 162, PageID.1509 at ¶ 3 (emphasis in original).)

Likewise, purchasing a tactical knife and a cane sword, as well as conducting internet searches for a firearm, ammunition, scopes, and "The Black Flag of Islam"—and saying "Jihad for the sake of Allah," as well as that he was a "Slave of Allah" and a member of "Mujahdeen Sniper" company—also did not constitute substantial steps toward creating a foreseeable risk of death or serious bodily injury to another person in this case, where Naser's alleged purpose in 2012 and 2013 was to fight and kill for ISIS in Iraq and Syria.

The Court thus turns to the issue of whether Naser's trips to the airport in November 2012 and January 2013 constituted substantial steps toward completion of the crime that created a foreseeable risk of death or serious bodily injury to another person. Based on the

government's representations in this case, and as evidenced by the actions of government agents at the Detroit and Chicago airports in November 2012 and January 2013, Naser could not simply go to an airport in the United States and get on a plane to Turkey, Lebanon, Syria, or Iraq. As both parties argued at a prior hearing, Naser was on the United States' "no-fly list" in November 2012 and January 2013. (*See* ECF No. 195, PageID.2269, 2313.) Those two occasions show that the government had the ability to, and did on those two occasions, prevent Naser from boarding a plane in the United States in order to travel internationally. However, unlike some reported § 2339B cases, where law enforcement agents immediately arrested a defendant who arrived at an airport to board a plane consistent with the intent of providing material support to an FTO,[9] Naser was not arrested on either occasion. The Court finds that Naser's inability to board an international flight and—notwithstanding the government's knowledge of Naser's activities, including that Naser had been in Mosul in 2012 and the listed pre-2014 overt acts—the lack of an arrest or charge against him when he

---

[9] *See, e.g., United States v. Alebbini*, 979 F.3d 537, 542 (6th Cir. 2020); *United States v. Tounisi*, 900 F.3d 982, 984 (7th Cir. 2018).

attempted to fly internationally may undermine the government's argument that those attempted flights created a foreseeable risk of death or serious bodily injury to another person.

Nevertheless, the Court concludes that a reasonable juror could find that Naser's actions, specifically the two attempts to board airplanes to Turkey and Lebanon in November 2012 and January 2013, respectively, constituted substantial steps toward completion of the offense,[10] such that there was a foreseeable risk of death or serious bodily injury to another person. The Court has not been presented with any evidence that a person being on the no-fly list guarantees that person cannot exit the United States in an array of ways. For example, it is possible that a person on the no-fly list may escape detection before boarding a plane that departs from a United States airport due to human error or by using an alternate passport. A person also might attempt to utilize some means other than a commercial flight.

---

[10] *See, e.g., United States v. Nitschke*, 843 F. Supp. 2d 4, 16 (D.C. Cir. 2011) (the court granted the defendant's motion to dismiss the indictment holding that no reasonable juror could find that the defendant intended to persuade a minor or that he took a substantial step in doing so); *United States v. Polson*, 154 F.Supp.2d 1230, 1236 (S.D. Ohio 2021) ("because a reasonable juror could find Defendant liable for mailing a threatening communication in violation of 18 U.S.C. § 876, the Indictment as alleged is valid and will not be dismissed").

For the reasons stated above, the Court concludes that the issue of whether Naser's pre-2014 overt acts involved one or more substantial steps toward completion of the § 2339B charge, such that there was a foreseeable risk of death or serious bodily injury to another person prior to October 5, 2014, is a question of fact for the jury. *See generally United States v. Wilder*, 87 F.4th 816, 820–821 (6th Cir. 2023) (unless the government's case is so lacking, whether defendant took a "substantial step" must be submitted to the jury); *United States v. Beasley*, No. 12-20030, 2014 WL 1847406, at *1 (E.D. Mich. May 8, 2014) (citing *Smith v. United States*, 568 U.S. 106, 113 (2013), and *United States v. Cunningham*, 679 F.3d 355, 374 (6th Cir.2012) (citing Sixth Circuit Pattern Jury Instruction § 3.12), *cert. denied*, 568 U.S. 1233 (2013))) (if the defense raises a statute of limitations defense with respect to the duration of the conspiracy, the duration of the conspiracy is a question of fact for the jury).

### e.    Resolution

For the reasons stated above, the Court finds that  whether the pre-2014 overt acts alleged in the second superseding indictment resulted in or created a foreseeable risk of death or serious bodily injury to any

person, as required to find that the unlimited statute of limitations afforded by § 3286(b) applies is a question of fact for the jury. Therefore, the Court cannot conclude that the pre-2014 overt acts are subject to the eight-year statute of limitations under 18 U.S.C. § 3286(a) or that they are time-barred. Accordingly, Naser's motion to strike certain overt acts from the second superseding indictment is **DENIED without prejudice**.

## V.    CONCLUSION

Accordingly, **IT IS ORDERED** that Naser's motion to dismiss the second superseding indictment for oppressive preindictment delay (ECF No. 197) is **DENIED**.

**IT IS FURTHER ORDERED** that Naser's motion to strike certain overt acts from the second superseding indictment (ECF No. 198) is **DENIED WITHOUT PREJUDICE**.

**SO ORDERED**.

Date: April 14, 2025

**s/Jonathan J.C. Grey**
JONATHAN J.C. GREY
UNITED STATES DISTRICT JUDGE

## <u>Certificate of Service</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 14, 2025.

<u>**s/ S. Osorio**</u>
Sandra Osorio
Case Manager