UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

Case No.  22-CR-20504

v.

Hon. Jonathan J.C. Grey

Aws Mohammad Naser,

Defendant.

_____/

### Government's Sentencing Memorandum

*"I am the son of the Islamic State.*
*If the mountains swayed, I will not sway."*

~ Aws Naser's Handwritten Index Card (Translated)
Tr. Ex. 12-8A

Aws Naser has supported ISIS—a violent foreign terrorist organization—for nearly all his adult life. He pledged himself to the terror group and its leader, Abu Bakr al-Baghdadi, and reaffirmed his oath, orally and in writing to other ISIS supporters, proclaiming himself a "Son of the Islamic State." This support led him to: 1) assist Russell Dennison, who joined, fought, and died for ISIS; 2) twice attempt to travel to become an ISIS fighter and, when that failed; 3) manufacture an improvised explosive device for use in a terror attack in the United States.

Naser has never renounced ISIS or withdrawn his support for the notorious global terrorist organization that has conducted and inspired deadly attacks against U.S. and Western interests around the world for over 20 years. He has no remorse and does

not accept responsibility for his actions. Naser considers himself to be a Solider of the Caliphate[1] with a mandate to either travel and join ISIS abroad or commit acts of terror in the United States. He continues to support ISIS's vision of a worldwide Caliphate, and his hatred for the United States has not waned.

Naser's ongoing support for ISIS and its goals, his loathing for the United States, and his violent criminal history, combined with his disregard for the rule of law and repeated failure to follow rules in prison and on parole present a clear threat to the public and warrant the imposition of a within-Guidelines sentence of 420-months' (35 years) imprisonment and a lifetime term of supervised release, with a computer monitoring provision. This sentence appropriately balances the seriousness of Naser's offenses, the need for just punishment, and the need to promote respect for the law, with his history and characteristics. It also avoids unwarranted sentencing disparities. Most importantly, a 420-month sentence is necessary to provide specific deterrence and protect the public from Naser.

## Guidelines Calculation

The Presentence Investigation Report (PSR) finds, and the Government agrees that Naser's guidelines are 360 to 540 months, based on a total offense level of 42 and

---

[1] The terms "Soldier of the Caliphate", "Son of the Caliphate" and "Soldier of the State" are all terms used to describe someone who has pledged allegiance to ISIS. ECF No. 324, PageID.4384. Someone who is wounded or killed fighting for ISIS is also referred to as a "Soldier of the Caliphate." ECF No. 328, PageID.5194.

a criminal history category of VI and limited by the applicable statutory maximums. PSR ¶ 91.

<div align="center"><strong>Section 3553(a) Sentencing Factors</strong></div>

Congress has provided factors for courts to consider when imposing a sentence in 18 U.S.C. § 3553(a). The most relevant factors are addressed below.

### a.  <u>Nature and Circumstances of the Offense</u>

The gravity of Naser's crimes cannot be overstated. Attempting to provide material support to the Islamic State not once, but twice, and building an explosive device for ISIS are among the most serious of federal crimes, more so with the jury's special verdict here finding that Naser's attempted provision in count one "resulted in, or created a foreseeable risk of, death or serious bodily injury to another person." ECF No. 359, PageID.8586.

The nature and circumstances of the offense are detailed extensively in the PSR at ¶¶ 12-35. A summary of relevant facts proved at trial, beginning with a short background of ISIS, is provided below.

### 1.  *Naser's Radicalization to Salafi-Jihadism*

In 2010-2011, a wave of mass protests and civilian uprisings—dubbed "The Arab Spring"—spread all over the Middle East, including Tunisia, Egypt, Libya, Yemen, and in Syria against the dictatorship of Bashar al-Assad. ECF No. 324, PageID. 4358-59, 4435-36. The al-Assad regime responded in early 2011 with troops, tanks, and violence, quickly turning the uprising into an armed rebellion that lasted for many years. Id. at

4358-59. The rebellion attracted the terrorist group ISIS, known first as Al Q'aida in Iraq (AQI), then Islamic State of Iraq (ISI) and al Nusra Front (ANF). Foreign fighters from across the world seeking to establish an Islamic State, or a global Caliphate, flocked into the region. Id. at 4359-60, 4364, 4374.

Naser became increasingly more radicalized as the Arab Spring unfolded. By age 22, Naser was preaching and proselytizing Salafi-jihadi extremism to students on the Henry Ford Community College (HFCC) campus and online. He was loud, disruptive, combative, and attempted to provoke campus police officers. HFCC banned him from campus in March 2011 and reported his conduct to a Dearborn Police Officer assigned to the Joint Terrorism Task Force (JTTF). ECF No. 325, PageID.4522. HFCC provided screenshots (see below) from Naser's YouTube channel, username <u>aws8819</u>, where Naser self-identified as a *mujahid*—a fighter for a foreign terrorist organization—and a *sniper*, and proclaimed his commitment to jihad and martyrdom. Id. at 4522-25.



Tr. Ex. 4-1.

Naser's YouTube content focused on violent jihad and martyrdom. The screenshots captured comments that had been posted to Naser's channel, including an approving post from Russell Dennison—"*Islam is the truth, path of the Righteous……strive hard……the time is now!*" Id. at 4525-26; *See* Tr. Ex. 4-1. And a disapproving post in which one viewer cautioned: "*Brother in Islam, if your idea of Jahad is to kill innocent Muslims and non-Muslims alike with suicide bombers, then you are not on the right path. The spirit of jahad starts from home, against your hatred and anger. Jahad is fighting against evil in the name of ALLAH.*" Id.

As further evidence of his commitment to the cause, in July 2011, Naser posted a comment (see below) that expressed his hatred for the United States ("*may allah let the earth swallow them and the skys crush them*"), declared his intent to move overseas and perform Hijrah—a term terrorist organizations have redefined to mean migrating to another land to fight in the jihad—and then listed his house for sale. ECF No. 324, PageID.4332-33; ECF No. 325, PageID.4558-59.

| 7/15/2011 | 9:05:00 PM | Aws8819 | Posted Comment to omarshakeer1 | "yea brother i'm sill band from school. but no problem Akhi i'm making hijra insha allah. i'm currently selling my house. as soon as I seel it i'm moving over seas. these kuffar won't even let anyone give dawah in public. true Kuffar here in the U.S brother may allah let the earth swallow them and the skys crush them." |

Tr. Ex. 4-25

## 2. *Naser's 2012 Trip to Iraq with Russell Dennison*

Naser's online relationship with Russell Dennison, an aspiring Salafi-jihadist preacher from Tampa, Florida, blossomed in 2011. They exchanged videos, comments, and other communications. Naser believed that he and Dennison were like-minded. He

told Dennison: "*i can say from speaking wi h you & watching your previous videos & present ones the We are on the Same Level on just about every hing.*" ECF No. 325, PageID.4571-73; *See* Tr. Ex. 4-25.1.

In December 2011, Naser and Dennison spoke on the telephone extensively and planned to travel together to Iraq. Id. at 4583, 4592, 4600. They used coded language and talked around issues because they believed their calls were being monitored. Id. at 4582, 4593. Naser knew that Iraq was not Dennison's ultimate destination, but a starting place for his journey and Naser offered to help him. Id. at 4601-04.

The Islamic State of Iraq (ISI)—later rebranded as ISIS—was the main jihadist terrorist group in Syria, and it actively recruited foreign fighters. ECF No. 324, PageID.4356, 4363-64. In 2011, ISI's leader, Abu Bakr al-Baghdadi, dispatched operatives led by Abu Muhammad al-Jolani to Syria to establish a foothold. Id. at 4355-58. By the late summer of 2011, al-Jolani was conducting ISI operations in Syria under the name, Jabhat al Nusrah or Nusra Front (ANF). Id.

ISI was also active and operating in Iraq. Id. at 4366-67. ISI did not control any specific areas in Iraq at this time, so when jihadists travelled there from all over the world, they relied on networks of smugglers inside Syria or Iraq to connect them to ISI. Id. at 4367-68. For Dennison to join ANF, he needed someone to vouch for him. Id. at 4365. Dennison needed Naser's help and Naser agreed to provide it. ECF No. 325, PageID.4594-95; Tr. Ex. 2-8 & 2-8A (Naser: "*we can travel together*"); Tr. Ex. 2-9 & 2-9A

(Naser: "*you're welcome to come with me anytime bro. You know, I have a house over there, you know you can stay with us.*").

Dennison's intent to join the mujahideen was known by the people in his circle. In 2011, Dennison frequently communicated with Norwegian jihadist, Thomas Pederson Welle, who used the monikers, "Welle92" and "Alnarweeg92." Id. at 4597. In December 2011, Dennison told Welle he was traveling overseas. Welle knew the purpose of Dennison's travel was to join the Mujahideen, and Welle encouraged him to do so: "*if you get an opportunity to meet up with some mujahideen (depends of course on where you are going) then take that step and join them inshallah.*" Id. at 4598-99.

Naser knew as well and planned to join Dennison. On January 5, 2012, Naser purchased a red-dot sight, a spotting scope with tripod, a night vision monocular, and tactical goggles: gear used by snipers, not gifts for family. Id. at 4605. Red-dot sights are affixed to rifles, handguns or pistols; tactical goggles are rated to withstand the impact of a 22-caliber bullet; night vision equipment is used for night operations and spotting scopes are used to see long distances. Id. at 4605-08. Naser purchased these warfighting materials as he was preparing to travel with Dennison. However, he returned these items on February 1, 2012, after Naser realized that he and Dennison had caught the attention of the FBI.[2]

---

[2] Dennison told Naser that the FBI interviewed him at the airport in Tampa, Florida, as he prepared to travel to meet Naser in Detroit on January 13, 2012. ECF No. 317, PageID.4058; *See* Gov't Ex. 1, January 13, 2012, transcript of audio recording "*those damn F-B-I agents were here to talk to me again.*"). On January 20, 2012, the FBI interviewed

7

On January 13, 2012, Dennison fled Tampa and flew to Detroit after fellow jihadist Sami Osmakac was arrested by the FBI on terrorism charges for attempting to use a weapon of mass destruction. ECF No. 317, PageID.4027, 4031-32. Dennison spent a week staying with Naser at his home. ECF No. 325, PageID.4613-15. On January 18, 2012, FBI agents watched while Naser and Dennison walked for nearly six hours in the bitter cold, below-freezing temperatures, talking animatedly throughout their ten-mile walk. Id. at 4617-18. They could speak freely without fear of being overheard. These are the actions of friends and coconspirators, not mere acquaintances.

Dennison and Naser planned to travel together to Erbil, Iraq, and purchased one-way plane tickets for January 21, 2012. Id. at 4615. Dennison departed, but Naser's departure was delayed until February 11, 2012, because he did not have the necessary travel documents. Id. at 4623, 4626. Dennison arrived in Erbil, and the pair continued to communicate via YouTube in the weeks before Naser successfully joined Dennison in Iraq.

Naser knew that Dennison planned to leave Iraq to join the mujahideen or the Islamic fighters. Id. at 4627; ECF No.330, PageID.5624. On February 4, 2012, Dennison told him: "*it will be good to have a brother with me. stay in touch with other brothers*

---

Naser at his home while Dennison was staying with him. On January 21, 2012, Naser was not permitted to travel to Iraq with Dennison. ECF No. 330, PageID.5563-64.

*also, we may have to go and visit them sometime, would be a nice time, i always to visit that place also.*"
ECF No. 325, PageID.4627; *See* Tr. Ex. 4-25.

According to Naser, he flew directly to meet up with Dennison in Erbil before visiting his family. ECF No. 330, PageID.5623. The pair lived together for several weeks and discussed Dennison's plans and next steps. Id. at 5623-24. Naser knew that Dennison was planning to join the Mujahideen and that he wanted to leave Iraq for Egypt, Yemen, or Syria. Id.

On March 15, 2012, Dennison contacted Mohammed Mohyeldeen (see below), an Iraqi-born Salafi-jihadist who lived in Norway, looking for the connections he and Naser needed to join the Mujahideen. ECF No. 325, PageID.4631-32.

| 3/15/2012 | 5:27:00 AM | Chekdamize7 | Mohyeldeen | "This is brother Abdullah, I was speaking to a bro her online and is account name is Alnarweeg he makes some creative vidoes, and he asked me to contact you concerning Iraq and said that you are originaly from here, Im here with a good brother, we traveled here toge her, inshaAllah you can be helpful to us, would like to know which places are good and would like to meet some good Muslim brothers as well. Let me know when you have time. Salamylakum" |
|---|---|---|---|---|

Tr. Ex. 4-25

Mohyeldeen responded. Five days later, on March 20, 2012, Naser and Dennison traveled together to Mosul where ISIS militias were operating. Id. at 4634; ECF No. 352, PageID.8343, 8353. Dennison left Iraq on April 18, 2012, and traveled to Egypt (where he was denied entry), Zarqa, Jordan, and then to Tripoli, Lebanon, where Mohyeldeen had connections. ECF No. 325, PageID.4633, 4640-46; ECF No. 327, PageID.4900. Although Naser remained in Iraq after Dennison left, the two "brothers" stayed in contact.

9

### 3. *Dennison's Journey to Syria to Join ANF (ISI)*

Ten days after Dennison left Iraq, Naser introduced himself to Mohyeldeen. Speaking cryptically, Naser identified himself as a "*brother*," referenced "*Walle92,*" and offered "*this will be to our benefit.*" (see below). ECF No. 327, PageID.4901.

| | |
|---|---|
| **Date:** | Sat, 28 Apr 2012 14:08:29 -0700 (PDT) |
| **From:** | aws naser <aws8819@yahoo.com> |
| **To:** | mohammad@live.no <mohammad@live.no> |
| **Subject:** | Asallamu Alykum |

Asallamu Alykum Akhi Mohyaldeen I'm Brother Abu Taha.

Brother Walle92 told me i should contact you.

Insha Allah this will be to our benefit.

Tr. Ex. 3-22

Meanwhile, with Mohyeldeen's guidance, Dennison made his way to Jordan. On April 18, 2012, he was in Zarqa, the home of ISIS founder Abu Musab al Zarqawi, with the "*real*" brothers. Id. at 4900; ECF No. 324, PageID.4353, 4370. Dennison caught the attention of Jordan's General Intelligence Department (GID) after an imam at a Mosque reported that Dennison was acting suspiciously. Dennison was ordered to leave Jordan. ECF No. 327, PageID.4902, 5011-12. Mohyeldeen suggested that Dennison travel to Egypt because "*we have many good chechnyan brothers there*" or to Tripoli, Lebanon, because "*there are some good brethren there.*" Id. at 4903. Dennison sought Mohyeldeen's help because Dennison's associates in Jordan were under surveillance by the Mukhabarat, a Jordanian Intelligence Service. Id. at 4904.

Mohyeldeen and Dennison were arrested by GID on July 11, 2012, when they met up in Jordan. Id. at 4907-08. Dennison was detained for 45 days until he received money from an outside source. Id. at 4909. He was released from prison and traveled to Tripoli, Lebanon, near the porous border with Syria. Id. at 4909, 5021-22. To enter Syria and join ANF, an American like Dennison needed help from someone with connections. ECF No. 324, PageID.4408.

Dennison contacted Naser from Jordan in June/July 2012, who directed him to Sheikh Omar Bakri, an extremist who lived in Tripoli and had the connections Dennison needed. Id. at 4402-03, 4408; ECF No. 327, PageID.5054; ECF No. 330, PageID.5624. Bakri helped Dennison enter Syria and join ANF. ECF No. 327, PageID.5054, 5065-66.

### 4. *Naser's Attempt to Join ANF in Syria in November 2012*

By September 6, 2012, Dennison had arrived in Syria and joined ANF. Id. at 4910-12. Naser returned to the United States on August 4, 2012, on his new Iraqi passport. Id. at 4913. By this time, Dennison was in Syria. ECF No. 330, PageID.5625. Dennison asked Naser for funds to purchase an AK-47. Id. Naser told the FBI that he agreed to send Dennison money for the weapon. Id.

Naser and Dennison exchanged several email messages. Dennison described his journey from Lebanon into Syria and told Naser that he now had the connections needed to get Naser into Syria. ECF No. 327, PageID.5060; *See* Tr. Ex. 4-11. Dennison asked Naser to alert him when he was ready to travel. Id. Dennison told Naser that a

nice [AK-47] cost $1,200 and asked Naser to bring enough money for them both to obtain one. Id. at 5059-61; ECF No. 330, PageID.5625; *See* Tr. Ex. 4-11. Naser responded that he needed two months and would bring enough money for them both. ECF No. 327, PageID.5063; *See* Tr. Ex. 4-12. In another email, Dennison explained that when he was in Lebanon, the Sheikh [Omar Bakri] told him that he would not need to bring any supplies or money, but the war had depleted the brothers' funds. Id. at 5065-66; *See* Tr. Ex. 4-13. Dennison told Naser they needed funds for a weapon to take down a plane. Id. at 5066-67. Dennison wanted his own weapon and told Naser he was going to "*arrange for the sheikh or someone else to help*" him get one. Id. Dennison told Naser to pray for them and "*come soon and come prepared, get ready, it is real here.*" Id. at 5066. In his reply later that day, Naser expressed his frustration that "*i am not with you.*" Id. at 5070; *See* Tr. Ex. 4-14. Naser again promised to bring "*what we need & more*" and to join Dennison "*as soon as possible.*" Id. Naser emailed Dennison on October 26, 2012, "*I will see you soon.*" Id. at 5072; *See* Tr. Ex. 4-16.

During this time, Naser searched the internet and watched videos about weapons, including many different types of tactical knives, swords, and other weapons. Id. at 5082-86; *See* Tr. Ex. 5-1. From November 1 to 4, 2012—just days before he was scheduled to travel—Naser searched for firearms (Glock 9mm), ammunition (1000 rounds of 9mm rounds), and sniper scopes (Bushnell sniper scope). ECF No. 328, PageID.5132-33; *See* Tr. Ex. 5-1. And as further evidence of his knowledge and intent,

on November 2, 2012, he watched a video of Russell Dennison speaking with an ISIS flag in the corner. Id. at 5142-43; *See* Tr. Ex. 5-22.

In the days leading up to his flight to join Dennison and ISIS, Naser consumed large volumes of ISIS and other terrorist propaganda that depicted extreme violence and brutality. *See* Tr. Ex. 5-2. On October 26, 2012 (the day he told Dennison that he would join him "*as soon as possible*"), Naser viewed 16 videos, some multiple times. ECF No. 330, PageID.5661. The videos, which included official ISIS media outlet productions, had common threads: anti-Shia, anti-U.S., and anti-Jewish content, alongside messaging that these three groups were responsible for Muslim oppression. Id. at 5662, 5663-64. The videos also portrayed the strength of the Mujahideen by depicting battles where the Mujahideen attacked U.S. facilities with weapons. Id. at 5662. Lions and fighters on horses were frequently depicted to symbolize bravery and commitment to jihad. Id. Naser watched videos praising Osama bin Laden and the September 11, 2001, Twin Towers attacks; calling for jihad as a religious obligation; calling for military action to establish a world-wide Caliphate; and showing gory beheadings in graphic detail. Id. at 5665-75. *See* Tr. Ex. 5-2. He also watched videos of Shiekh Omar Bakri praising ISIS's founder, Abu Musab al-Zarqawi. Id. at 5674.

Naser obtained weapons—a sword cane and a tactical knife—and a rifle scope, and purchased a one-way ticket to Erbil, Iraq. ECF No. 328, PageID.5138-41, 5255. On November 7, 2012, Naser arrived at the Detroit Metropolitan Airport, checked in his luggage, and cleared the security checkpoint. Id. at 5250-57. He was stopped by law

enforcement as he walked towards the assigned gate. Naser was not permitted to board the plane. Id. at 5253.

### 5. *Naser's Attempt to Join ISIS in Syria in January 2013*

Wary but undeterred, on November 10, 2012, Naser visited 60 webpages looking for alternative ways to depart the United States. ECF No. 335, PageID.5745-46. He searched for airports in Canada and Mexico, visas to Egypt, visa and refugee information for Norway and Tunisia, visa requirements to enter Lebanon, and once he decided on a plan, for a one-day car rental in Beirut. Id. at 5746-49. On December 31, 2012, Naser purchased a one-way ticket to Beirut, Lebanon, departing from O'Hare Airport in Chicago, Illinois, on January 2, 2013, and a bus ticket from Detroit to Chicago the same day. Id. at 5764.

Hours before he was scheduled to board his bus to Chicago, on January 1, 2013, Naser committed two acts of violence at two different Detroit-area gas stations where he had very briefly been employed and fired for suspected theft. Id. at 5766-69. After exacting retribution against his former employers for perceived grievances, Naser took the bus to Chicago and attempted to board the January 2, 2013, flight to Beirut, Lebanon. He was once again denied boarding, and he returned home to Michigan. Id. at 5780. Naser turned his attention to Russell Dennison, who he blamed for his inability to perform Hijrah. Id. at 5793. Naser retaliated by posting a video warning his fellow jihadists that Dennison was an agent of the FBI and the Dajjal—or anti-Christ. Id. at 5781-82.

### 6. *Naser's Incarceration for Armed Robbery*

On January 4, 2013, Naser was arrested by local authorities for armed robbery at the Mobil gas station in Bloomfield, Michigan. Id. at 5789. He was convicted after a jury trial and sentenced to 3-20 years in prison. PSR ¶ 25. Naser was released from custody and placed on parole supervision on March 18, 2016. Id.

### 7. *Naser's Attempt to Support ISIS with a Destructive Device*

In June 2014, while Naser was incarcerated for the armed robbery conviction, ISIS scored military victories, declared the establishment of a global Caliphate in Syria, and announced Abu Bakr al-Baghdadi as Caliph. ECF No. 324, PageID.4374-77. ISIS called on all Muslims to pledge allegiance to al-Baghdadi, who ISIS considered to be the only legitimate Muslim ruler in the world, and to perform Hijrah by coming to Iraq and Syria to build the nascent Caliphate. Id. at 4375-79.

ISIS's military successes were short lived. As their territory shrank, they changed their messaging and encouraged their supporters to carry out terror attacks where they lived by any means available, including blowing things up, stabbing people, or ramming people in their cars. Id. at 4380-81. ISIS claimed that these lone wolf attacks furthered their cause by depleting the enemy's resources. Id. at 4381. ISIS communicated with its supporters through its official media outlets like Al-Hayat, Al-Furqan, and Al-Naba, its official publications like DABIQ and RUMIYAH, and recruitment videos like FLAMES OF WAR. ISIS disseminated its propaganda materials through social media platforms like

15

Twitter and Telegram. ECF No. 336, PageID. 6039-041, 6075-76; *See* Tr. Exs. 9-13, 9-14, 17-120.

ISIS also provided instructions and other information on how to successfully conduct attacks. Id. at 6087. Supporter groups like Mujahideen Secrets Channel Group (MSCG) were created to provide expert training and instruction on manufacturing explosives. Id. at 6130-31. MSCG invited jihadists to join the group by stating: *"Oh brother: if you are honest with asking for jihad and you cant migrate to jihad land or contact mujahideen then don't miss the duty of training for jihad by watching our channel."* Id. at 6120. The group claimed to help "*those who could not arrive to mujahideen to get training from experts on our channel."* Id. As one MSCG administrator explained, the primary purpose of MSCG was "*to disseminate military sciences and the manufacture of explosives.*" Id. at 6135; *See* Tr. Ex. 10-8.

Naser's incarceration did not deradicalize or deter him from attempting to materially support ISIS. Instead, he was more committed than ever but, because of his parole conditions, he was careful to hide his activities to avoid detection. Naser maintained an LG phone, which he hid from his parole agents. He used this phone extensively to conduct his ISIS-support activities. He downloaded Tor and Orfox, which are web browsers that anonymize users and searches and leave very little information for forensic examiners to find. ECF No. 350, PageID.7924-25. Favored by criminals, these browsers are often used to access the dark web. From the little forensic data that remained from Naser's use of Tor and Orfox, the FBI learned that Naser used

these tools to search for "castor seeds" and "mustard," which are associated with deadly weapons like ricin. Id. at 7925-26; ECF No. 336, PageID.6096.

Within weeks of his release, in May 2016, Naser obtained a Telegram account using the moniker "ISxxxIS" (username "Abu Hamzah") and created a bot that he registered as "ISxOne1Bot" (username "Dabiq"). ECF No. 336, PageID.6105, 6149. Naser transferred approximately 1646 messages between these accounts. ECF No. 344, PageID.6721-22; *See* Tr. Ex. 10-2. These messages included videos entitled, "And fight all of the polytheists," "The last will of a soldier of the Islamic State executor," "The punishment of traitors," "The roar of the lions," "Fight them O' monotheist," "Waterers of Jihad," and "Attack where they live," Id. at 6725-32, 6740.

Naser joined MSCG on June 2, 2016, and communicated with the group extensively. Using his secret LG phone, Naser researched and reviewed explosives-making materials and recipes. ECF No. 336, PageID. 6089. Of the 109,267 messages between Naser and MSCG, the FBI forensically recovered only 1,387—approximately one percent. Id. at 6118-19. There were numerous messages in the MSCG chat found on Naser's phone from supporters seeking information about manufacturing explosives. The posts were contained in Tr. Ex. 10-11, translated from Arabic, and included the following:

- June 25, 2017, user "Islam prevails and nothing surpasses it. Al-Ahwazi" posted the following message: "*Peace be upon you, if there is someone on the private,*

*could you provide very simple instruction on making a bomb for planting in any location or an explosive belt?*" Id. at 6095.

- On June 26, 2017, user "Abu Ayman Al-Yemani" posted detailed instructions on the making fatal doses of the poison, ricin using castor oil seeds. Al-Yemani advertised: "*The fatal dose: 0.035 gm of pure poison. For Children only, this does is available in 3-6 seeds because of their weak immunity. But actually in 20 seeds for adults. The infected person dies in a maximum of 4 days.*" Id. at 6096-97.

- On July 1, 2017, user "Son of state" posted "*Brothers, a channel for making explosives, God bless you.*" Id. at 6098.

- On July 1, 2017, user "For the religion of God, I will take revenge" posted "*An easy course in making explosives*" with two links, "*For receiving questions: @meqdambot*" and "*t.me/Meqdam7.*" Id. at 6098-99.

- On July 2, 2017, a user posted a message requesting books, videos, or text links on making explosives and asked to receive a personal message with this information. Id. at 6100.

- On July 3, 2017, a user posted a message asking for detailed information about manufacturing an explosives belt. Id. at 6101.

- On July 9, 2017, a user posted a message: "*I want an explosive material other than tnt for an explosive belt, made from material that is easy to obtain and has a strong effect, and may God reward you with good.*" Id. at 6101-02.

- On July 17, 2017, a user posted a message: "*If possible, brothers, information about the black plastic explosive I found in the book of "Easy Explosives" but without details or a method of preparation; so please advise us; may God bless you.*" Id. at 6103.

On December 18, 2016, using a voice changer application to disguise his voice, Naser recorded himself reaffirming his pledge to the Islamic State—"*I do not resign nor dismiss / I say what the lions said / . . . / I am the son of the Islamic State / If the mountains swayed, I will not sway.*" ECF No. 350, PageID. 7907-7913; *See* Tr. Ex. 18-2 & 18-2A. He forwarded this recording, along with other ISIS materials, to his ISxOne1Bot. Id. at 7940-42; *See* Tr. Ex. 10-2.

In July 2017, Naser forwarded a renewal of the ISIS oath of allegiance to Abu-Bakr al-Baghdadi to his ISxOne1Bot (below). ECF No. 344, PageID.6741-42.



Tr. Ex. 10-2.

He also forwarded explosives-related materials, including a recipe for the explosive copper azide, and a video entitled, "Attack them O'monotheist, The making

19

of the simplest effective explosive charge at home," and videos entitled "attack where they live." ECF No. 350, PageID.7939-40; ECF No. 344, PageID.6727, 6738-40; *See* Tr. Ex. 10-2, 10-11.

He joined chatgroups on Paltalk and asked other supporters if they knew how to make explosives. ECF No. 351, PageID.8220-21; *See* Tr. Ex. 11-1. In April 2017, he downloaded and viewed an Ibn Taymiyyah Media Center (ITMC) video that provided step-by-step instructions for manufacturing the explosive triacetone triperoxide (TATP) and assembling an improvised explosive device (IED). ECF No. 350, PageID.7983-84; ECF No. 346, PageID.7316-24, 7326-29 (Sealed); *See* Tr. Ex. 18-3 & 18-3A.

Naser chatted with other ISIS supporters and encouraged them to go beyond words and commit acts of terror out in the world by, for instance, burning forests with a book of matches.[3] ECF No. 349, PageID.7751-54. In May 2017, while exhorting

---

[3] Naser possessed an issue of Inspire magazine containing an article entitled: "It is your freedom to ignite a firebomb, the AQ Chef." ECF No. 350, PageID.8002; Tr. Ex. 16-5. The article encouraged readers to build an explosive to set off forest fires. Id. at 8002-03. The article included instructions for assembling an ignition switch to ignite the main explosive charge using Christmas tree lights and the powder from match heads. Id. at 8003-04. Naser's stored both in his basement bomb lab. ECF No. 344, PageID.6849-52. In addition, in January 2017, around the time that Naser was chatting with these other ISIS supporters, ISIS's English-language magazine RUMIYAH urged its supporters to use arson to "target wildlands and buildings." *See* DNI First Responder's Toolbox, *Mitigating the Threat of Terrorist-Initiated Arson Attacks on Wildland-Urban Interface Areas*, available                                                                                                      at https://www.dni.gov/files/NCTC/documents/jcat/firstresponderstoolbox/124s_-_Mitigating_the_Threat_of_Terrorist-Initiated_Arson_Attacks_on_Wildland-Urban_Interface_Areas.pdf.

supporters to commit attacks, Naser admitted that when he was in Mosul in 2012, he had surveilled and later killed a Christian gold shopkeeper, stolen the man's money, and provided it to the Mujahideen. Id. at 7751-52; ECF No. 325, PageID.4635. Naser's admission was chilling because he and Dennison visited Mosul in March 2012. ECF No. 325, PageID.4636-38; *See* Tr. Exs. 3-17 to 3-21.

Naser connected with an explosives manufacturing instructor who identified himself as "abouhamza_10" (a.k.a. abouhamzatounsi) in a Paltalk chatroom called "Ansar Dawlat AlKhilafah AlIslamiyah," or "Supporters of the Islamic Caliphate State." He later connected with this same bomb maker on Telegram. ECF No. 351, PageID.8210-11. During their communications on September 15, 2017, Naser admitted that he had successfully created a detonator and asked abouhamza_10 to provide him with a more powerful explosives recipe. Id. at 8210, 8217-19. Abouhamza_10 began explaining the four elements of a sticky explosives charge and asked Naser to resume their discussion on Telegram; a call that lasted nearly seven minutes. Id. at 8218-20; *See* Tr. Exs. 11-12, 11-13, 17-1. In a Paltalk chat two days later, on September 17, 2017, Naser suggested using a booby-trapped truck to hit Twitter and used emojis for a truck and explosive (below). Id. at 8230-32, *See* Tr. Ex. 11-14. Naser had a grievance against Twitter because the company had canceled his Twitter account. Id. at 8230.

2017-09-17 15:53:38Z   *USER_ACTION:* Room description: Ansar Dawlat AlKhilafah AlIslamiyah   Supporters of the Islamic Caliphate State

2017-09-17 15:53:38Z   **111800716** ( 111800716 )  -  أحسن شي نضرب شركت توتر   Best thing is to hit the Twitter company.

15:54   *USER_ACTION:* Room description: grp_name_na

2017-09-17 15:54:53Z   *USER_ACTION:* Room description: Ansar Dawlat AlKhilafah AlIslamiyah   Supporters of the Islamic Caliphate State

2017-09-17 15:54:53Z   **111800716** ( 111800716 )  -  شاحنة مفخخة تخلي توتر تبطل حذف الانصار   A booby trapped truck would let Twitter quit canceling Al-Ansar [supporters].

Tr. Ex. 11-14

September-October 2017 were particularly busy months for Naser. He lived in a single-story, single-family home with his pregnant partner, Noor Al-Bahiya, and their two young children. ECF No. 350, PageID.8076-77. Al-Bahiya delivered their third child on September 25, 2017. Id. at 8085-86. In the days leading up to her delivery, Naser told Al-Bahiya that he had rented out the three bedrooms in the home and he gave her an ultimatum—she could either move into the basement of the home with him and their children; or move into his brother's smaller home with his brother's family. Id. at 8079-82. On September 27, 2017, Naser instructed Al-Bahiya to remove all her property from the bedroom and to make the space ready for renters. Id. at 8077, 8080-81; *See* Tr. Ex. 16-1.35. Having recently delivered their third child, Al-Bahiya objected. Id. at 8082. Naser told Al-Bahiya that there was nothing that she could do to get in the way of his goals or achieving his goals and she could either help him or get out of his way. Id. at 8079-80. Crying, Al-Bahiya agreed to move out of the home with their children but asked Naser for additional time because she was tired and it physically hurt her to move around so soon after giving birth to his child. Id. at 8082-83, *See* Tr. Ex. 16-1.37.

With Al-Bahiya and his children safely out of his house, Naser moved into the basement where he continued making explosives with abouhamza_10 and worked on drones. *See* Tr. Ex. 11-1. On October 17, 2017, Naser again reaffirmed his oath to ISIS (see translation below), this time by speaking the oath in front of other ISIS supporters in a Paltalk chatroom. ECF No. 351, PageID.8243-47. This was the same oath he had recorded in December 2016 with a disguised voice and transferred to his bot, and it was the same oath found handwritten on index cards observed by his parole agent during home visits earlier that summer. Id.

> In the name of God, the most compassionate, the most merciful:
>
> I do not resign nor dismiss
> I say what the lions said
> I am from the kinana [quiver] of the master of the two pillars
> A new lion and my claws are on the ground
> And if I started I do not go back.
> It will not be shortened, the set date in the book, and it will not increase.
> I am the son of the Islamic State
> If the mountains swayed, I will not sway.
>
> Takbeer [Glorifying God]. God is great.

Tr. Ex. 11-38 & 11-38A

Naser built a bomb lab in his basement, assembling within arm's reach, chemicals (including acetone, hydrogen peroxide, and sulfuric acid), tools, and equipment (including glass jars, switches, initiators, fuses, wiring) necessary to successfully manufacture TATP and build an IED. ECF No. 345, PageID.7020-32. In addition to the bomb lab, he had drones and multiple weapons (tactical knives and sword cane) on

hand in his basement. Id. at 7063-64; ECF No. 351, PageID.8153, 8166-67. Naser's bomb-making IED lab was stocked with the same materials recommended by the bomb-maker in the step-by-step ITMC video that Naser had downloaded onto his phone and viewed in April 2017. ECF No. 345, PageID.7032-33, 7038-39; ECF No. 350, PageID.7983-84; *See* Tr. Ex. 18-3 & 18-3A. Naser also had fragmentation (BBs and hunting pellets) and glass jars which create IEDs that the ITMC bomb-makers claimed are "*very effective in closed spaces such as, a bus, a restaurant, or something similar.*" ECF No. 347, PageID.7470-76; *See* Tr. Ex. 18-3 & 18-3A. Naser was making IEDs and assembling delivery drones for use in an ISIS attack in the United States. He would have succeeded but for law enforcement action.

### b.  Naser's History and Characteristics

Naser is 37 years old. Born in Baghdad, Iraq, Naser entered the United States as a refugee at age 12, and moved to Dearborn, Michigan, when he was 15. (PSR ¶ 72). Although not legally married, Naser and Noor Al-Bahiya lived as husband and wife from approximately 2008-2009 until his arrest in October 2017. They have three children, born in 2011, 2013, and 2017. Naser's relationship with Al-Bahiya was turbulent, and Al-Bahiya has accused Naser of domestic violence and sexual assault.

Naser dropped out of high school in the 11th grade and may have acquired a G.E.D. in 2007. PSR ¶ 85. From July 2007 through early or mid-2008, Naser was employed as a contract linguist and sent to Iraq as a translator for the United States Marine Corps where, according to Naser, he received weapons training. PSR ¶ 86. Naser

24

returned from Iraq in 2008 and enrolled at Henry Ford Community College (HFCC). He attended classes there from August 2008 until December 2010 but was expelled before he completed a degree because he was combative and disruptive. PSR ¶ 84; *See* Gov't Ex. 2, HFCC Expulsion Letter. While on parole, Naser briefly attended Schoolcraft Community College but did not complete any program. PSR ¶ 83.

Naser's employment history is rife with conflict and violence. Prior to his 2013 felony armed robbery conviction and for a handful of weeks in November-December 2012, he was employed at a Mobil gas station in Bloomfield Township and a Sunoco gas station in Detroit. Naser was fired from both jobs upon suspicion of theft. PSR ¶ 63. He retaliated against his former employers with violence, as described in more detail below. Similarly, while on parole in 2017, Naser slashed the tires of a co-worker's car in retaliation for being fired. PSR ¶ 64.

### 1. Naser's Criminal History

Naser has a violent and disturbing criminal history.

In April 2006, when he was 18 years old, Naser was convicted of disorderly conduct on school property. PSR ¶ 60. Although a minor offense, the nature and circumstances of this offense provide insight into Naser's character. In that case, Naser returned to school after being suspended for fighting with another student. The suspension did not deter Naser from physical conflict, and this early disorderly conduct conviction was the first in what would become a pattern for Naser: predatory violence and retaliation. After returning to school from the suspension, Naser verbally abused

25

the student at lunch. The student moved tables to avoid conflict with Naser. Unwilling to quit, Naser approached the other student and took a swing at him. Naser was combative and struggled with staff members who grabbed Naser to stop him. Police were called and the case was referred to the Wayne County Prosecutor's Office for criminal prosecution. Naser received a two-year diversion sentence—a significant sentence for a disorderly conduct. But diversion didn't work. Naser failed to report as directed and to get fingerprinted. He failed to appear at a hearing and a warrant issued for his arrest. He also failed to attend anger management or to pay his fines/costs. Naser's diversion was revoked in December 2006. PSR ¶ 60.

A month later, in January 2007, Naser committed an assault and battery against his mother and was sentenced to 12 months of probation. During an argument, Naser shoved his mother over a couch, causing the couch to flip over and her to fall to the ground. He stood over her, pointing his finger and swearing, before violently throwing an object at the wall. PSR ¶ 61.

On January 1, 2013, Naser committed more acts of violence. The first occurred at a Sunoco Gas Station in Detroit where Naser had briefly worked and had been fired. Naser retaliated. According to police reports, Naser entered the Sunoco, purchased 6 quarts of motor oil, and poured the oil over candy bars and in the ATM, EBT, and credit card machines, causing significant damage. Naser was not charged with this offense.

Less than 30 minutes later, Naser entered the Mobil Gas Station in Bloomfield Township where, several weeks earlier, he had worked and been fired upon suspicion of theft. Naser retaliated. Naser walked directly to a store shelf and grabbed a package containing pepper spray. Naser then pepper-sprayed, assaulted, and robbed the cashier. The cashier suffered large bruises on his head, a scrape on the left side of his face, and injuries to his eyes from the pepper spray. PSR ¶ 63. Naser was convicted of armed robbery after a jury trial in 2013 and sentenced to 3 to 20 years' custody. During his incarceration, Naser failed to follow prison rules, and he was repeatedly sanctioned for misconduct violations.

While on parole in 2017 (and unbeknownst to his parole agent), Naser was convicted of breach of peace and placed on probation. In that case, Naser was fired from his gas station job after a disagreement with a co-worker. He retaliated against the co-worker by slashing the man's car tires. Naser failed to report this police contact, arrest, and conviction to his parole agent.

### 2. Naser's Parole Violations

Naser was on parole supervision for his armed robbery conviction for nearly 18 months—from March 18, 2016, until his arrest on October 30, 2017. During that time, he accrued 50 parole violations. On January 18, 2018, after a parole revocation hearing, Naser was found guilty of many of the most serious violations. These included engaging in new criminal behavior; assaultive, abusive, threatening and/or intimidating behavior; failure to notify his parole agent that he had police contact on several dates; submitting

a false and inaccurate report by failing to notify his parole agent of a violation of a Personal Protection Order (PPO); and possessing weapons and ammunition (BB's and pellets), firearm components (CO2 cartridges, a magazine and BBs), a stun gun, a knife, a concealed sword, and a firearm. Notably, Naser's parole violations did <u>not</u> include the crimes of conviction in this case—attempting to provide material support to a foreign terrorist organization or being a felon in possession of a destructive device (explosive).

Some of Naser's parole violations were related to Al-Bahiya who, in August 2017, obtained a PPO against Naser and reported a history of domestic violence. PSR ¶ 75. She alleged that in January 2017, Naser punched her and choked her for a few seconds, and in February 2017, that Naser threatened to kill her and her daughter, and take their son and leave. Id. She also alleged that Naser threatened to take their children to Iraq without her permission. Id.

In the weeks leading up to the parole revocation hearing, Naser attempted to persuade Al-Bahiya to testify falsely by recanting her allegations of domestic violence and by claiming ownership of the BB gun found in the home after she moved out in September 2017. Id. ECF No. 350, PageID.8072, *See* Tr. Exs. 2-21, 2-23; Gov't Ex. 3, Jail Calls, lines 1-6, 8, 18. Al-Bahiya refused. She instead reminded Naser of what he had done to her and the fact that he forced her to move out of their home even though she had given birth to their son just three days earlier. *See* Gov't Ex. 3, line 8. Naser separately asked his brother to falsely claim that the gun was his and to falsely claim

ownership over his vehicle to support Naser's efforts to suppress evidence. ECF No. 350, PageID.8073, 8075-76; *See* Tr. Ex. 2-22; Gov't Ex. 3, lines 7, 9, 14-17.

Al-Bahiya did not appear or testify at the hearing, leading to the dismissal of several parole violations. On November 9, 2017, Naser was returned to custody for 60 months as a parole violator. PSR ¶ 63. He remained angry and threatened Al-Bahiya. For instance, during calls with his mother on February 6, 2018, Naser stated: "*She better pray and fast; and wish that I don't get out of jail. I will not live in injustice. She has to go and testify.*" And "*She wants to run from the truth mom. I will not let her escape from this reality. The reality she put me in by not coming to testify. She will not escape this reality. I am not going anywhere, even for another five years. She can't escape me.*" Gov't Ex. 3, line 22. Naser's anger did not cool, and for the next several years, Naser continued to blame Al-Bahiya for seeking a PPO, claiming that she caused his incarceration. *See* Gov't Ex. 3, lines 18, 24-26, 33-42.

### 3. *Naser's Misconducts During Incarceration*

Naser's violence and refusal to follow the rules continued during his incarceration. He accrued nearly 40 violations while in state custody. *See* Gov't Ex. 4, MDOC Misconducts. He received citations for, among other things, fighting; creating a disturbance; possession of dangerous contraband (three citations); destruction/misuse of property (two citations); disobeying a direct order (eight citations); interference with administration rules (eleven citations); possessing stolen property/theft; and forged documents/forgery.

29

After his arrest in October 2022, Naser continued to accrue misconduct violations in custody. Naser was found by a Discipline Hearing Officer to be in possession of a dangerous weapon in his cell (see below) on January 20, 2023. He was given a 30-day disciplinary sentence in the Special Housing Unit, a 120-day loss of email and visitation privileges, and a loss of 41 days of good conduct time.



On February 14, 2023, Naser was found guilty of phone abuse—allowing another inmate to make a call using Naser's account. Naser was sanctioned and lost phone privileges for 30 days, commissary for 60 days, and 13 days of good conduct time.

On April 10, 2025, Naser was found guilty of accepting money from another inmate without authorization. He was sentenced to a suspended sentence of 30 days loss of commissary.

### 4.  *Naser's Violence Against Noor Al-Bahiya*

Naser was angry with Al-Bahiya for seeking a PPO against him in August 2017, and he blamed her for his incarceration. He attempted to persuade her to recant her allegations of domestic violence. Many of these communications were recorded while

Naser was in custody. *See* Gov't Ex. 3. Al-Bahiya never recanted. She refused to lie for Naser and instead reminded him of the abuse she suffered. For instance, on October 18, 2017, a few weeks after kicking her out of their home, Naser told Al-Bahiya that she was miserable "*because you went against me*" when she obtained the PPO. *See* Gov't Ex. 5 & 5A at 09:48. Al-Bahiya responded: "*you hit me…you fucking threatened me. You attempted to fucking kill me. On top of all that – on top of all that you used to force yourself inside me.*" Id at 11:04-11:20. Al-Bahiya told Naser: "*No I don't even want revenge. I just want to be free from your evil….you're an evil man…you are an evil man.*" Id at 02:38-02:50.

In another call that day, Al-Bahiya reminded Naser that he "*beat the crap out of me the same day, or the second day you found out that I was pregnant? Yeah, remember?*" Gov't Ex. 6 & 6A at 08:55. When Naser responded that he did not remember, Al-Bahiya stated: "*Yeah, you don't remember Aws, alright. And remember how you like wanted to drag me to that room and kill me? Remember?*" Id at 09:02. During the call, Naser asked Al-Bahiya to rate their relationship before and after she filed the PPO, stating, "*were we better before or after?*" Id at 17:55. Al-Bahiya responded the relationship "*was the exact same.*" Id at 18:18.

On December 30, 2017, Al-Bahiya emailed Naser: "*Aws you left a bruise on my face for a week and a half. one side of my face was swollen.*" Gov't Ex. 4, line 10.

Naser's history and characteristics, which include violence against his mother, partner, and anyone who he believes has wronged him, his lengthy pattern of predatory, aggressive, retributive behavior, his extensive prison disciplinary history, and inability

31

to follow court ordered conditions of release are all aggravating factors that weigh heavily in favor of a 420-month sentence.

### c.  Adequate Deterrence and Protecting the Public

*"The way I think about it bro, fuck this country bro. I don't give a fuck about this country. I don't wanna live in this country. I don't want—I'll piss on this country bro."*

~ Tr. Ex. 2-18: Aws Mohammad Naser, January 19, 2023

There are two types of deterrence, specific and general deterrence. "Specific deterrence looks to dissuade an individual defendant from committing future crimes, while general deterrence aims to have the same effect on the population at large." *United States v. Boucher*, 937 F.3d 702, 710 (6th Cir. 2019) (cleaned up). "Terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal." *United States v. Ceasar*, 10 F.4th 66, 79 (2d Cir. 2021) (quoting *United States v. Mumuni*, 946 F.3d 97, 112−13 (2d Cir. 2019)).

Naser became radicalized in his early 20s, and his support for ISIS has never waned. Not during his periods of incarceration. Not during trial. Not in his jail calls. Not now. Instead, Naser expresses his support every time he makes a call from jail, and he is asked to confirm his identity by reciting "United States of America." But Naser can't say it. Instead, to this day,[4] Naser recites "Islamic States of America" each time he is asked to confirm his voice because his support for ISIS and his hatred for the United States is unwavering.

---

[4] His most recent call occurred on February 18, 2026.

Rehabilitation for Naser means deradicalization, which is a process through which an individual abandons or rejects violent extremist beliefs or ideology. *Beyond Belief – Preventing and Countering Violent Extremism in America* (FBI) (Cilke et al., 2025, pp. 46-59). Unlike the myriads of programs designed to reduce recidivism through education, vocational training, and therapy, there are no established deradicalization programs that are guaranteed to reverse the process of radicalization and rehabilitate individuals like Naser who have adopted extremist ideologies. Id. at 47.

Experts' findings and the FBI's Behavioral Analysis Unit (BAU) have found that law enforcement can disrupt extremist activities but deradicalization cannot be compelled. Id. at 46-48. It must be voluntary and without coercion. Id. Former extremists and individuals incarcerated for terrorism-related offenses have described deradicalization as a transformative and lengthy process that occurs in steps and requires a change in the individual's identity and sense of self. Id. at 47. It does not happen overnight. Id. at 49.

Naser has been fixated and focused on his extremist ideology and commitment to ISIS for years. Fixation (an increased focus, pathological preoccupation) into identification (development of a pseudo-commando or warrior mentality, identifying as an agent to advance a cause or belief system) is a critical component of those who conduct a targeted attack. *Making Prevention a Reality: Identifying, Assessing, and Managing the Threat of Targeted Attacks* (FBI) (Ammon et al., 2016). Naser stayed fixed and focused even when he knew that the FBI was actively investigating him and Dennison; when he

believed Dennison was an FBI informant and had betrayed him; when he was denied boarding at the airports in Detroit and Chicago; when he was serving his state sentence in prison; when he was being monitored by parole agents; when his home and Apple iPhone were searched by his parole agents; and when he believed he was under active surveillance by the FBI. Naser remained fixed on his commitment to ISIS and adapted to these challenges through deception and manipulation while increasing the lethality of his planned material support. Naser also developed a warrior mentality and identified as an ISIS member and fighter who desired to become a martyr for the cause.

Naser has turned to violence across all spectrums of life as a solution to perceived grievances, injustices, and slights: at home, at school, at work, in personal relationships, with this mother and intimate partner, in custody, and for ISIS. Naser's violent history is predatory, planned, and purposeful, and he has exhibited problematic behaviors that include exploiting and manipulating those closest to him and unhealthy peer and family dynamics. *Beyond Belief – Preventing and Countering Violent Extremism in America* (FBI) (Cilke et al., 2025, pp. 7, 26); *Making Prevention a Reality: Identifying, Assessing, and Managing the Threat of Targeted Attacks* (FBI) (Ammon et al., 2016, p. 4). He routinely externalizes the blame (it's always someone else's fault) and does not accept responsibility for his own actions and behaviors. Examples abound. He blamed Al-Bahiya for his arrest and incarceration, for filing a PPO, and for going "against" him. He blamed the Mobil store clerk he pepper-sprayed and assaulted for resisting Naser when he took money from the cash register. And he blamed Dennison for thwarting Naser's attempts to travel to

34

join ISIS, labeling him an FBI informant. There are no identifiable internal or external influences, such as healthy social supports, access or receptiveness to assistance, or positive coping mechanisms that would lower the risk he poses. *Beyond Belief – Preventing and Countering Violent Extremism in America* (FBI) (Cilke et al., 2025, p. 7).

It is difficult to imagine what could deter Naser from continuing to support ISIS. No one, not friends, family, or religious scholars, can convince Naser that he is on the wrong path. All efforts to deter, dissuade, and monitor him—school suspension, diversion, probation, imprisonment, parole—have failed. He has been unable to hold a job or complete a degree, and he has demonstrated a flagrant disregard for the rule of law, in and out of prison. Nothing can move Naser away from violent extremism or mitigate the threat Naser poses. To date, he has failed to rethink his life choices, and it is unclear what effect a rehabilitative sentence imposed by a government that he does not respect will have, if any. There is no indication that Naser has or will consider alternatives to violent ideology or using violence to resolve his grievances. Naser also lacks positive prosocial peer or family involvement, which are essential to success. Naser's family is unable to appropriately support him and have instead been the victims of his violence.

Naser's continued fixation on violent extremism, ability to access the online environment, and lack of prosocial or positive family involvement reduce the likelihood that he will deradicalize and therefore rehabilitate.

35

Naser has pledged his life to ISIS, stating: *"if the cause ends … I would be sorry that I did not end with them. … I would not want to keep on existing … while the State does not exist anymore."* ECF No. 351, PageID.8243-45; *See* Tr. Ex. 11-38. Given Naser's unchanged beliefs, a significant sentence is necessary to protect the public. Our community deserves to be protected from him and his violence, at least for the next 35 years. As Naser himself said about ISIS, "*No one knows when God Almighty will grant us victory. No one knows. But I believe in one thing. Whatever those people do, they would never succeed. They would never succeed. I swear, every time I see them* [ISIS] *stressed, I yearn to be with them in that stress."* Id. at 8239; *See* Tr. Ex. 11-3. Naser has supported ISIS for years, and only law enforcement has prevented him from killing on ISIS's behalf. The Court should believe Naser when he says that he is the Son of the Islamic State. Given that he has not changed his beliefs, only a lengthy prison sentence will protect the public from his violence at this point.

A significant sentence will also deter others thinking about fighting for terrorists. ISIS was and remains highly successful at recruiting young people from around the world to travel to join the Islamic State and convincing them to fight and die on its behalf. Or, if travel was not possible, to commit acts of terror at home. These foreign fighters and lone wolves formed the core of ISIS's strength. The cost of ISIS's rise and reign of terror is incalculable.

The need for deterrence is even more important here because of ISIS's devastating brutality, which continues to this day and must be met with full

36

accountability. A significant, 35-year sentence is necessary to deter others from taking up arms against the United States and our allies and fighting for violent, repressive terrorist organizations. ISIS may have lost its physical territory, but the terror group continues to thrive. Its followers continue to conduct terror attacks in Syria, the United States, and elsewhere.

Just last month, on March 7, 2026, two ISIS supporters, Emir Balat and Ibrahim Kayumi, threw two TATP based IEDs at Gracie Mansion, the home of New York Mayor, Zohran Mandami. *See United States v. Balat* et. al., SDNY Crim. No. 26-mj-00701, Doc. 1. The devices were each comprised of a glass mason jar containing TATP, nuts and bolts affixed to the exterior of the jar by duct tape, and an attached fuse. *Id.* This should sound familiar: these are the exact type of devices that Naser was assembling in his basement bomb lab.

And less than a week later, on March 12, 2026, Mohamed Bailor Jalloh—an ISIS supporter who, like Naser, made multiple attempts to join ISIS, attempted to acquire a gun to carry out a murder plot, and was ultimately convicted of providing material support to ISIS in 2017[5] and had recently been released early from his 11 year prison

---

[5] Jalloh attempted to travel and join ISIS in 2015 but changed his mind. *See United States v. Jalloh,* EDVA Crim. No. 16-cr-00163, Doc. 37. He provided cash to support ISIS (over $1000) and purchased an AR-15 rifle for use in an ISIS attack in the United States. Id. He waived indictment and pleaded guilty to an information that charged attempting to provide material support and resources to ISIS. Id. At sentencing, Jalloh claimed to reject ISIS. He wrote a letter expressing deep regret, profound shame and remorse, and his love for the United States. Id. at Doc. 49-1. He characterized ISIS as "evil and inhuman," and promised to help other misguided youth from falling prey to ISIS's

sentence—opened fire in a classroom at Old Dominion University, killing one person and wounding two others in what is being investigated as an act of terrorism. *See* https://apnews.com/article/jalloh-old-dominion-university-shooting-islamic-state-b257727b0167982fbffafae2eb8548fd; https://www.pbs.org/newshour/nation/old-dominion-shooter-was-previously-convicted-of-islamic-state-ties.

As these two cases demonstrate, ISIS continues to attract, inspire, and direct extremists to plan and execute terrorist attacks in the United States. Significant sentences are essential to protecting the public from terrorists like Naser who remain committed to supporting ISIS.

d. **Seriousness of the Offense, Just Punishment, and Respect for Law**

The guidelines create a sentencing range so that courts can sentence similarly situated defendants appropriately based upon the severity of their conduct. The guidelines here are high because "terrorism crimes are among the most serious with which a defendant in federal court can be charged." *United States v. Aws Naser*, No. 24-2044 (6th Cir. 2025) (quoting *United States v. Musaibli*, No. 18-20495, 2022 WL 1695765, at *10 (E.D. Mich. May 26, 2022)) (internal quotations omitted).

---

"superficial and dishonest interpretation of Islam." *Id.* The Government recommended the statutory maximum sentence of 240 months, but the court varied downward, sentencing Jalloh to 132 months. He was released two and a half years early.

When it enacted 18 U.S.C. § 2339B, Congress made specific findings about the serious threat posed by international terrorism. *See* Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) §§ 301(a)(1)-(7), PL 104-132, 110 Stat. 1214 (Apr. 24, 1996), note following 18 U.S.C. § 2339B (Findings and Purpose). Among other things, Congress found that "international terrorism is a serious and deadly problem that threatens the vital interests of the United States," and "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." *Id.* The serious nature of defendant's crimes weighs in favor of a within Guidelines sentence of 420 months.

Significant custodial sentences are consistent with the Sentencing Guidelines, of course, and necessary to address the public policy concerns in § 3553(a), even if Naser did not ultimately succeed in his attempts to fight for ISIS abroad or commit a lone wolf attack at home. That's because "terrorism is different," as the Second Circuit explained:

> We conclude by underscoring that the Guidelines, while only advisory, appropriately reflect Congress's considered judgment that terrorism is different from other crimes. Terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal. Moreover, when it comes to sentencing terrorism, Congress and the United States Sentencing Commission plainly intended for the punishment of crimes of terrorism to be significantly enhanced without regard to whether, due to events beyond the defendant's control, the defendant's conduct failed to achieve its intended deadly consequences. Thus, in determining what constitutes a sufficient sentence for a terrorist defendant whose conduct did not result in death or physical injury, a sentence at the high end of the applicable

range may plainly be reasonable if supported by the balance of § 3553(a) factors.

*United States v. Mumuni Saleh*, 946 F.3d 97, 112–13 (2d Cir. 2019) (cleaned up).

ISIS killed tens if not hundreds of thousands of people in Iraq and Syria, many of them civilians. Ten thousand civilians died in the Battle of Mosul alone, which occurred from October 2016 until July 2017.[6] ISIS conducted and inspired terrorist attacks around the world, killing thousands more and terrorizing everyone else.

And Naser sought out this violence. Unlike many the Court sees, he had choices. He had options. He had a family who supported him. He had all the benefits that living in the United States offers. But he chose and continues to choose terrorism. Naser has a lack of respect for American law, as evidenced by both his criminal conduct and his conduct during this case.

Just punishment and respect for the law compel a sentence as significant as the choice—the decision—to swear allegiance to a foreign terrorist organization and try to fight against the United States. A 35-year sentence is both significant and just.

###   e.  <u>Avoiding Unwarranted Sentencing Disparities</u>

The Court should begin its analysis of the § 3553(a) factors with the Sentencing Guidelines because the "Guidelines purport to take into consideration most, if not all,

---

[6] CBS NEWS, *AP: Death toll in Mosul 10 times higher than acknowledged*, available at https://www.cbsnews.com/news/ap-mosul-isis-civilian-death-toll-10-times-higher-us-iraq-acknowledge/.

of the other § 3553(a) factors." *United States v. Haj-Hamed*, 549 F.3d 1020, 1025 (6th Cir. 2008); *see also Kimbrough v. United States*, 552 U.S. 85 (2007) ("[I]n the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.") (internal quotation marks omitted).

Guideline-recommended sentences are important because "one of the principal functions of the Sentencing Reform Act of 1984 was to eliminate 'unwarranted sentenc[ing] disparities among defendants with similar records who have been found guilty of similar conduct.'" *United States v. Poynter*, 495 F.3d 349, 352 (6th Cir. 2007) (quoting 18 U.S.C. § 3553(a)(6)).

Sentences imposed outside "the Guidelines are afforded no presumption of reasonableness." *United States v. Herrera-Zuniga*, 571 F.3d 568, 582 (6th Cir. 2009). "Variances from the Guidelines risk creating unwarranted disparities among similarly situated defendants nationwide" and "the Sentencing Reform Act of 1984—which created the Sentencing Commission and the Guidelines it promulgates—was designed to guard against those very disparities." *United States v. Boucher*, 937 F.3d 702, 708 (6th Cir. 2019) citing *Dorsey v. United States*, 567 U.S. 260, 265 (2012).

Variances from the Guidelines must be supported by a sufficiently compelling justification. *Gall v. United States*, 552 U.S. 38, 50 (2007), *United States v. Tristan-Madrigal*, 601 F.3d 629, 633 (6th Cir. 2010). And "the greater the district court's variance, the more compelling the evidence must be." *United States v. Stall*, 581 F.3d 276, 281–82 (6th

41

Cir. 2009). A 420-month sentence, which falls below the midpoint of the advisory Guideline range, is presumptively reasonable and neither Naser's conduct nor his history and characteristics present any justification—compelling or otherwise—warranting a downward variance.

This is a unique case. Often defendants who attempt to provide material support are arrested at the time of their first attempt, whether it be attempting to fly out of the country to join ISIS, or attempting to send money to ISIS, or attempting to obtain weapons for ISIS. Given this unique fact pattern it is impossible to find any cases directly on point.

The Probation Department referenced only three cases where defendants scored an offense level 42 and CHC VI pursuant to § 2M5.3. The median sentence for those three defendants was 240 months, and the average was 214 months. However, according to the Probation Department, these were not comparable cases of defendants who are similarly situated or who have been convicted of similar crimes. It can be difficult to discern sentencing parity in terrorism cases because sealed files and classified information are more common in such cases and, therefore, it is hard to fully evaluate whether another case is similar or dramatically different. Thus, a within-Guidelines sentence of 420 months in this case would not create a sentencing disparity.

**The Flawed and Unhelpful Mitigation Memo**

Naser submitted a mitigation memorandum prepared by Mr. Mubin Shaikh from Parents for Peace (P4P) that purports to evaluate Naser's ideological posture, level of

radicalization, and threat he poses to public safety. However, Mr. Shaikh's assessment is unhelpful and deeply flawed. He is not qualified to conduct a threat assessment or violence risk assessment (VRA) or to offer any opinions regarding Naser's purported disengagement, level of radicalization, or violent intent. A threat assessment evaluates the threat of violence a defendant currently poses. Because Naser is in prison, this assessment is limited. A VRA, on the other hand, evaluates the risk of threat of future violence. According to BAU experts, this type of assessment can <u>only</u> be conducted by an experienced forensic psychologist or psychiatrist.[7] Mr. Shaikh is neither.

Mr. Shaikh's curriculum vitae states that he received training on the Terrorist Radicalization Assessment Protocol-18 (TRAP-18), which is a structured professional judgment tool used in threat assessment and threat management. It cannot be used during a VRA. Mr. Shaikh did not use TRAP-18 to evaluate the current threat Naser poses (while in prison). He instead focused on Naser's pathway to violence behavior, and the risk Naser poses for violence in the future, which are both indicative of the VRA. Mr. Shaikh is not qualified to conduct a VRA or opine on these subjects.

In formulating his opinions, Mr. Shaikh relied on very limited information (the Rule 29 briefings and the PSR), and information obtained from talking to and believing with Naser. Mr. Shaikh allegedly spent a scant six hours with Mr. Naser, likely over a

---

[7] The Government has retained a qualified forensic psychiatrist to conduct an analysis and prepare a report, which will be filed with the Court once it is complete.

virtual platform such as Zoom,[8] and he accepted as true Naser's statements. He did not corroborate or confirm those statements with family, law enforcement, prison staff, or any objective sources. He assessed Naser's credibility using an approach that is not recognized within the scientific community and would not pass muster under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993) (As gatekeeper, court should evaluate whether the reasoning or methodology underlying expert testimony is scientifically valid, including whether the theory or technique has been tested, subjected to peer review and publication, and has widespread acceptance within the scientific community). Nor did he question Naser's motivations for being interviewed or consider the likelihood that Naser's engagement with P4P and his alleged desire for change may not be genuine but contrived to provide a mitigation argument at sentencing.

Mr. Shaikh did not use any structured judgment tools, or scientifically recognized methods. Instead, he conducted a highly subjective assessment using techniques that experts consider inappropriate and illegitimate. For instance, in opining that Naser

---

[8] Naser is housed at the Federal Detention Center (FDC) Milan. Naser's case manager and counselor conducted a thorough review of Naser's visitor logs and electronic communication records. They reported that P4P are not on Naser's approved visitor or contact list. FDC Milan has no record of P4P meeting with Naser. Naser's attorneys scheduled three unmonitored one-hour attorney-Zoom calls on February 4, 13, and 20, 2026. Despite repeated requests for information, the defense has refused to disclose to the Government the dates and times Mr. Shaikh and/or other P4P employees met with Naser, or any notes, recordings, test results, or statements Naser made to P4P that were relied upon by P4P in making their assessment. Naser also refused to be interviewed by any Government experts.

44

opposes extremism and terrorism, Mr. Shaikh improperly gave great weight to Naser's reaction to his personal background as an undercover operative and no weight to evidence of Naser's years-long attempts to provide material support to ISIS. In fact, he "deliberately did not discuss the underlying offense with" Naser in part because Naser's attorneys counseled him not to discuss the facts of his case. *See* Def. P4P Report, at 7. Thus, Mr. Shaikh's opinion, which is offered to show Naser's current ideological posture, level of radicalization, and potential threat to public safety, was formulated without any consideration of the most obvious and relevant source of this evidence, the offenses of conviction.

P4P claims to intervene in cases of radicalization <u>before</u> violence occurs and strengthens families as protective factors against extremist recruitment. But Mr. Shaikh does not consider the fact that Naser has already mobilized to violence (as shown by his multiple violent attacks, described above), or Naser's behaviors along the pathway to violence. Perhaps because these topics were off limits for him and he was prohibited from discussing them with Naser. He does not analyze other risk factors considered in VRAs, such as potential grievances, loss of control, disappearing anchors, loss of social status, victim mentality and subsequent lack of insight, psychological factors such as emotional distress, ability to cope with stress, and instability. He doesn't analyze protective factors, which can mitigate risk by promoting long-term stability, accountability, and prosocial functioning, and include advancing age, stable employment, educational attainment, engagement in meaningful and structured

45

activities, sustained positive social supports, capacity for empathy, effective self-regulation, adaptive coping strategies, and the ability to maintain healthy interpersonal and intimate relationships. Mr. Shaikh did not adequately consider these factors, perhaps because Naser lacks them. He is young, lacks a history of stable employment, has been unable to complete an educational program, has failed to meaningfully engage in any structured activities, has no positive family support, frames his legal situation as persecution connected to his religious identity and practice, disavows responsibility for his actions and exhibits a victim mentality.

Mr. Shaikh references Naser's loss of family connection, divorce, and separation from his children as destabilizing stressors, but ignores Naser's role in creating those stressors through manipulation and violent acts against family members. Had he done so, it is likely Mr. Shaikh's conclusions would have been different. This is not objective assessment but advocacy. It is a letter of support from someone who likely has never even met Naser. The Court should give it no weight.

### Supervised Release

Given Naser's crimes and unchanged beliefs, a lifetime term of supervised release is appropriate here. The guidelines specifically allow for a lifetime of supervision in terrorism and related offenses, and courts in this circuit have imposed this lengthy term. *See, e.g.*, *United States v. Hayne*, 835 F. App'x 855, 858 (6th Cir. 2020); *Wright*, 747 F.3d at 416; *United States v. Stafford*, 782 F.3d 786, 791 (6th Cir. 2015); *United States v. Amawi*, 695 F.3d 457, 488 (6th Cir. 2012). Lifetime supervision is particularly appropriate in this

case because of Naser's criminal conduct and repeated violations of release conditions while on state parole in 2016-2017.

The Probation Department will need the ability to ensure that Naser is obeying the law and not engaging in conduct that presents a risk of danger to the public. Here, that means prohibiting Naser from consuming ISIS propaganda. The government therefore recommends that the Court impose a computer monitoring provision during Naser's term of supervised release. Naser radicalized in large part by spending time on the internet: watching ISIS propaganda videos, listening to lectures from Salafi-jihadi extremists, reading issues of RUMIYAH and DABIQ, and engaging with others online. This is not surprising, as an increasingly large body of scholarly work confirms that "the internet [has] a significant influence in the radicalization process of the violent extremists and terrorists."[9] Courts in this district and others have imposed computer monitoring provisions in terrorism cases like this one. *See, e.g.*, *United States v. Musaibli*, 18-cr-20495 (EDMI), ECF No. 291, PageID.3520; *United States v. Gregerson*, 16-cr-20552 (EDMI), ECF No. 64, PageID.743; *United States v. Amin*, 15-cr-00164 (EDVA), ECF No. 20, PageID.283.

---

[9] Ines von Behr, Anaïs Reding, Charlie Edwards, Luke Gribbon, RAND EUROPE, *Radicalisation in the digital era: The use of the internet in 15 cases of terrorism and extremism*, available at https://www.ojp.gov/ncjrs/virtual-library/abstracts/radicalisation-digital-era-use-internet-15-cases-terrorism-and-0.

Here, given the gravity of Naser's crimes and his penchant for internet usage, the government respectfully requests that the Court enter the following special conditions, nearly all of which were imposed in the *Gregerson* and *Musaibli* cases, that:

1. The defendant is prohibited from utilizing a computer during the term of supervised release with the exception of and solely for legal research, outside employment, as a specific class assignment in an accredited educational institution or to send or receive typed email messages without attached electronic files or images embedded in the body for a message, or for other uses, as approved in advance by the probation officer.

2. The defendant shall only access the internet through one internet capable device. All other internet capable devices, such as cellular phones and gaming consoles, shall not have the internet connected. The defendant is prohibited from accessing any online computer service at any location including, but not limited to, public libraries, internet cafes, and places of employment or education without the permission of the probation officer.

3. The defendant shall not use any social media platforms such as Telegram, Paltalk, Skype, Discord, or any other software that specializes in providing chat and voice calls.

4. The defendant shall be required to use the English language when communicating online and he shall be required to obtain prior approval before communicating in a foreign language. Defendant will be required to pay fo the cost of translating his communications in a foreign language.

5. The defendant shall provide the probation officer with accurate information about all computer systems (hardware/software), all passwords and Internet Service Provider(s), that the defendant has potential access to and abide by all rules of the United States Probation Department's Computer Monitoring Program. The defendant shall only access a computer approved by the probation officer. The defendant shall consent to the probation officer conducting periodic, unannounced examinations of all computer systems, which may include computer monitoring software at the defendant's expense.

6. To ensure compliance with these provisions, the defendant shall submit his/her person, residence, computer and/or vehicle to searches conducted by the United States Probation Department at a reasonable time and manner. You shall inform

48

any other residents that the premises and your computer may be subject to a search pursuant to this condition. The defendant shall provide the probation officer with access to any requested financial information including billing records (telephone, cable, internet, satellite, etc.).

## Conclusion

The United States recommends that the Court impose a within-guidelines, 420-month sentence followed by a lifetime of supervised release with a computer monitoring provision.

Respectfully submitted,

JEROME F. GORGON, JR.
United States Attorney

*/s/ Saima S. Mohsin*
Saima S. Mohsin
First Assistant United States Attorney
Saima.Mohsin@usdoj.gov
(313) 226-9100

*/s/ Hank Moon*
Hank Moon
Assistant United States Attorney
Hank.Moon@usdoj.gov

Date: April 30, 2026

## CERTIFICATE OF SERVICE

I hereby certify that I sent a true and accurate copy of the Government's

Sentencing Memorandum to defense counsel by electronic filing.

<div style="margin-left:50%">

*s/ Saima S. Mohsin*
Saima S. Mohsin
First Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-9163
Saima.Mohsin@usdoj.gov

</div>